1  Reed R. Kathrein (139304)
   HAGENS BERMAN SOBOL SHAPIRO LLP
2  715 Hearst Avenue, Suite 202
   Berkeley, CA 94710
3  Telephone: (510) 725-3000
   Facsimile: (510) 725-3001
4  reed@hbsslaw.com

5  Steve W. Berman
   Tyler Weaver
6  Thomas E. Loeser (202724)
   HAGENS BERMAN SOBOL SHAPIRO LLP
7  1301 Fifth Avenue, Suite 2900
   Seattle, WA 98101
8  Telephone: (206) 623-7292
   Facsimile: (206) 623-0594
9  steve@hbsslaw.com
   tyler@hbsslaw.com
10 toml@hbsslaw.com

11 (Additional counsel listed on signature page)

12                  UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14 DANIEL JANKANISH and HEATHER          )   No.
   JANKANISH, a married couple, and DAVID L. )
15 MCFERRIN, on behalf of themselves and all )   CLASS ACTION COMPLAINT
   others similarly situated,                )
16                                           )   JURY TRIAL DEMANDED
                                             )
17              Plaintiffs,                  )
          v.                                 )
18                                           )
   FIRST AMERICAN TITLE INSURANCE           )
19 COMPANY and                              )
   FIRST AMERICAN SMS, aka SMS             )
20 SETTLEMENT SERVICES,                     )
                                             )
21              Defendants.                  )
   _____ )

22

23

24

25

26

27

28

010052-12 238960 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ................................................................................................. 1

II.   JURISDICTION AND VENUE ......................................................................... 7

III.  PARTIES ............................................................................................................ 7

      A.    Plaintiffs ................................................................................................... 7

      B.    Defendants ............................................................................................... 8

IV.   FACTUAL ALLEGATIONS ............................................................................. 9

      A.    The Nature of Escrow Services ............................................................... 9

      B.    Federal Regulation Under RESPA ......................................................... 12

      C.    Escrow Regulation and Consumer Protection in California ................... 15

      D.    The Affiliate Reconveyance Scheme ..................................................... 16

      E.    The Captive Reconveyance Scheme ....................................................... 17

      F.    The Retained Interest Scheme ................................................................ 18

      G.    The Wire/Express Fee Scheme ............................................................... 20

      H.    Plaintiff David McFerrin's Transaction ................................................. 20

      I.    The Jankanish Refi Transaction .............................................................. 23

      J.    The Jankanish Sale Transaction .............................................................. 28

V.    EQUITABLE TOLLING, DISCOVERY RULE RE:  STATUTES OF LIMITATIONS ..... 32

VI.   CLASS ACTION ALLEGATIONS ................................................................. 32

VII.  CLAIMS FOR RELIEF ................................................................................... 36

VIII. PRAYER FOR RELIEF ................................................................................... 50

IX.   JURY TRIAL DEMANDED ............................................................................ 52

CLASS ACTION COMPLAINT
010052-12 238960 V1

Plaintiffs, Daniel and Heather Jankanish and David L. McFerrin, by their attorneys, on behalf of themselves and all others similarly situated, bring this action for treble damages and injunctive relief under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601 *et seq.*, and California law against the above-named defendants, demand a trial by jury, and complain as follows:

## I.    INTRODUCTION

1.    Millions of real estate transactions in the United States utilize the services of a third-party escrow company to settle purchase and sale transactions of real property and refinancing transactions. As a third-party facilitator of the transaction, the escrow company is relied upon by all parties to the transaction to act as a disinterested and unbiased neutral facilitator and fiduciary agent, acting pursuant to its escrow instructions in exchange for an agreed escrow fee.

2.    An escrow company performing a real estate settlement in a purchase/sale transaction is responsible principally for: (1) taking delivery of the agreed payment from the buyer and/or his/her mortgagor, and delivering in return to the buyer good title to the purchased property; and (2) taking title to the property from the seller, paying off existing mortgage loans and delivering the net proceeds of the sale. In a refinance transaction, the escrow company is responsible for ensuring that prior loans are paid off with the proceeds of the new loan(s) and new loans properly recorded. The escrow agent controls the disbursement of funds from escrow pursuant to its fiduciary and agency duties and the parties' escrow instructions; and the escrow agent certifies that the HUD-1 Settlement Statement truly and accurately reflects the actual disbursements made and the identity of any recipient of funds from the escrow.

3.    As part of the settlement process, whether it is a purchase transaction or a refinance transaction, when prior secured loans are paid off, deeds of trust or liens associated with such prior loans must be extinguished and new deeds of trusts or liens associated with the new mortgages or loans must be recorded. ***The process of extinguishing the deeds of trust and liens associated with real property loans that are being paid off in the settlement transaction is known as reconveyance.***

4.    Major lenders handle their own reconveyance either at no charge to the borrower or with a charge that is included in the payoff amount due from the borrower to close the loan account. As a result, in virtually all transactions involving major lenders the escrow company does not, in fact,

1    process, prepare or record the reconveyance of the prior loan deed(s).  At most, it may merely track

2    the transaction to ensure that reconveyance has occurred.

3         5.     In addition, lenders begin charging interest to homeowners on their mortgage loans

4    immediately upon disbursement of the loan proceeds to the escrow account.  The escrow provider,

5    however, may not disburse the loan proceeds from the escrow account to the prior lender or to the

6    home seller for several days following the payment of the loan proceeds by the new lender.  The

7    period of time between the receipt of proceeds from the new loan and the time of disbursement of

8    those funds to the prior lender or the home seller is commonly called the "Float."  As a result of the

9    Float, national escrow companies, such as Defendant First American Title Insurance Company

10   ("FATIC") routinely hold hundreds of millions of dollars in their escrow accounts.

11        6.     As set forth more fully below, Defendant FATIC has cast aside the presumed and

12   claimed neutrality and fiduciary and agency duties of an escrow provider in favor of their own

13   interests by unfairly, deceptively and illegally undertaking multiple schemes to charge and collect

14   illegal, unearned, duplicative and unreasonable fees and by using the collective value of customers'

15   escrow deposits and the Float to earn credits and other benefits that Defendant FATIC keeps for its

16   own profits.

17        **Scheme 1:  Affiliate Reconveyance Scheme.**

18        7.     In the first such scheme, Defendant ("FATIC") or its division The Talon Group

19   ("Talon") (collectively, "FATIC") provide escrow services and fail to timely disclose that customers'

20   prior lenders are performing the actual reconveyances of the paid off loans.  FATIC then hides the

21   affiliated relationship between itself and SMS Settlement Services, which is actually a trade name for

22   Defendant First American SMS ("FASMS"), and charges escrow customers reconveyance "tracking

23   fees" paid to FASMS that are three times higher than the price for "tracking" advertised by FASMS

24   on its website.  As a result, FATIC violates federal and state law by failing to timely disclose the

25   payment for settlement services is to an affiliated company, by failing to timely disclose the

26   estimated charge and notifying consumers that they need not use this company; and by collecting a

27   fee that is:  (1) illegally referred to an affiliated company; and (2) a charge for which no or nominal

28   services are performed.  This "Affiliate Reconveyance Scheme" works as follows:

- 2 -

**Affiliate Reconveyance Scheme**

CONSUMER

Pays for reconveyance in loan payoff

PRIOR LENDER
Performs reconveyance

Pays FATIC Escrow Fee

First American Owns FATIC & FASMS

Pays FATIC 3x FASMS market rate for reconveyance "tracking"

FATIC
Requires use of FASMS but does not disclose common ownership

FASMS
Advertises "FasTrax" for $35, charges $113 to FATIC consumer

**Scheme 2**:  **Captive Reconveyance Scheme.**

8.      In the second scheme, Defendant FATIC provides escrow services and fails to timely disclose that customers' prior lenders are performing the actual reconveyances of the paid off loans. FATIC then charges and collects reconveyance or "tracking" fees that it pays to itself or falsely and deceptively states are paid to fictitious settlement services providers.  As a result, FATIC violates federal and state law by collecting a fee that is:  (1) deceptively and inadequately described on the settlement statement; (2) illegally split with a settlement services provider; (3) duplicative of the reconveyance fee charged by the prior lender; and (4) a charge for which no or nominal services are performed, and is therefore unearned and unreasonable.  This "Captive Reconveyance Scheme" works as follows:

CLASS ACTION COMPLAINT
010052-12 238960 V1

- 3 -



**Captive Reconveyance Scheme**

CONSUMER

Pays prior lender reconveyance processing in payoff amount

$$

Prior lender performs reconveyance, and charges for it in payoff amount

Pays FATIC Escrow Fee

$$

Pays FATIC additional fees for reconveyance processing

$$

FATIC charges escrow fee and charges for reconveyance(s) it does not perform

9.      By engaging in the Affiliate Reconveyance Scheme and the Captive Reconveyance Scheme, Defendant FATIC illegally requires the use of its own additional and duplicate reconveyance services, dupes and deceives consumers and breaches its contracts with consumers and its fiduciary and agency duties to its customers by collecting unearned and deceptively labeled reconveyance fees for providing services that it is already obligated to provide under the closing instructions in exchange for the agreed escrow fee.

**Scheme 3: Retained Interest Scheme.**

10.     In the third scheme, Defendant FATIC pools customers' required deposits in escrow and the loan proceeds from customers' new loans and holds those deposits at particular banking institutions prior to disbursement in exchange for interest and other benefits that FATIC keeps and retains for itself. FATIC is provided with free or highly discounted banking services, such as wire fees, and is also provided access to large lines of credit that it can then use for investment purposes.

- 4 -

1    Rather than providing its escrow customers with the interest earned or benefits accruing from the

2    deposits, FATIC keeps them as added profit. As a result of this unfair and deceptive practice,

3    Defendant FATIC violates state and federal law by receiving a thing of value in exchange for

4    referring business incident to federally related mortgage loan. Defendant FATIC also breaches its

5    escrow agreements with customers and its fiduciary and agency duties. This "Retained Interest

6    Scheme" works as follows:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21



22    **Scheme 4: The Wire Fee Scheme.**

23          11.    In the fourth scheme, Defendant FATIC charges purported out-of-pocket expenses on

24    the HUD-1 Settlement Statement, such as "Wire/Express" fees that are paid by customers as closing

25    costs. Yet, as a result of the Retained Interest Scheme and other business arrangements with banks,

26    FATIC does not, in fact, pay for the charged services or pays only a small portion of the amounts that

27    it then charges its customers at a much higher rate. As a result, Defendant FATIC violates federal

28    and state law by collecting a fee that is: (1) deceptively and inadequately described on the settlement

- 5 -

CLASS ACTION COMPLAINT
010052-12 238960 V1

statement; (2) illegally split with a settlement services provider; and (3) a charge for which no or nominal services are performed, and is therefore unearned and unreasonable. FATIC dupes and deceives its customers and breaches its contracts with customers and fiduciary and agency duties to its customers by collecting unearned, excessive and deceptively disclosed Wire/Express fees. This "Wire Fee Scheme" works as follows:



12.    On information and belief, Defendants engage in these practices nationwide across hundreds of thousands of transactions and have reaped ill-gotten gains in excess of tens of millions of dollars.

13.    In this action Plaintiffs, on behalf of four classes of FATIC escrow customers, seek damages on behalf of a nationwide class arising from Defendants' violations of federal and California law.

CLASS ACTION COMPLAINT
010052-12 238960 V1

## II.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.
§ 1331, in that it is a civil action arising under the laws of the United States. The Court additionally
has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), in that this is a "civil action in
which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and
costs, and is a class action in which – (A) any member of a class of plaintiffs is a citizen of a State
different from any defendant." The named Plaintiffs are citizens of Washington and Defendants First
American Title Insurance Company and First American SMS are citizens of the State of California.

15.    Defendants transact business, maintain offices or are found within the Northern
District of California. The interstate commerce described herein is carried on, in part, within the
Northern District of California and the illegal charges and deceptive acts herein alleged were carried
on, in part, in the Northern District of California.

## III.    PARTIES

### A.    Plaintiffs

16.    Plaintiff David L. McFerrin is a married person[1] residing within the State of
Washington. During the Class Period,[2] Mr. McFarrin refinanced his home in Tacoma, Washington,
and Defendant FATIC was the escrow settlement service provider in that transaction. Mr. McFerrin
has been injured by reason of the illegal, unfair and deceptive acts alleged.

17.    Plaintiffs Daniel and Heather Jankanish ("the Jankanishes") are a married couple
residing within the state of Washington. During the Class Period, the Jankanishes refinanced their
home on 42nd Avenue N.E. in Tacoma, Washington, on or about February 13, 2007 (the "Jankanish
Refi Transaction"); and sold a home on 48th Avenue N.E. in Tacoma, Washington, on or about
March 14, 2007 (the "Jankanish Sales Transaction"). Defendant FATIC, through its Talon Group

---

[1]    The property at issue in this case was owned by Mr. McFarrin separately and apart from the
community property of his marriage. Mr. McFarrin's wife executed a quitclaim deed as part of the
settlement of the refinance transaction.

[2]    The Class Period of five (5) years is based upon RESPA's statutory requirement that escrow
providers retain records of transactions for five years from the transaction date. *See* 24 C.F.R.
3400.14(h).

1   division was the named escrow agent for the Jankanish Refi Transaction while Defendant FATIC

2   through its own name was the named escrow agent for the Jankanish Sales Transaction.  In each

3   transaction, the Jankanishes have been injured by reason of the illegal, unfair and deceptive acts

4   alleged.

5   **B.     Defendants**

6          18.     Defendant First American Title Insurance Company ("FATIC") is a California

7   Corporation with its principal place of business at 1 First American Way, Santa Ana, California.  The

8   Talon Group ("Talon") states on its website that it is "a division of First American Title Insurance

9   Company."[3]  FATIC does business in its own name and under the name Talon Group in California

10  and throughout the United States.  References in this Complaint to FATIC include, without

11  limitation, Talon and references to Talon include, without limitation FATIC.

12         19.     Defendant First American SMS ("FASMS") is a California Corporation with its

13  principal place of business at 200 Commerce, Irvine, California.  FASMS does business in the State

14  of California and throughout the United States.

15         20.     The First American family of companies – which includes the parent company First

16  American Corporation ("First American"), Defendant FATIC, Talon and Defendant FASMS, and

17  their affiliates – is engaged in selling title insurance and escrow services to purchasers of commercial

18  and residential real estate throughout the United States, including California.  Nationally, First

19  American accounts for approximately 30 percent of title premiums, which in 2007 amounted to

20  roughly $4.3 billion.

21         21.     The First American family of title insurance companies and their affiliates are wholly-

22  owned and controlled by First American, and on information and belief each engages in the practices

23  described herein as part of company-wide practices.  Through its subsidiaries, First American is a

24  provider of title insurance, specialty insurance, real estate settlement services, information services

25  and claims management services.  First American had 2006 revenues of roughly $8.8 billion.

26

27

28  [3]     *See* http://www.talonnw.com (last visited on May 11, 2008).

CLASS ACTION COMPLAINT

010052-12 238960 V1

22.    Defendant FASMS maintains an internet website at http://firstamsms.com. This website contains a page titled "FasTrax™ Tracking Service" which describes in detail the reconveyance tracking service provided by FASMS.[4]  The page includes the following:

**FasTrax Tracking Service Features**

- Obtain appropriate documents from the paid off lenders
- Confirm the accuracy of the documents
- Record the document in the appropriate jurisdiction
- 24/7 internet access to status reports and images of recorded documents

23.    Links on the http://www.firstamsms.com website connect to http://www.smsfastrax.com which contains a page describing "How SMS FasTrax Works" and "How To Place An Order."[5]  This webpage includes "Pricing Information" and advertises **"$35 service fee per payoff** plus applicable recording fees."  (Emphasis in original.)

24.    Recognizing that the norm is for the prior lender to complete the recordation and reconveyance process, the page also states:  "If the lender's payoff statement indicates they are collecting the recording fee, you do not need to remit this additional amount."

## IV.    FACTUAL ALLEGATIONS

**A.    The Nature of Escrow Services**

25.    In the purchase, sale or refinance of real estate, all of the parties entrust legal documents and money to an escrow agent, which is a fiduciary and agent of the principals and is responsible for transferring the papers and funds and recording documents when the escrow closes.

26.    Under common law, and by statute and regulation, an escrow agent must act as a neutral party, strictly following the needs, interests and instructions of the principals, who are the buyers and sellers (or owners and lenders in the case of refinance transactions) of the real estate at issue.  Escrow agents are fiduciaries and are prohibited from self-dealing or obtaining any benefits for themselves during the transaction, and escrow agents must ensure that the terms of the transaction

---

[4]    http://www.firstamsms.com/products_services/fastrax.php (last visited on April 23, 2008).
[5]    http://www.smsfastrax.com/HowItWorks.asp (last visited on April 23, 2008).

CLASS ACTION COMPLAINT
010052-12 238960 V1

are carried out with scrupulous honesty, diligence and impartiality.  Escrow agents must communicate all material facts to the principals in unambiguous, clear terms and in a timely manner concerning the pending transactions, the use of the principals' funds, and their services to the principals.

27.    Escrow agents hold escrow accounts in trust for the benefit of the principals, and not for their own benefit.  Escrow agents do not own the funds deposited into escrow; such funds belong to the principals.  Escrow agents are generally required to promptly deposit and disburse all funds received in and out of an account in a public depository and to track and account for all receipts and disbursements from each account.

28.    An escrow company performing a real estate settlement in a purchase/sale or refinance transaction acts pursuant to escrow instructions that are purportedly agreed between the principals to the transaction.  In actuality, the escrow instructions are prepared by the escrow provider and often supplemented by the lender and provided to the home buyers/sellers or refinancers only at the time of final signing of documents.

29.    *Consumers are not given a genuine opportunity to review and/or question the instructions and do not and cannot negotiate the instructions for fear of derailing the scheduled close of the transaction, which would result in the potential loss of the opportunity for sale/purchase, the risk of claims or lawsuits for failure to close, or incurring additional fees and costs.*

30.    In general in a purchase/sale transaction, the escrow provider is responsible for: (1) taking delivery of the agreed purchase price from the buyer and/or his/her mortgagor(s), and delivering in return to the buyer good title to the purchased property; (2) taking title to the property from the seller and delivering in return the net proceeds of the sale; and (3) fairly and accurately disclosing and disbursing payments to settlement services providers in connection with the transaction.  In a refinance transaction, the escrow company is responsible for:  (1) ensuring that prior loans are paid off and new loans properly recorded; and (2) fairly and accurately disclosing and disbursing payments to settlement services providers in connection with the transaction.

- 10 -

31.     As part of the settlement process, whether it is a purchase/sale transaction or a refinance transaction, when prior mortgages or loans that were secured by the real property are paid off, deeds of trust or liens associated with such prior loans must be extinguished and new deeds of trusts or liens associated with the new mortgages or loans must be recorded. ***The process of extinguishing the deeds of trust and liens associated with real property loans that are being paid off in the settlement transaction is known as reconveyance.*** Defendant FATIC provides real estate settlement services, including escrow services as described above.

32.     Historically, escrow providers would include with payoff funds to a prior lender in a transaction a form evidencing payment in full of the prior note. The lender would complete the form and return it to the escrow provider, and the escrow provider would then complete the necessary reconveyance processing and have the reconveyance recorded. In this context, escrow providers charged a reconveyance processing fee to consumers to cover their costs of actually providing the service of processing the reconveyance. By statute, California has set a presumptively reasonable reconveyance processing fee of $45 per loan.[6]

33.     However now, and for at least the time period relevant to this complaint, most, if not all, major lenders handle their own reconveyance processing either at no charge to the borrower or with a charge that is included in the payoff amount due from the borrower to close the loan account. As a result, in virtually all transactions involving major lenders – and in the transactions of Plaintiffs and the Reconveyance Classes[7] – the escrow company does not, in fact, prepare, process or record the reconveyance of the prior loan deed(s), it merely ensures that it has occurred. There are national and local companies that offer reconveyance tracking services to escrow providers, including Defendant FASMS, who advertises reconveyance tracking services on its website for $35 per loan.[8]

34.     It is also common to escrow agreements and instructions that escrow providers are paid a fee for the agreed services and reimbursed for out-of-pocket expenses. Historically, these

---

[6]    *See* Cal. Civ. Code § 2941, subd. (e)(2).

[7]    The "Reconveyance Classes" includes the Affiliate Reconveyance Class and the Captive Reconveyance Class, each as defined herein.

[8]    *See* http://www.smsfastrack.com/HowItWorks.asp, viewed on May 12, 2008.

- 11 -

expenses would include costs associated with transferring funds to and from the escrow safekeeping
account to the accounts of sellers and prior lenders.  However due to their relationships with the
banks that hold the escrow safekeeping accounts, escrow providers, and Defendant FATIC in this
case, are able to wire funds to and from the escrow safekeeping account free of charge or at
significantly discounted rates.

35.     As a lucrative adjunct to their title insurance offerings, the nation's leading title
insurance companies, such as Defendant FATIC, have dramatically increased their presence and
power in the national escrow market.  In 2006, title insurers provided $621 million of escrow
services, up approximately 50% from $423 million in 2002.[9]

## B.     Federal Regulation Under RESPA

36.     The Real Estate Settlement Service Protection Act of 1974 ("RESPA") was enacted to
protect consumers from "unnecessarily high settlement charges caused by certain abusive practices"
in mortgage lending.  *See* 12 U.S.C. § 2601(a).

37.     Section eight of RESPA prohibits kickbacks, unearned fees and non-disclosed
affiliated business arrangements.  It provides in relevant part to this complaint as follows:

(a) Business Referrals.  No person shall give and no person shall accept
any fee, kickback, or thing of value pursuant to any agreement or
understanding, oral or otherwise, that business incident to or part of a
real estate settlement service involving a federally related mortgage
loan shall be referred to any person.

(b) Splitting charges. No person shall give and no person shall accept
any portion, split, or percentage of any charge made or received for the
rendering of a real estate settlement service in connection with a
transaction involving a federally related mortgage loan other than for
services actually performed.

(c) Fees, salaries, compensation, or other payments. Nothing in this
section shall be construed as prohibiting ..., (2) the payment to any
person of a bona fide salary or compensation or other payment for
goods or facilities actually furnished or for services actually
performed....(4) affiliated business arrangements so long as (A) a
disclosure is made of the existence of such an arrangement to the
person being referred and, in connection with such referral, such
person is provided a written estimate of the charge or range of charges
generally made by the provider to which the person is referred...at or

---

[9]     *See* American Land Title Association Industry Annual Statements available on the World-Wide-Web at http://www.alta.org/industry/financial.cfm.

before the time of the referral...; (B) such person is not required to use any particular provider of settlement services, and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship...

(d) Penalties for violations...

...

(2) Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

....

(5) In any private action brought pursuant to this subsection, the court may award to the prevailing party the court costs of the action together with reasonable attorneys fees.

12 U.S.C. § 2607.

38.     RESPA confers on the Secretary of the Department of Housing and Urban Development ("HUD") the authority to prescribe rules and regulations to achieve the statute's purposes. *See* 12 U.S.C. § 2617(a).  The relevant regulation adopted by HUD is known as Regulation X and sets forth in relevant part:

§ 3500.14 Prohibition against kickbacks and unearned fees.

(a) Section 8 violation.  Any violation of this section is a violation of section 8 of RESPA (12 U.S.C. 2607) and is subject to enforcement as such under § 3500.19.

(b) No referral fees.  No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person.  Any referral of a settlement service is not a compensable service, except as set forth in § 3500.15(g)(1).  A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business.

(c) No split of charges except for actual services performed.  No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.  A charge by a person for which no or nominal services are performed or for which

- 13 -

1    duplicative fees are charged is an unearned fee and violates this
     section. The source of the payment does not determine whether or not
2    a service is compensable. Nor may the prohibitions of this Part be
     avoided by creating an arrangement wherein the purchaser of services
3    splits the fee.

4         ....

5    (e) Agreement or understanding. An agreement or understanding for
     the referral of business incident to or part of a settlement service need
6    not be written or verbalized, but may be established by a practice,
     pattern or course of conduct. When a thing of value is received
7    repeatedly and is connected in any way with the volume or value of the
     business referred, the receipt of the thing of value is evidence that it is
8    made pursuant to an agreement or understanding for the referral of
     business.
9
     (f) Referral –(1) A referral includes any oral or written action directed
10   to a person which has the effect of affirmatively influencing the
     selection by any person of a provider of a settlement service or
11   business incident to or part of a settlement service when such person
     will pay for such settlement service or business incident thereto or pay
12   a charge attributable in whole or in part to such settlement service or
     business.
13
     (2) A referral also occurs whenever a person paying for a settlement
14   service or a business incident thereto is required to use (see § 3500.2,
     "required use") a particular provider of settlement service or a business
15   incident thereto.

16        ....

17   (g) Fees salaries, compensation and other payments.

18        ....

19   (3) Multiple services. When a person in a position to refer settlement
     service business...receives a payment for providing additional
20   settlement services as part of a real estate transaction, such payment
     must be for services that are actual, necessary and distinct form the
21   primary services provided by such person.

22   24 C.F.R. § 3500.14.

23        39.    "Required use" is defined as follows:

24   Required use means a situation in which a person must use a particular
     provider of settlement service in order to have access to some distinct
25   service or property, and the person will pay for the settlement service
     or the particular provider or will pay a charge attributable, in whole or
26   in part, to the settlement service.

27   24 C.F.R. § 3500.2

28
                                      - 14 -

40.    The escrow services provided by Defendants and the settlement fees charged to Plaintiffs and the Classes[10] are settlement services subject to RESPA Regulation. The placing of a pooled escrow account at a particular banking institution is "business incident to or part of a settlement service involving a federally related mortgage loan."

C.    **Escrow Regulation and Consumer Protection in California**

41.    In response to a flurry of lawsuits regarding the failure of lenders to timely file and record reconveyances, California codified the reconveyance process setting strict time requirements and a hierarchy of the preferred method of effectuating a reconveyance. Lenders are presumed to reconvey the title they hold upon payment of the secured debt and only upon their failure to do so in a specified time can title and escrow companies perform a reconveyance. *See* Cal. Civ. Code § 2941; Cal. Fin. Code § 22319. California has set a presumptively reasonable reconveyance processing fee of $45 per loan. *See* Cal. Civ. Code § 2941, subd. (e)(2).

42.    Independent California escrow providers are licensed and regulated pursuant to an extensive set of statutes in the California Financial Code. *See* Cal. Fin. Code § 17000 *et seq.* The escrow regulations forbid knowing or reckless participation in any fraud, and knowing or reckless misstatements or omissions. *See* Cal. Fin. Code § 17414. Any violation of federal law is also a violation of the escrow regulations. *See* Cal. Fin. Code § 17425.

43.    However, title insurance companies who perform escrow services are not subject to the extensive escrow regulatory scheme. *See* Cal. Fin. Code § 17006. Instead, when escrow services are provided by a title insurer, such as Defendants in this case, they are statutorily defined as "the business of title insurance" and exclusively regulated by the Insurance Commissioner under the Insurance Code. *See* Cal. Ins. Code §§ 12340.3; 12414.29.

44.    There are no provisions of the Insurance Code which specifically regulate or describe unfair and deceptive acts in the provision of escrow services. However, the Insurance Code forbids unfair methods of competition and unfair and deceptive acts or practices in the business of insurance. *See* Cal. Ins. Code § 790.02.

---

[10]    The "Classes" includes the Affiliate Reconveyance Class, the Captive Reconveyance Class, the Retained Interest Class and the Wire/Express Fee Class, each as defined herein.

CLASS ACTION COMPLAINT
010052-12 238960 V1

45.    The Insurance Code expressly provides that any interest earned on money deposited in an escrow trust account belongs not to the escrow company but to the principals to the escrow transaction. *See* Cal. Ins. Code § 12341.5.

**D.    The Affiliate Reconveyance Scheme**

46.    As set forth herein and described in detail above, Defendants employed a fraudulent and corrupt schemes to reap duplicate, unearned, and unreasonable reconveyance fees from consumers.

47.    The first of which, the Affiliate Reconveyance Scheme operated, generally, in the following manner:

i.    Defendant FATIC would agree to act as the settlement agent in an Affiliate Reconveyance Class member's real estate transaction involving a federally related mortgage loan, agreeing to a set escrow fee in exchange for performing its duties under the escrow instructions or agreement;

ii.    FATIC would request a loan payoff statement from the Affiliate Reconveyance Class member's prior lender(s);

ii.    The loan payoff statement would include fees for reconveyance processing and recording which FATIC would include in the amounts required to be paid to the prior lender from the escrow proceeds or would indicate the reconveyance processing and recording will be done at no cost to the Affiliate Reconveyance Class member;

iii.    Defendant FATIC would not disclose to the Affiliate Reconveyance Class member that the prior lender(s) were processing and recording the reconveyance(s);

iv.    Defendant FATIC would require Affiliate Reconveyance Class members to use Defendant FASMS for additional reconveyance settlement services and would charge and collect additional reconveyance fees from the Affiliate Reconveyance Class member, above and beyond the agreed escrow fee, to be paid from the escrow proceeds.

- 16 -

48.    As a direct result of the Affiliate Reconveyance Scheme, Defendants systematically and repeatedly caused Affiliate Reconveyance Class members to pay to Defendants fees far above the agreed escrow fees in exchange for no additional settlement services rendered beyond which Defendants had already agreed to perform pursuant to the Escrow Agreements and Escrow Instructions.  Defendants failed to disclose their self dealing and omitted material facts pertaining to the escrow in violation of its common law duty as a fiduciary and agent to its customers.

E.    **The Captive Reconveyance Scheme**

49.    The Captive Reconveyance Scheme is the second fraudulent and corrupt scheme employed by Defendants concerning reconveyance fees.

50.    The Captive Reconveyance Scheme operated, generally, in the following manner:

i.    Defendant FATIC would agree to act as the settlement agent in a Captive Reconveyance Class member's real estate transaction involving a federally related mortgage loan, agreeing to a set escrow fee in exchange for performing its duties under the escrow instructions or agreement;

ii.    Defendant FATIC would request a loan payoff statement from the Captive Reconveyance Class member's prior lender(s);

iii.    The loan payoff statement would include fees for reconveyance processing and/or recording which Defendant FATIC would include in the amounts required to be paid to the prior lender from the escrow proceeds or would indicate the reconveyance processing and recording will be done at no cost to the Captive Reconveyance Class member;

iv.    Defendant FATIC would not disclose, or in the case of transactions through its Talon Group division would not timely disclose to the Captive Reconveyance Class member that the prior lender(s) were processing and recording the reconveyance(s) and/or that there would be additional reconveyance or "tracking" fees;

v.    Defendant FATIC would require Captive Reconveyance Class members to use FATIC for additional reconveyance settlement services or would falsely state

- 17 -

that reconveyance/tracking fees were being paid to a fictitious services provider and would charge and collect additional reconveyance fees from the Captive Reconveyance Class member, above and beyond the agreed escrow fee, to be paid from the escrow proceeds.

51.     As a direct result of the Captive Reconveyance Scheme, FATIC systematically and repeatedly caused Class members to pay to FATIC fees far above the agreed escrow fees in exchange for no additional settlement services rendered beyond which FATIC had already agreed to perform pursuant to the Escrow Agreements and Escrow Instructions.  Defendant FATIC failed to disclose its self dealing and omitted material facts pertaining to the escrow in violation of federal law and Defendant FATIC's common law duties as a fiduciary and agent to its customers.

**F.     The Retained Interest Scheme**

52.     Defendant FATIC and Talon also engaged in a scheme ("the Retained Interest Scheme"), whereby Defendant FATIC received from banks interest payments, or credits or benefits in lieu of cash payments of interest, on escrow trust account balances.  Under the duties that FATIC owed its principals, and under the California Insurance Code, these monies belonged to the principals and not to Defendant FATIC.

53.     The Retained Interest Scheme operated, generally, in the following manner:

     i.     Defendant FATIC would agree to act as the settlement agent in a Retained Interest Class member's real estate transaction involving a federally related mortgage loan, agreeing to a set escrow fee in exchange for performing its duties under the escrow instructions or agreement;

     ii.     Defendant FATIC would collect from Retained Interest Class members earnest money, deposits and the proceeds of their new mortgage loans and deposit and comingle these funds into their pooled escrow accounts held at third-party financial institutions;

     iii.     In exchange for holding the pooled escrow accounts, the third-party financial institutions would provide valuable interest, earning credits, and other benefits directly to Defendant FATIC;

- 18 -

iv.     Defendant FATIC would retain and keep these valuable benefits for itself and make no accounting of these benefits to Retained Interest Class members.

54.     Defendant FATIC has failed to disclose to consumers, including Plaintiffs and the Retained Interest Class, that interest, earnings credits, or other benefits were given to FATIC as a result of the deposits in escrow. By failing to disclose these practices, Defendant FATIC collected illegal referral fees and failed to disclose its self dealing and omitted material facts pertaining to the escrow in violation of its common law duty as a fiduciary and agent to its customers, in breach of the authority given to it in the escrow instructions, in breach of its contracts with its principals and in violation of federal law and the laws of California.

55.     On information and belief, the Retained Interest Scheme was not limited to monies deposited into escrow prior to or on the day of closing, but also included interest paid on Float. In other words, FATIC earned and kept for itself interest for several days following closing, until all checks and disbursements cleared the general escrow account.

56.     Defendant FATIC did not use the interest or earnings credits for the benefit of Plaintiffs, nor for members of the Retained Interest Class. The interest, or its functional equivalent, provided a direct financial benefit to FATIC. The Retained Interest Scheme was used to bolster the profits of Defendant FATIC and its Talon Group division, and it did not result directly or indirectly in any reduction of fees charged by FATIC and Talon, nor any cost saving or other benefit for customers. At no time was any program, effort, or mechanism used by FATIC and Talon to reduce fees for escrow services in recognition of the secret interest payments and other consideration that Defendant FATIC received.

57.     The Retained Interest Scheme and FATIC's retention of interest, earnings credits, or other benefits in these circumstances was an illegal receipt of referral fees in exchange for placing the escrow accounts at a particular financial institution, in violation of RESPA, and a breach of Defendant FATIC's fiduciary and agency duties, an unfair and deceptive business practice, and a breach of contract. Under the duties that FATIC and Talon owed their principals, and under the California Insurance Code, these monies (and any earnings thereon) belonged to the principals and not to FATIC.

- 19 -

**G.     The Wire/Express Fee Scheme**

58.     Defendant FATIC and Talon also engaged in a scheme ("the Wire/Express Scheme"), whereby FATIC charged Plaintiffs and the Wire/Express Class for settlement services for which Defendant FATIC did not actually have to pay the indicated amounts.

59.     The Wire/Express Scheme operated, generally, in the following manner:

    i.     Defendant FATIC and Talon would agree to act as the settlement agent in a Wire/Express Fee Class member's real estate transaction involving a federally related mortgage loan, agreeing to a set escrow fee in exchange for performing its duties under the escrow instructions or agreement;

    ii.    Defendant FATIC and Talon would set forth on the HUD-1 and collect from Wire/Express Fee Class members fees purportedly as reimbursement for wire fees charged to Defendant FATIC by their banks in connection with the Wire/Express Fee Class members' transaction;

    iii.   The purported wire fees would in fact be waived or substantially discounted by FATIC's banks and FATIC would not disclose the waiver or discount and would instead keep and retain the purported wire fee expense as profit.

60.     By placing each of these charges and fees on the settlement statement, FATIC represented that they would in fact be paid at closing out of the escrowed funds and that such expenses were in fact incurred.

61.     Defendant FATIC collected from customers charges that it never incurred, or, in the alternative, charged customers excessive fees relative to the fees it paid. Either way, FATIC retained charges, either in full or in part, for expenses that it never paid, in violation of RESPA. Under the duties that FATIC owed its principals, and under the California Insurance Code, these monies belonged to the principals and not to Defendant FATIC.

**H.     Plaintiff David McFerrin's Transaction**

62.     On or about June 15, 2006, Plaintiff David McFerrin signed closing documents for a refinance of his home located at 4025 South Park Avenue, Tacoma, Washington. The "settlement agent" was First American Title Insurance Company and the place of settlement was 24105 S.E.

- 20 -

CLASS ACTION COMPLAINT
010052-12 238960 V1

Kent-Langley Road, Maple Valley, Washington. First American Title Insurance Company's "Escrow Number" was 4205-833645.

63.    Mr. McFerrin's refinancing transaction involved two new loans totaling $144,000 and the repayment of two prior mortgage loans, a first mortgage from American Servicing Company ("ASC") and a second mortgage from EMC Mortgage Company ("EMC"). Each of these loans was a "federally related mortgage loan" as defined in RESPA.

64.    At the time of signing his refinancing documents, Mr. McFerrin was provided with an unsigned copy of the documents presented to him (the "McFerrin Closing Packet").

65.    The McFerrin Closing Packet contained an "Estimated Settlement Statement" for Mr. McFerrin's transaction ("McFerrin HUD-1") that contained three pages and was completed by Defendant FATIC.

66.    The McFerrin HUD-1 indicated a settlement date of June 23, 2006.

67.    The McFerrin HUD-1 sets forth in detail a litany of fees paid by Mr. McFerrin in connection with his refinancing and, according to the applicable regulations, should identify the person or company receiving each settlement fee and a description of the fee.[11]

68.    As set forth in the McFerrin HUD-1, Mr. McFerrin paid a "Settlement or Closing Fee" to Defendant FATIC in the amount of $487.80, which was a $450 fee plus $37.80 in applicable sales tax. Mr. McFerrin also paid a $250 "Escrow Fee for 2nd Mortgage" to FATIC, plus $21 tax.

69.    Mr. McFerrin paid $446.08 to FATIC for two title insurance policies in the face amounts of his new loans. Mr. McFerrin also paid FATIC $35 to record a quitclaim deed; $60 to record his first mortgage deed of trust; $50 to record his second mortgage deed of trust; $10 for an electronic technology fee; and $60 for messenger/courier fees.

---

[11]    24 C.F.R. § 3500, Appendix A specifically requires the following:

> Blank lines are provided in Section L for any additional settlement charges. Blank lines are also provided for additional insertions in Sections J and K. The names of the recipients of the settlement charges in Section L and the names of the recipients of adjustments described in Section J or K should be included on the blank lines.

*See also* 24 C.F.R. § 3500.8.

- 21 -

70.     Under the section labeled "1300 Additional Settlement Charges," Section L, line 1303 of the McFerrin HUD-1 states that a "Reconveyance Tracking Fee" of $226 was paid to "SMS Settlement Services.[12]

71.     The McFerrin Closing Packet also contained a three-page document on First American Title Insurance Company letterhead dated May 23, 2006, indicating Mr. McFerrin's name and property address on the final page, FATIC's escrow number on the first page, and titled "ESCROW INSTRUCTIONS BORROWER(S)," ("McFerrin Closing Instructions").

72.     The McFerrin Closing Instructions state on the second page:

> If there are underlying encumbrances being paid off which require the obtaining of a Fulfillment Deed, Reconveyance, Release or Satisfaction, you are instructed to pay the demand of the appropriate party and obtain and record such a document....

73.     Nowhere in the McFerrin Closing Packet, or in any other documentation provided to Mr. McFerrin, did Defendants disclose that FATIC and FASMS are affiliated companies, wholly owned by First American. Nor was Mr. McFerrin ever provided with the charge or range of charges generally made by FASMS. Defendant also failed to disclose to Mr. McFerrin that he was not required to use FASMS or any particular provider of settlement services.

74.     Nowhere in the McFerrin Closing Packet, or in any other documentation provided to Mr. McFerrin, did Defendants disclose that the true business name of "SMS Settlement Services" is First American SMS.

75.     Rather than charge Mr. McFerrin the $35 per payoff service fee that Defendant FASMS advertises on its website, FATIC instead charged, and Defendant FASMS collected, $113, nearly three times the advertised amount for "Reconveyance Tracking Fee" and paid this amount to

---

[12]     Line 1303 is within Section L of the HUD-1 and thus "The names of the recipients of the settlement charges in Section L ... should be included on the blank lines." *See, supra,* footnote 11. With respect to line 1303 in particular, the HUD-1 instructions at 24 C.F.R. § 3500 Appendix A state the following:

> Lines 1303-1305 are used for any other settlement charges not referable to the categories listed above on the HUD-1, which are required to be stated by these instructions. Examples may include structural inspections or pre-sale inspection of heating, plumbing, or electrical equipment. These inspection charges may include a fee for insurance or warranty coverage.

CLASS ACTION COMPLAINT
010052-12 238960 V1

its sister company, without making any of the disclosures required by RESPA and in derogation of Defendant FATIC's statutory duties under the California Insurance Code and its fiduciary duty not to engage in unfair and deceptive acts.

76.     In addition, Mr. McFerrin did not receive any share of the interest, earnings credits, or other benefits that FATIC received as a result of the pooling of Mr. McFerrin's funds with the funds of other escrow principals.  Further, while Mr. McFarrin paid interest on his new loan from the moment that the funds were paid into the escrow account, he did not receive any of the interest, earning credits or other benefits that FATIC received as a result of the Float on the loan proceeds.

77.     Mr. McFerrin did not receive any disclosure that FATIC would pool Mr. McFerrin's funds and Float, with the funds and Float of other escrow principals, nor that FATIC receives interest, earnings credits, or other benefits based on the amount of those pooled funds.  FATIC disclosed only at the time of closing the transaction that Mr. McFerrin would not receive interest on the deposit, but did not at any time disclose that Defendants would earn interest, earnings credits, or other benefits.

78.     As a result of FATIC's illegal, unfair and deceptive nondisclosure of its receipt of interest, earnings credits and other benefits from the banks holding its escrow accounts, Mr. McFerrin and the Retained Interest Class have been monetarily and financially harmed in an amount at least equal to the benefits received by FATIC (and earnings thereon) and the illegally, unfairly and deceptively collected escrow fees paid to FATIC and FASMS and unknowingly tendered by Mr. McFerrin and the Retained Interest Class.

I.     **The Jankanish Refi Transaction**

79.     On or about February 9, 2007, Plaintiffs Daniel and Heather Jankanish signed closing documents for a refinance of their home located at 3509 42nd Avenue N.E., Tacoma, Washington. The "settlement agent" was Defendant FATIC, through its division, The Talon Group and the place of settlement was 24401 104th Avenue S.E., Suite 102, Kent, Washington.  Talon's "File Number" was 5-0701-028.

80.     The Jankanish Refi Transaction involved a new loan in the amount of $480,000 and the repayment of two prior mortgage loans, a first mortgage from Chase Bank ("Chase") and a

- 23 -

second mortgage from KeyBank. Each of these loans was a "federally related mortgage loan" as defined in RESPA.

81.     At the time of signing the refinancing documents, the Jankanishes were provided with an unsigned copy of the documents presented to them (the "Jankanish Refi Closing Packet"). Signing was the first and only opportunity that Jankanishes had to review the contents of the Jankanish Refi Closing packet.

82.     Shortly after signing their documents, the Jankanishes received from Talon a final Settlement Statement for the Jankanish Refi Transaction ("Jankanish Refi HUD-1") that contained four pages and was completed by Talon.

83.     The Jankanish Refi HUD-1 indicated a settlement date of February 13, 2007.

84.     The Jankanish Refi HUD-1 sets forth in detail a litany of fees paid in connection with the refinancing and, according to the applicable regulations, should identify the person or company receiving each settlement fee and a description of the fee.[13]

85.     As set forth in the Jankanish Refi HUD-1, the Jankanishes paid a "Settlement or Closing Fee" to Defendant Talon in the amount of $462.40, which was a $425 escrow fee plus $37.40 in applicable sales tax.

86.     The Jankanishes paid a $70.72 "Wire/Express" to Talon.

87.     The Jankanishes paid $710.46 to "Talon Title" (which, on information and belief, is another division of FATIC) for a title insurance policy in the face amount of their new loan. The Jankanishes also paid Talon $52 to record their new mortgage.

88.     Under the section labeled "1100 Title Charges," Section L, line 1112 of the Jankanish Refi HUD-1 states that a "Reconveyance Fee" of $230 was paid to "Talon Group/Recon Dept".[14]

---

[13]    See supra, note 9.

[14]    Line 1112 is within Section L of the HUD-1 and thus "The names of the recipients of the settlement charges in Section L ... should be included on the blank lines." See, supra, Note 11. With respect to line 1112 in particular, the HUD-1 instructions at 24 C.F.R. § 3500 Appendix A state the following:

> Lines 1111-1113 are for the entry of other title charges not already itemized. Examples in some jurisdictions would include a fee to a private tax service, a fee to a county tax collector for a tax certificate, or a fee to a public title registrar for a certificate of title in a Torrens Act transaction.

- 24 -

89.     The Jankanish Refi HUD-1 indicates that they were charged $257,984.92 to pay off the prior Chase loan and $79,259.67 to pay off the prior KeyBank loan. In the Chase loan, this payoff amount included a $40 "Statement/Demand fee" and a $32 fee for recording the reconveyance of the loan. In the KeyBank loan, this payoff amount included a "Reconveyance Fee" of $28.

90.     The Jankanish Refi Closing Packet also contained a four-page document and a two-page document, each on letterhead stating "The Talon Group A Division of First American Title Insurance Company," and each with the escrow file number that appeared on the Jankanish Refi HUD-1. The four-page document was titled, "Closing Agreement and Escrow Instructions for Refinancing Transaction;" and the two-page document was titled: "Supplement To Closing Agreement and Escrow Instructions For Refinancing Transaction Including Instructions to record Documents and Disburse Funds" (collectively the "Jankanish Refi Escrow Instructions").

91.     The Jankanish Refi Escrow Instructions provide on the first page:

> **Documents.** The closing agent is instructed to select, prepare, complete, correct, receive, hold, record and deliver documents as necessary to close the transaction. The closing agent may request that certain documents be prepared or obtained by the parties or their attorneys, in which case the parties shall deliver the requested documents to the closing agent before the closing date. Execution of any document will be considered approval of its form and contents by each party signing such document.

> **Deposits and Disbursements of Funds.** Before the closing date, each party shall deposit with the closing agent all funds required to be paid by such party to close the transaction....All funds received by the closing agent shall be deposited in a trust account with any bank doing business in the State of Washington and may be transferred to any other such accounts. The closing agent shall not be required to disburse any funds deposited by check or draft until it has been advised by its bank that such check or draft has been honored. All disbursements shall be made by the closing agent's check.

> ....

> **Verification of Existing Encumbrances.** The closing agent is instructed to request a written statement from the holder of each existing encumbrance on the property, verifying its status, terms and balance owing. The closing agent is authorized to rely upon such written statements in the performance of its duties, without liability for their accuracy or completeness.

92.     The Jankanish Refi Escrow Instructions provide on the second page:

**Closing Agents Fees and Expenses.** The closing agents fee is intended as compensation for the services set forth in these instructions. If additional services are required to comply with any change or addition to the parties agreement or these instructions, or as a result of any party's assignment of interest or delay in performance, the parties agree to pay a reasonable additional fee for such services. The parties shall also reimburse the closing agent for any out-of-pocket costs and expenses incurred by it under these instructions. The closing agents fees, costs and expenses shall be due and payable on the closing date or other termination of the closing agents duties and responsibilities under these instructions, and shall be paid by the borrower unless otherwise provided in the parties agreement.

**Reconveyance.** The Talon Group – Reconveyance Department will provide reconveyance tracking services. Such services follow up after closing to be sure a full reconveyance or satisfaction of liens paid at closing are recorded to clear the title. The charges will be separately shown on the HUD-1 settlement statement and will be the amount charged for the particular transaction. There are other reconveyance service providers available with similar services. You are free to shop around to determine that you are receiving the best services and the best rate for these services. If you wish to do so your preference should be expressed to The Talon Group in time to arrange for the services and fees in time for closing.

93.     The Jankanish Refi Escrow Instructions provide on the first page of the Supplement:

**Settlement Statement Approved.** The settlement statement prepared by the closing agent is approved by me, made part of these instructions by this reference, and I agree to pay my costs expenses and other obligations itemized on that statement. I understand that any estimated amounts will be adjusted to reflect the exact amounts required when funds are disbursed, that the settlement statement continues to be subject to audit at any time, and if monetary error is found, the amount will be paid by the party liable for such payment to the party entitled to receive it.

....

**Instruction to Close.** The closing agent is instructed to perform its customary closing duties under these instructions, to deliver and record documents according to these instructions, and to disburse the funds according to the settlement statement, adjusting estimated amounts, when the closing agent has the documents required to close the transaction in its possession and has, or will obtain when the documents have been delivered and recorded: [loan proceeds and a title insurance policy].

94.     The Jankanish Refi HUD-1 contained the following agreements on the third page, immediately above the signature blocks:

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and

- 26 -

CLASS ACTION COMPLAINT

010052-12 238960 V1

disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have cause or I will cause the funds to be disbursed in accordance with this statement.

Settlement Agent: _____ Date: _____
                        Rosie Bechera, The Talon Group

95.     Talon charged and kept $230 in duplicative and unearned sums for nominal settlement services rendered, effectively increasing its escrow fee from $425 to $655, without providing any services beyond which it was already contractually obligated to provide for the agreed $425 escrow fee.

96.     Talon's untimely disclosure at closing of its policy of charging and collecting fees for reconveyance "tracking" did not provide the Jankanishes with any opportunity to determine that Talon was charging three times what its own affiliate, Defendant FASMS, charges for these same services. Talon's attempted disclosure was on its face ineffective as it invited shopping around but cautioned that the Jankanishes indicate their preference "in time to arrange for the services and fees in time for closing." Of course, since the Jankanishes did not and could not know that Talon intended to charge them reconveyance "tracking" fees until they were actually at their closing, it was impossible for them to indicate a contrary preference "in time for closing."[15]

97.     Rather than charge the Jankanishes the $35 per payoff tracking fee that Talon's affiliate, Defendant FASMS advertises on its website, Talon instead charged $115 per loan, nearly three times FASMS' advertised amount for "Reconveyance Tracking" and paid this amount to itself, making only a last-minute disclosure of its profiteering, in derogation of federal law, and its statutory duties under the California Insurance Code and its fiduciary duty not to engage in unfair and deceptive acts and self-dealing.

98.     As a result of Talon's illegal, unfair and deceptive collection of its tripled reconveyance tracking fees, the Jankanishes and the Captive Reconveyance Class have been

---

[15]     Though Defendant FATIC appears to charge reconveyance fees in all escrow transactions with prior loans being paid off, for reasons as yet unknown to Plaintiffs, it only makes these late and ineffective disclosures of this practice in transactions through its Talon Group division.

1   monetarily and financially harmed in an amount at least equal to the reconveyance tracking fees

2   illegally, unfairly and deceptively collected by Talon and unknowingly tendered by the Jankanishes

3   and the Captive Reconveyance Class.

4        99.    The Jankanishes did not receive any share of the interest, earnings credits, or other

5   benefits that Talon received as a result of the pooling of the Jankanishes' funds with the funds of

6   other escrow principals. Further, while the Jankanishes paid interest on their new loan from the

7   moment that the funds were paid into the escrow account, they did not receive any of the interest,

8   earning credits or other benefits that Talon received as a result of the Float on the loan proceeds.

9        100.   The Jankanishes did not receive any disclosure that Talon would pool their funds and

10   Float, nor that Talon receives interest, earnings credits, or other benefits based on the amount of

11   those pooled funds.

12        101.   As a result of Talon's illegal, unfair and deceptive nondisclosure of its receipt of

13   interest, earnings credits and other benefits from the banks holding its escrow accounts, the

14   Jankanishes and the Retained Interest Class have been monetarily and financially harmed in an

15   amount at least equal to the benefits received by Talon (and earnings thereon) and the illegally,

16   unfairly and deceptively collected escrow fees paid to Talon and unknowingly tendered by the

17   Jankanishes and the Retained Interest Class.

18        102.   The Jankanishes did not receive any disclosure that Talon would not have to pay the

19   entire sums it disclosed as Wire/Express fees that Talon charged to and collected from the

20   Jankanishes. As a result of Talon's illegal, unfair and deceptive statements that it made particular

21   disbursements for wire fees, when in truth and fact its bank waived, offset or significantly discounted

22   any such fees associated with wiring the funds from the Jankanish Refi Transaction, the Jankanishes

23   and the Wire/Express Class have been harmed in an amount at least equal to the wire/express fees

24   illegally and deceptively collected by Talon and FATIC.

25   **J.    The Jankanish Sale Transaction**

26        103.   On or about March 13, 2007, Plaintiffs Daniel and Heather Jankanish signed closing

27   documents for the sale of a home located at 4001 48th Avenue N.E., Tacoma, Washington. The

28

- 28 -

CLASS ACTION COMPLAINT
010052-12 238960 V1

1  "settlement agent" was Defendant FATIC and the place of settlement was 33600 6th Avenue S, Suite
2  105, Federal Way, Washington. FATIC's "File Number" was 4204-977440.
3       104.   The Jankanish Sale Transaction involved the repayment of a prior mortgage loan from
4  Countrywide Home Loans Servicing LP ("Countrywide"). This loan was a "federally related
5  mortgage loan" as defined in RESPA.
6       105.   At the time of signing the closing documents, Mr. and Ms. Jankanish were provided
7  with an unsigned copy of the documents presented to them (the "Jankanish Sale Closing Packet").
8  Signing was the first and only opportunity that Jankanishes had to review the contents of the
9  Jankanish Sale Closing packet.
10       106.   The Jankanishes received from FATIC in the Jankanish Sale Closing Packet an
11  Estimated Settlement Statement for the Jankanish Sale Transaction ("Jankanish Sale HUD-1") that
12  contained three pages and was completed by FATIC.
13       107.   The Jankanish Sale HUD-1 indicated a settlement date of March 14, 2007.
14       108.   The Jankanish Sale HUD-1 sets forth in detail a litany of fees paid in connection with
15  the sale and, according to the applicable regulations, should identify the person or company receiving
16  each settlement fee and a description of the fee.[16]
17       109.   As set forth in the Jankanish Sale HUD-1, the Jankanishes paid a "Settlement or
18  Closing Fee" to Defendant FATIC in the amount of $1305.60, which was a $1200 escrow fee plus
19  $105.60 in applicable sales tax.
20       110.   Under the section labeled "1300 Title Charges," Section L, line 1303 of the Jankanish
21  Sale HUD-1 states that "reconveyance/tracking" of $113 was paid to "Northwest Post Closing
22  Center." [17]
23

---

24  [16]   *See supra*, note 11.
25  [17]   Line 1303 is within Section L of the HUD-1 and thus "The names of the recipients of the
26  settlement charges in Section L ... should be included on the blank lines." *See, supra,* footnote 11.
   With respect to line 1303 in particular, the HUD-1 instructions at 24 C.F.R. § 3500 Appendix A state
   the following:
27       Lines 1303-1305 are used for any other settlement charges not referable to the
28       categories listed above on the HUD-1, which are required to be stated by these
       instructions. Examples may include structural inspections or pre-sale

CLASS ACTION COMPLAINT
010052-12 238960 V1

111.    A query of the Washington and California Secretary of State databases reveals no company or organization licensed to do business under the name "Northwest Post Closing Center."

112.    The Jankanish Sale HUD-1 indicates that they were charged $108,118.91 to payoff their prior Countrywide loan. This payoff amount included a $30 "Reconveyance Fee" and a $32 fee for recording the reconveyance.

113.    The Jankanish Sale Closing Packet also contains a five-page document on First American Title Insurance Company letterhead, dated (on pages 2-5) March 13, 2007, with the escrow file number that appeared on the Jankanish Sale HUD-1. The document is titled, "Escrow Instructions Improved Property" (the "Jankanish Sale Escrow Instructions").

114.    The Jankanish Sale Escrow Instructions provide on the first page:

> Escrowee has been handed a copy of the Purchase and Sale Agreement or such other documents and any Addendums, as constitute the Agreement to sell and purchase this property. Acting in accordance therewith, Escrowee is directed to close the transaction, and shall perform said closing in accordance with the following instructions.

115.    The Jankanish Sale Escrow Instructions provide on the second page:

> Buyer herein has deposited $1,000.00, in U.S. funds as Earnest Money with Prudential Northwest Realty; and hands you herewith, and/or through their lender will deliver to Escrowee, funds sufficient to close. Buyer further hands you, or will cause to be delivered to you, such documents as may be required of them to close this transaction. You are instructed to disburse or pay out said funds when you have recorded the necessary conveying document and/or such other documents as required by this transaction, and can cause to be issued [the agreed title insurance policy].
>
> ...
>
> Sellers authorize deduction and payment of all encumbrances except those to be excepted from coverage in the title insurance policy and to pay all other disbursements and charge as itemized on the estimated closing statement and/or HUD-1 Settlement Statement (the "Closing Statement"), which seller signs contemporaneously herewith.
>
> If there are underlying encumbrances being paid off which require the obtaining of a Fulfillment Deed, Reconveyance, Release or Satisfaction, you are instructed to pay the demand of the appropriate party and obtain and record such a document. Sellers approve payment of the amount of the demand, including interest and/or penalties and

inspection of heating, plumbing, or electrical equipment. These inspection charges may include a fee for insurance or warranty coverage.

- 30 -

late charges, as shown on the Closing Statement, even if Escrowee has not been able to obtain written verification of the amount claimed as due.

116.    The Jankanish Sale Escrow Instructions provide on the third page:

All disbursements shall be in U.S. funds and shall be by escrowee's check, or by wire transfer. Escrow funds will be place in an escrow account which will pay no interest to depositor unless specifically requested. Parties hereto understand and agree that all funds delivered into escrow are subject to immediate deposit, and that all checks must clear and be credited to escrowee's trust account as good and sufficient U.S. funds before closing can be completed. Any delay in clearing deposits will delay closing.

117.    The Jankanish Sale HUD-1 contained the following agreement on the bottom of the first page:

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have cause or I will cause the funds to be disbursed in accordance with this statement.

Settlement Agent: _____    Date: _____

118.    Notwithstanding the Jankanish Sale HUD-1, on information and belief, FATIC did not make a disbursement of $113 to "Northwest Post Closing Center for "reconveyance/tracking." Instead, FATIC kept this duplicative and unearned sum for no or nominal settlement services rendered, effectively increasing its escrow fee from $1200 to $1313, without providing any services beyond those which it was already contractually obligated to provide for the agreed $1200 escrow fee.

119.    Rather than charge the Jankanishes the $35 per payoff tracking fee that FATIC's affiliate, Defendant FASMS advertises on its website, FATIC instead charged $113, nearly three times FASMS' advertised amount for "Reconveyance Tracking" and paid this amount purportedly to Northwest Post Closing Center, but on information and belief, instead paid it to itself, making no disclosure of its profiteering, in derogation of federal law, and its statutory duties under the California Insurance Code and its fiduciary duty not to engage in unfair and deceptive acts.

120.    The Jankanishes did not receive any share of the interest, earnings credits, or other benefits that FATIC received as a result of the pooling of the Jankanishes' funds with the funds of other escrow principals. Further, while the Jankanishes paid interest on their new loan from the

- 31 -

moment that the funds were paid into the escrow account, they did not receive any of the interest, earning credits or other benefits that FATIC received as a result of the Float on the loan proceeds.

121.    The Jankanishes did not receive any disclosure that FATIC would pool their funds and Float, nor that FATIC receives interest, earnings credits, or other benefits based on the amount of those pooled funds.

122.    As a result of FATIC's illegal, unfair and deceptive nondisclosure of its receipt of interest, earnings credits and other benefits from the banks holding its escrow accounts, the Jankanishes and the Retained Interest Class have been monetarily and financially harmed in an amount at least equal to the benefits received by FATIC (and earnings thereon) and the illegally, unfairly and deceptively collected escrow fees paid to FATIC and unknowingly tendered by the Jankanishes and the Retained Interest Class.

## V.    EQUITABLE TOLLING, DISCOVERY RULE RE:  STATUTES OF LIMITATIONS

123.    Any applicable statutes of limitations have been tolled by Defendants' illegal, unfair and deceptive practices.  Defendants have concealed from Plaintiffs and the Classes the truth about their illegal, unfair and deceptive practices described herein, thereby tolling the running of the applicable statutes of limitations.

124.    Plaintiffs and the Classes could not have reasonably discovered Defendants' illegal, unfair and deceptive practices as alleged herein until recently.

125.    Defendants are estopped from relying on any statute of limitations defense because of their illegal, unfair and deceptive pricing practices as alleged herein.

126.    Until shortly before filing this Complaint, Plaintiffs had no knowledge that Defendants had engaged in the illegal, unfair or deceptive practices described in this Complaint.

## VI.    CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action on behalf of themselves and on behalf of the following proposed Classes:

### Class 1:  The Affiliate Reconveyance Class

All persons excluding governmental entities, Defendants, subsidiaries and affiliates of Defendants, who purchased directly, from one or more

- 32 -

of the Defendants and/or their affiliates and subsidiaries, escrow services for residential property in the United States involving a federally related mortgage loan, during the five-year period preceding the filing of this complaint and who were (1) charged one or more reconveyance fee(s) by Defendant FATIC; (2) such fee was paid to an affiliated company of Defendant FATIC; and (3) Defendants did not disclose the affiliation.

### Class 2:  The Captive Reconveyance Class

All persons excluding governmental entities, Defendants, subsidiaries and affiliates of Defendants, who purchased directly, from one or more of the Defendants and/or their affiliates and subsidiaries, escrow services for residential property in the United States involving a federally related mortgage loan, during the five-year period preceding the filing of this complaint and who were (1) charged one or more reconveyance fee(s) by Defendant FATIC; (2) where Defendant FATIC did not actually perform the service of preparing, processing and/or recording the reconveyance associated with the reconveyed loan in the underlying real estate transaction.

### Class 3:  The Retained Interest Class

All persons or entities excluding governmental entities, Defendants, subsidiaries and affiliates of Defendants, who, in the course of the purchase, sale, or refinance of real property in the United States involving a federally related mortgage loan, during the five-year period preceding the filing of this complaint, deposited funds or paid interest to their lenders on funds deposited in escrow accounts controlled by Defendant FATIC and/or its affiliates and subsidiaries and were not paid interest on the deposits or given the value of the benefits in lieu of interest and any earnings thereon.

### Class 4:  The Wire/Express Class

All persons excluding governmental entities, Defendants, subsidiaries and affiliates of Defendants, who purchased directly, from one or more of the Defendants and/or their affiliates and subsidiaries, escrow services for residential property in the United States involving a federally related mortgage loan, during the five-year period preceding the filing of this complaint and who were (1) charged one or more wire/express fee(s) by Defendant FATIC; (2) where Defendant FATIC did not actually incur wire fees in the amounts that they charged in the underlying real estate transaction.

128.    It is estimated that members of the Classes include hundreds of thousands, if not millions, of consumers.  They are so numerous that their joinder would be impracticable.

129.    Except as to the amount of damages each member of the Classes has by him/herself sustained, all other questions of fact and law are common to the Classes, including but not limited to the unfair and deceptive acts and practices of Defendants.

- 33 -

130.    Plaintiffs, along with all other members of the Classes, were injured as a result of the Affiliate Reconveyance Scheme, the Captive Reconveyance Scheme, the Retained Interest Scheme, and the Wire/Express Fee Scheme.

131.    Plaintiff McFerrin, as representative of the Affiliate Reconveyance Class, will fairly and adequately protect the interests of the members of the Affiliate Reconveyance Class. The interests of Plaintiff McFerrin are coincident with, and not antagonistic to, the interests of the members of the Affiliate Reconveyance Class.

132.    Plaintiffs Daniel and Heather Jankanish, as representatives of the Captive Reconveyance Class, will fairly and adequately protect the interests of the members of the Captive Reconveyance Class. The interests of the Jankanishes are coincident with, and not antagonistic to, the interests of the members of the Captive Reconveyance Class.

133.    Plaintiffs McFerrin and Daniel and Heather Jankanish, as representatives of the Retained Interest Class, will fairly and adequately protect the interests of the members of the Retained Interest Class. The interests of Plaintiffs are coincident with, and not antagonistic to, the interests of the members of the Retained Interest Class.

134.    Plaintiffs Daniel and Heather Jankanish, as representatives of the Wire/Express Class, will fairly and adequately protect the interests of the members of the Wire/Express Class. The interests of the Jankanishes are coincident with, and not antagonistic to, the interests of the members of the Wire/Express Class.

135.    Plaintiffs do not have any conflict of interest with other members of the Classes that they represent. Plaintiffs' claims are typical of the claims of the Classes they represent and they will fairly and adequately reflect the interests of the respective Classes. Counsel is competent and experienced in state and federal class action litigation and has been retained to represent the Classes.

136.    Plaintiffs also bring this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, for the illegal, unfair and deceptive acts of Defendants.

137.    Defendants have acted, continued to act, refused to act and continued to refuse to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

- 34 -

138.    Common questions of law and fact exist with respect to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. Among the questions of law or fact common to the Classes are the following:

- Whether Defendants have engaged in the alleged illegal, unfair and deceptive acts of charging unearned and unreasonable reconveyance tracking fees and paying such fees to an undisclosed affiliated settlement services provider, as set forth herein;

- Whether Defendants have engaged in the alleged illegal, unfair and deceptive acts of charging duplicative, split, unearned and unreasonable reconveyance processing fees, as set forth herein;

- The duration and scope of Defendants' alleged illegal, unfair and deceptive acts;

- Whether Defendants' acts have caused damages to Plaintiffs and other purchasers of escrow services from Defendants;

- Whether Defendant FATIC received interest or other benefits or credits that served as the functional equivalent of interest on the average daily balance of escrow funds under its control;

- Whether Defendant FATIC's practice of retaining interest, earnings credits, or other benefits without disclosing its practice to principals is unfair and deceptive;

- Whether Defendant FATIC charged for wire/express fees that it did not actually incur;

- Whether Defendants' acts were in violation of RESPA;

- Whether Defendant FATIC owed fiduciary and agency duties to its customers;

- Whether Defendant FATIC breached its fiduciary and agency duties to the Plaintiffs and the members of the Classes;

- Whether Defendants have been unjustly enriched;

- Whether Defendants misrepresented or concealed from Plaintiffs any of its violations of law or duties as an agent or fiduciary, thereby delaying the accrual of any cause of action and tolling any otherwise applicable statutes of limitations.

139.    This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the Classes are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from Defendants' illegal, unfair and deceptive conduct.

- 35 -

140.   There will be no extraordinary difficulty in the management of the class action.

## VII.   CLAIMS FOR RELIEF

## COUNT I

### ON BEHALF OF THE RECONVEYANCE CLASSES[18] AND THE WIRE/EXPRESS CLASS

### BREACH OF CONTRACT (ESCROW INSTRUCTIONS)

141.   Plaintiffs reallege and incorporate by reference the preceding allegations as if fully set forth above.

142.   Defendant FATIC formed agreements and entered into contracts with Plaintiffs and the members of all the Classes including offer, acceptance and consideration ("Escrow Contracts"). The terms of the Escrow Contracts are memorialized in the Escrow Instructions provided to Plaintiffs and the members of the Classes.

143.   Plaintiffs and the members of the Classes paid an agreed escrow fee as compensation for the services set forth in the escrow instructions including ensuring that the appropriate reconveyance documents are prepared and recorded and the HUD-1 Settlement Statement accurately reflected the disbursements made in the transaction.

144.   The services set forth in the Escrow Contracts for Plaintiffs and members of the Reconveyance Classes included the obligation of FATIC to ensure that prior loans were properly reconveyed and recorded. For example, Plaintiff McFerrin's Escrow Contract stated: "If there are underlying encumbrances being paid off which require the obtaining of a Fulfillment Deed, Reconveyance, Release or Satisfaction, you are instructed to pay the demand of the appropriate party and obtain and record such a document...." Similarly, the Jankanish Refi Transaction Escrow Contract included: "The closing agent is instructed to select, prepare, complete, correct, receive, hold, record and deliver documents as necessary to close the transaction."

---

[18]   The "Reconveyance Classes" includes the Affiliate Reconveyance Class and the Captive Reconveyance Class.

145.    Defendant FATIC was also obligated under the Escrow Contracts to disclose to Plaintiffs and the Reconveyance Classes the actual fee that it was charging for the settlement services that it was providing.

146.    Plaintiffs and the members of the Classes fulfilled their contractual obligations to Defendant FATIC by paying the escrow fees stated and charged by Defendant FATIC.

147.    Defendant FATIC breached the Escrow Contracts by charging reconveyance fees in addition to the escrow fees charged for no additional settlement services other than those Defendant FATIC was already obligated to perform.

148.    Defendant FATIC also breached the Escrow Contracts by failing to disclose to Plaintiff McFerrin and the Affiliate Reconveyance Class that they were not required to use Defendant FASMS for reconveyance-related settlement services and that reconveyance processing was actually being performed by the prior lenders at no charge or for fees separately paid by Plaintiff and the Affiliate Reconveyance Class in their loan payoffs.

149.    Defendant FATIC also breached the Escrow Contracts by failing to timely disclose to the Jankanishes and the Captive Reconveyance Class that they were not required to use FATIC for reconveyance related settlement services and that reconveyance processing was actually being performed by the prior lenders at no charge or for fees separately paid by the Jankanishes and the Captive Reconveyance Class in their loan payoffs.

150.    Defendant FATIC also breached the Escrow Contracts by failing to disclose to the Jankanishes and the Captive Reconveyance Class that "Northwest Post Closing Center" was a fictitious entity and the reconveyance fees purportedly paid to Northwest Post Closing Center were actually paid to Defendant FATIC.

151.    Defendant FATIC also breached the Escrow Contracts by failing to disclose to the Jankanishes and the Wire/Express Class that it was not incurring wire fee expenses in the amounts that it was stating on the HUD-1 Settlement Statements that it provided to members of the Wire/Express Class.

CLASS ACTION COMPLAINT
010052-12 238960 V1

152.    As a direct and proximate result of Defendant FATIC's breaches of the Escrow Contracts, Plaintiffs and the Reconveyance Classes and Wire/Express Class have suffered damages in an amount to be proven at trial.

## COUNT II

### ON BEHALF OF THE RECONVEYANCE CLASSES AND THE WIRE/EXPRESS CLASS

### BREACH OF CONTRACT (HUD-1)

153.    Plaintiffs reallege and incorporate by reference the preceding allegations as if fully set forth above.

154.    By its terms, the HUD-1 Settlement Statements in each Plaintiffs and Class members transaction created a binding written agreement between the Class members and Defendant FATIC (the "HUD-1 Contract").

155.    For example, in the McFerrin Transaction, Plaintiff McFerrin agreed: "I have carefully reviewed the HUD-1 settlement statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and distributions made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 settlement statement."

156.    Defendant FATIC agreed in return: "The HUD-1 settlement statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement." The Jankanish Refi HUD-1 and the Jankanish Sale HUD-1 contained similar promissory language.

157.    Defendant FATIC breached the HUD-1 Contracts by failing to make a true and accurate account of the funds disbursed by failing to disclose to Plaintiff McFerrin and the Affiliate Reconveyance Class that they were not required to use Defendant FASMS for reconveyance services and that reconveyance processing was actually being performed by the prior lenders at no cost or for fees separately paid by Plaintiff McFerrin and the Affiliate Reconveyance Class in their loan payoffs.

158.    Defendant FATIC also breached the HUD-1 Contracts by failing to make a true and accurate account of the funds disbursed by failing to disclose or to timely disclose to the Jankanishes and the Captive Reconveyance Class that they were not required to use FATIC for reconveyance

- 38 -

services and that reconveyance processing was actually being performed by the prior lenders at no cost or for fees separately paid by the Jankanishes and the Captive Reconveyance Class in their loan payoffs.

159.    Defendant FATIC also breached the HUD-1 Contracts by falsely stating on the HUD-1 Settlement Statements provided to the Jankanishes and the Captive Reconveyance Class that funds were being disbursed to Northwest Post Closing Center, when in truth and fact, such funds were being kept and retained by Defendant FATIC.

160.    Defendant FATIC also breached the HUD-1 Contracts by falsely stating on the HUD-1 Settlement Statements provided to the Jankanishes and the Wire/Express Class that funds were being disbursed in amounts paid for wire fees, when in truth and fact, such fees were waived or substantially discounted by FATIC's banks and the fees or a significant portion of the fees were being kept and retained by Defendant FATIC.

161.    As a direct and proximate result of Defendant FATIC's breaches of the HUD-1 Contracts, Plaintiffs and the Reconveyance Classes and Wire/Express Class have suffered damages in an amount to be proven at trial.

### COUNT III

### ON BEHALF OF THE RECONVEYANCE CLASSES

### VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT
### 12 U.S.C. § 2607

162.    Plaintiffs reallege and incorporate by reference the preceding allegations.

163.    Plaintiffs and the Reconveyance Classes contracted with Defendant FATIC for the provision of settlement services in connection with a transaction involving a federally related mortgage loan.

164.    Defendant FATIC and Defendant FASMS are affiliated companies under the common ownership of First American.  By referring reconveyance business to FASMS (1) without disclosing the affiliated relationship; (2) without providing a written estimate of the charge or range of charges generally made by FASMS; and (3) without disclosing that consumers are not required to use any particular provider of reconveyance services, Defendants have engaged and continue to engage in the

- 39 -

1  practice of making illegal business referrals for the rendering of a real estate settlement service in

2  violation of 12 U.S.C. § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2.

3       165.    By requiring members of the Affiliate Reconveyance Class to use FASMS for

4  reconveyance tracking services, Defendants have engaged and continue to engage in the practice of

5  requiring the use of a real estate settlement service provider in violation of 12 U.S.C. § 2607(a)-(c),

6  Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2.

7       166.    By charging reconveyance tracking fees that are paid to an affiliated company that are

8  nearly three times higher than such affiliated company's generally available rate for the same

9  services, Defendants have engaged and continue to engage in the practice of making a payment that

10  bears no reasonable relationship to the market value of the services provided and is not for services

11  actually performed or provided in violation of 12 U.S.C. § 2607(a)-(c) and Regulation X, 24 C.F.R.

12  § 3500.14.

13       167.    By receiving a payment for "multiple services," as that term is used in Regulation X,

14  which are not actual, necessary and distinct from the primary services provided, Defendants have

15  violated 12 U.S.C. § 2607, and Regulation X, 24 C.F.R. § 3500.14.

16       168.    By charging reconveyance fees in transactions in which they have not performed

17  reconveyance processing, Defendant FATIC has engaged and continues to engage in the practice of

18  receiving a portion, split and percentage of a fee for the rendering of a real estate settlement service

19  other than for services actually performed in violation of 12 U.S.C. § 2607 and Regulation X, 24

20  C.F.R. § 3500.14.

21       169.    By charging reconveyance fees in real-estate transactions in which Plaintiffs and the

22  Captive Reconveyance Class have separately been charged for reconveyance processing by their

23  prior lenders, Defendant FATIC has engaged and continues to engage in the practice of receiving a

24  duplicate reconveyance fee for the rendering of a real estate settlement service in violation of 12

25  U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14.

26       170.    By failing to disclose that "Northwest Post Closing Center" is a fictitious entity and

27  the same company as Defendant FATIC; failing to provide a written estimate of the charges to be

28  paid; failing to disclose that consumers are not required to use "Northwest Post Closing Center;" and

- 40 -

by receiving funds for reconveyance settlement services in addition to a return on ownership of "Northwest Post Closing Center," Defendant FATIC has violated 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14.

171.    Under 12 U.S.C. § 2607(d)(2), Plaintiffs and the Reconveyance Classes are entitled to statutory damages for Defendants' violations of 12 U.S.C. § 2607 in an amount equal to three times the amount of the reconveyance fees and "tracking" fees charged and involved in Defendants' violations.

172.    Under 12 U.S.C. § 2607(d)(5), Plaintiffs and the Reconveyance Classes are entitled to the court costs of the action together with reasonable attorney's fees.

## COUNT IV

## ON BEHALF OF THE WIRE/EXPRESS CLASS

## VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT
### 12 U.S.C. § 2607

173.    Plaintiffs reallege and incorporate by reference the preceding allegations.

174.    Plaintiffs and the Wire/Express Class contracted with Defendant FATIC for the provision of settlement services in connection with a transaction involving a federally related mortgage loan.

175.    By charging wire fees that are not in fact incurred by Defendant FATIC, FATIC has engaged and continues to engage in the practice of making a payment that bears no reasonable relationship to the market value of the services provided and is not for services actually performed or provided in violation of 12 U.S.C. § 2607(a)-(c) and Regulation X, 24 C.F.R. § 3500.14.

176.    By receiving a payment for "multiple services," as that term is used in Regulation X, which are not actual, necessary and distinct from the primary services provided, Defendant FATIC has violated 12 U.S.C. § 2607, and Regulation X, 24 C.F.R. § 3500.14.

177.    By charging wire fees in transactions in which they have not had to pay the fees that are charged to the Wire/Express Class, Defendant FATIC has engaged and continues to engage in the practice of receiving a portion, split and percentage of a fee for the rendering of a real estate

- 41 -

1    settlement service other than for services actually performed in violation of 12 U.S.C. § 2607 and

2    Regulation X, 24 C.F.R. § 3500.14.

3        178.    Under 12 U.S.C. § 2607(d)(2), Jankanishes and the Wire/Express Class are entitled to

4    statutory damages for Defendant FATIC's violations of 12 U.S.C. § 2607 in an amount equal to three

5    times the amount of the Wire/Express fees charged and involved in Defendant FATIC's violations.

6        179.    Under 12 U.S.C. § 2607(d)(5), the Jankanishes and the Wire/Express Class are

7    entitled to the court costs of the action together with reasonable attorney's fees.

8    <u>**COUNT V**</u>

9    **ON BEHALF OF THE RETAINED INTEREST CLASS**

10   **VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT**
**12 U.S.C. § 2607(a)**

11   

12       180.    Plaintiffs reallege and incorporate by reference the preceding allegations.

13       181.    Plaintiffs and the Retained Interest Class contracted with Defendant FATIC for the

14   provision of settlement services in connection with a transaction involving a federally related

15   mortgage loan.

16       182.    The deposit and maintenance of pooled escrow funds from members of the Retained

17   Interest Class and their lenders in Defendant FATIC's accounts at banking institutions is business

18   incident to or part of real estate settlement services involving federally related mortgage loans.

19       183.    By receiving interest, earning credits and other benefits from banks in exchange for

20   holding its escrow accounts at such banks, Defendant FATIC has accepted a fee, kickback and thing

21   of value pursuant to an agreement and understanding to refer business incident to or part of real

22   estate settlement services involving federally related mortgage loans, in violation of 12 U.S.C.

23   § 2607 and Regulation X, 24 C.F.R. § 3500.14.

24       184.    Under 12 U.S.C. § 2607(d)(2), Plaintiffs and the Retained Interest Class are entitled to

25   statutory damages for Defendant FATIC's violations of 12 U.S.C. § 2607 in an amount equal to three

26   times the amount of the escrow fees charged and involved in Defendant FATIC's violations.

27       185.    Under 12 U.S.C. § 2607(d)(5), Plaintiffs and the Retained Interest Class are entitled to

28   the court costs of the action together with reasonable attorney's fees.

- 42 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT VI

### ON BEHALF OF THE RECONVEYANCE CLASSES,
### THE WIRE/EXPRESS CLASS
### AND THE RETAINED INTEREST CLASS

### UNJUST ENRICHMENT

186.    Plaintiffs reallege and incorporates by reference the preceding allegations.

187.    As a result of the Affiliate Reconveyance Scheme and the Captive Reconveyance Scheme, Defendants have received a benefit from Plaintiffs and the Classes in the form of the reconveyance fees Plaintiffs and the Reconveyance Classes paid to Defendants, which fees were unearned, duplicative, unreasonable and made in additional to the escrow fee charged by Defendant FATIC for no additional or nominal settlement services and made in violation of federal and state law.

188.    As a result of the Wire/Express Scheme, Defendant FATIC has received a benefit from the Jankanishes and the Wire/Express Class in the form of the wire fees that were charged to Wire/Express Class members, but for which FATIC had no costs or costs significantly less than the amounts that were charged, which fees were unearned, unreasonable and made in violation of federal and state law.

189.    As a result of the Retained Interest Scheme, Defendant FATIC misappropriated and converted interest, or its functional equivalent, earned on the escrow funds of Plaintiffs and members of the Retained Interest Class.  It is inequitable for Defendant FATIC to retain any benefit of interest or its equivalent, even if Defendant FATIC claims title in such property, where Defendant FATIC violated its duty as agent and fiduciary to provide such to Plaintiffs and the members of the Retained Interest Class, and/or violated its duty to disclose the taking on terms that were timely, fair and in good faith.

190.    Defendants are aware of their receipt of the above-described benefits.

191.    Defendants received the above-described benefits to the detriment of Plaintiffs and each of the other members of the respective Classes.

192.    Defendants continue to retain the above-described benefits to the detriment of Plaintiffs and the respective Classes.

- 43 -

193.    As a result of Defendants' unjust enrichment, Plaintiffs and the respective Classes have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

## COUNT VII

### ON BEHALF OF THE RECONVEYANCE CLASSES, THE WIRE/EXPRESS CLASS AND THE RETAINED INTEREST CLASS

### BREACH OF FIDUCIARY DUTY

194.    Plaintiffs reallege and incorporate by reference the preceding allegations.

195.    In the course of acting as an escrow agent, Defendant FATIC served as a fiduciary to Plaintiffs and members of the Classes.  The fiduciary duty of an escrow agent includes the obligation to act with scrupulous honesty and to refrain from self-dealing that harms the principal.  Specific fiduciary duties of an escrow agent include:  (a) paying interest earned on escrow funds to the depositing party; (b) disclosing all material facts concerning the agent's services; (c) charging fees only for services actually performed and charges actually incurred and not in substantial excess to costs; and (d) performing services in accord with legal duties.

196.    Defendant FATIC breached its fiduciary duties to Plaintiffs and members of the Classes by engaging in misrepresentations and self-dealing, including the Affiliate Reconveyance Scheme, the Captive Reconveyance Scheme, the Wire/Express Scheme and the Retained Interest Scheme and specifically:  (a) charging wire fees not incurred or charging greatly in excess of Defendant FATIC's actual costs, if any; (b) charging fees on behalf of itself or its affiliate Defendant FASMS for settlement services greatly in excess of Defendant FATIC's actual costs or the market value, if any, of such services without disclosing the affiliate relationship; (c) receiving interest, earnings credits, or other benefits on escrow funds and failing to pay this interest to Plaintiffs and members of the Classes; (d) failing to pay interest, earnings credits, or other benefits earned on deposited escrow funds to the depositing party; (e) disbursing or causing to be disbursed escrow funds in a manner other than authorized by escrow instructions; and (f) affirmatively misrepresenting and/or omitting to state material facts pertaining to an escrow.

- 44 -

197.    Defendant FATIC's breaches of its fiduciary duties have directly and proximately caused damage to Plaintiffs and members of each of the Classes in an amount to be determined at trial.

### COUNT VIII

**ON BEHALF OF THE RECONVEYANCE CLASSES,
THE WIRE/EXPRESS CLASS
AND THE RETAINED INTEREST CLASS**

**BREACH OF AGENCY DUTY**

198.    Plaintiffs reallege and incorporate by reference the preceding allegations.

199.    As an escrow agent, Defendant FATIC was obligated not to engage in any self-dealing to the detriment of its principal. As escrow agent for Plaintiffs and members of the Classes, Defendant FATIC failed in its duty to fully, faithfully, and honestly carry out the responsibilities of an escrow agent.

200.    Defendant FATIC, by (1) charging for reconveyance tracking to be paid to its undisclosed affiliate FASMS at three times the advertised rate of FASMS; (2) charging for reconveyance fees without disclosing that prior lenders were performing the actual reconveyances; (3) illicitly taking profits from the escrow accounts of Plaintiffs and the members of the Classes and retaining such profits; and (4) charging for wire fees when it was not actually incurring any expenses associated with such charges, violated its duty to pay profits to its principals made in connection with transactions conducted on behalf of the principals, in accordance with common law, and with the Restatement (Second) of Agency § 388.

201.    Defendant FATIC breached its duty to Plaintiffs and the members of the Classes by receiving and retaining secret interest on escrow deposits. Defendant FATIC violated its duty to use care to keep the interest on escrow funds safe until such funds could be remitted or delivered properly, and Defendant FATIC failed to use due care to account for any interest earned on Plaintiffs' accounts and the accounts of the members of the Classes, in accordance with common law and the Restatement (Second) of Agency § 427.

202.    Defendant FATIC's breaches of duty as an agent have directly and proximately caused damage to the Plaintiffs and all members of the Classes. Plaintiffs and the members of the

- 45 -

Classes are entitled to restitution of all unjust enrichment and secret profits wrongfully taken, including the value or proceeds of any and all benefits illegally acquired by Defendant FATIC from the use of Plaintiffs funds and loan proceeds in the escrow account, in addition to any other losses suffered by Plaintiffs and the members of the classes.

## COUNT IX

**ON BEHALF OF THE RECONVEYANCE CLASSES,
THE WIRE/EXPRESS CLASS
AND THE RETAINED INTEREST CLASS**

**VIOLATION OF CALIFORNIA UNFAIR BUSINESS PRACTICES ACT**
**(Bus. & Prof. Code §§ 17200, *et seq.*)**

203.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

204.    By carrying out the Affiliate Reconveyance Scheme, the Captive Reconveyance Scheme, the Wire/Express scheme and the Retained Interest Scheme, Defendants have (1) directly and indirectly employed a scheme, device and artifice to defraud and mislead borrowers and sellers and defraud any person; (2) directly and indirectly engaged in an unfair and deceptive act toward a person; (3) directly and indirectly obtained property by fraud and misrepresentation; and (4) knowingly made published and disseminated false, deceptive and misleading information.

205.    Defendants and each of them are residents of the State of California.  On information and belief, the actions and underlying decisions of Defendants, alleged herein emanated from and occurred within the State of California and, therefore, is it reasonable and appropriate to apply California law to Defendants' acts throughout the United States.

206.    Defendants have engaged and continue to engage in the Affiliate Reconveyance Scheme, the Captive Reconveyance Scheme, the Wire/Express Scheme and the Retained Interest Scheme.  Defendants' acts and practices as described herein constitute unlawful, fraudulent and/or unfair business acts and practices.  As such, Defendants' conduct violates Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL").

207.    Defendants' conduct described herein constitutes an unlawful business practice within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, in that the conduct violates RESPA, the

California Insurance Code and the common law of unjust enrichment. Specifically, as alleged herein, Defendant FATIC has:

        a.      Violated 12 U.S.C. § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2 by referring reconveyance tracking business to FASMS (1) without disclosing the affiliated relationship; (2) without providing a written estimate of the charge or range of charges generally made by FASMS; and (3) without disclosing that consumers are not required to use any particular provider of reconveyance tracking services;

        b.      Violated 12 U.S.C. § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2 by requiring consumers to use FASMS for reconveyance tracking services;

        c.      Violated 12 U.S.C. § 2607(a)-(c) and Regulation X, 24 C.F.R. § 3500.14 by receiving a payment for "multiple services," as that term is used in Regulation X, which are not actual, necessary and distinct from the primary services provided;

        d.      Violated 12 U.S.C. § 2607(a)-(c) and Regulation X, 24 C.F.R. § 3500.14 by charging reconveyance tracking fees that are paid to an affiliated company that are nearly three times higher than such affiliated company's generally available rate for the same services, thus engaging and continuing to engage in the practice of making a payment that bears no reasonable relationship to the market value of the services provided and is not for services actually performed or provided;

        e.      Violated 12 U.S.C. § 2607(b) and Regulation X, 24 C.F.R. § 3500.14 by charging reconveyance fees in transactions in which it has not performed reconveyance processing, thus engaging and continuing to engage in the practice of receiving a portion, split and percentage of a fee for the rendering of a real estate settlement service other than for services actually performed;

        f.      Violated 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14 by charging reconveyance fees in real-estate transactions in which the Jankanishes and the Captive Reconveyance Class have separately been charged for reconveyance processing by their prior lenders, thus engaging and continuing to engage in the practice of receiving a duplicate reconveyance fee for the rendering of a real estate settlement service;

        g.      Violated 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14 by failing to disclose that "Northwest Post Closing Center" is a fictitious entity and the same company as

Defendant FATIC; failing to provide a written estimate of the charges to be paid; failing to disclose that consumers are not required to use "Northwest Post Closing Center;" and by receiving funds for reconveyance settlement services in addition to a return on ownership of "Northwest Post Closing Center;"

        h.      Violated 12 U.S.C. § 2607(a)-(c) and Regulation X, 24 C.F.R. § 3500.14 by charging wire fees that are not in fact incurred by Defendant FATIC, thus engaging and continuing to engage in the practice of making a payment that bears no reasonable relationship to the market value of the services provided and is not for services actually performed or provided;

        i.      Violated California Insurance Code, Section 790.02 by engaging in the above described unfair and deceptive acts or practices in the business of insurance;

        j.      Violated California Insurance Code Section 12413.5 by retaining interest, earnings credits, and/or other benefits that Defendant FATIC accrued based on amounts deposited in escrow by Plaintiffs and the Classes; and

        k.      Violated the common law governing unjust enrichment by receiving a benefit from Plaintiffs and the Classes in the form of: (1) the reconveyance tracking fees Plaintiff McFerrin and the Affiliate Reconveyance Class paid to Defendants, which fees were unearned and unreasonable and made in violation of federal and state law; (2) the reconveyance fees Plaintiffs Daniel and Heather Jankanish and the Captive Reconveyance Class paid to Defendant FATIC, which fees were unearned, duplicative and unreasonable and made in violation of federal and state law; (3) the wire fees made by Plaintiffs Daniel and Heather Jankanish and the Wire/Express Class paid to Defendant FATIC, which fees were unearned, unreasonable, deceptively charged and made in violation of federal and state law; and (4) interest, earnings credits, or other benefits on escrow funds received as payments for the referral of business incident to real estate settlement service and in violation of federal and state law.

        208.    Defendant FATIC's conduct as described herein violates not only the unlawful prong of the UCL, but also constitutes a violation of the UCL's "unfair" prong, independent of the other causes of action asserted herein. Defendant FATIC's conduct offends public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers. Any justification for

- 48 -

1    Defendant FATIC's practices is outweighed by the consequences and harm to Plaintiffs and the

2    Classes.

3        209.    Defendant FATIC's conduct as described herein also violates the "deceptive" prong

4    of the UCL, independent of the other causes of action asserted herein. Defendant FATIC acted

5    deceptively in the following manner:

6            a.    Defendant FATIC had a duty under RESPA to (1) disclose its affiliated

7    relationship with FASMS; (2) provide a written estimate of the charge or range of charges generally

8    made by FASMS; and (3) disclose that consumers are not required to use any particular provider of

9    reconveyance tracking services. Defendant FATIC deceptively failed to make these required

10   disclosures and charged FATIC escrow customers reconveyance tracking fees paid to FASMS that

11   are three times higher than the prices advertised by FASMS on its website.

12           b.    Defendant FATIC deceives consumers and members of the Affiliate

13   Reconveyance Class by calling FASMS "SMS Settlement Services" on the HUD-1 settlement

14   statement, thereby obscuring the fact that FATIC and FASMS are affiliated. Defendant FATIC also

15   deceives consumers and the Reconveyance Class by collecting additional unearned and deceptively

16   labeled reconveyance tracking fees for providing services that they are already obligated to provide

17   under the closing instructions in exchange for the agreed escrow fee.

18           c.    Defendant FATIC deceives consumers and members of the Captive

19   Reconveyance Class by only disclosing its intention to charge reconveyance "tracking" fees at

20   closing such that members of the Captive Reconveyance Class have no genuine opportunity to

21   challenge the fees or request that any such service be provided at a lower rate or by a different

22   provider.

23           d.    Defendant FATIC deceives consumers and members of the Captive

24   Reconveyance Class by falsely stating on the HUD-1 Settlement Statement that it is disbursing

25   reconveyance/tracking fees to Northwest Post Closing Center, when it truth and fact, it is keeping

26   and retaining such fees.

27

28

-49-

e.    Defendant FATIC deceives consumers and the Retained Interest Class by collecting interest, earnings credits, and/or other benefits based on the accrued escrow deposits of Plaintiffs and the Retained Interest Class without disclosing its practices.

210.    Plaintiffs and the Classes have suffered injury in fact and have lost money or property as a result of Defendants' unlawful, unfair and/or deceptive business practices. Each of Defendants' omissions was material to Plaintiffs and the Classes in entering into the transaction with Defendants and Plaintiffs and the Classes relied on Defendants' false and misleading misrepresentations in entering into the transactions at issue.

211.    The above-described unlawful, unfair and/or deceptive business practices present an ongoing threat of continuing injury to Plaintiffs, the Classes and the general public. Among other things, Plaintiffs, the Classes and the general public continued to be financially disadvantaged by such conduct. Such wrongful conduct is continuing and, unless Defendants are restrained, they will continue to engage in such conduct.

212.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Classes, individually and on behalf of the public, seek an order of this Court enjoining Defendants from continuing their unfair, unlawful, and/or deceptive business acts or practices in the State of California and elsewhere. The public, Plaintiffs and the Classes will be irreparably harmed if such an order is not granted.

213.    Further, Plaintiffs and the Classes, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    For an order declaring that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure, Rule 23, and for an order certifying this case as a class action and appointing Plaintiffs as representatives of the Classes;

B.    For an order declaring that: (i) Defendants were obligated to disclose to Plaintiffs and the Reconveyance Class that Defendant FASMS was affiliated with Defendant FATIC; (ii) Defendants were obligated to disclose to Plaintiffs and the Reconveyance Class the charge or

- 50 -

1  range of charges generally made by FASMS; (iii) Defendants were obligated to disclose to Plaintiffs

2  and the Reconveyance Classes that they were not required to use any particular provider of

3  settlement services; and (iv) Defendants violated RESPA and the laws of California by failing to

4  make such disclosures;

5       C.    For an order declaring that Defendants required the use of FASMS and charged

6  Plaintiff McFerrin and the Affiliate Reconveyance Class nearly three times the generally advertised

7  FASMS rate for the same services, thus making a payment bearing no reasonable relationship to the

8  market value of the services provided, not for services actually performed, in violation of RESPA

9  and California law;

10       D.    For an order declaring that Defendant FATIC misappropriated and converted interest,

11  or its functional equivalent, earned on the escrow funds of Plaintiffs and the Retained Interest Class;

12       E.    For an order declaring that Defendant FATIC breached its fiduciary duties and agency

13  duties to Plaintiffs and the Classes by carrying out the Affiliate Reconveyance Scheme, the Captive

14  Reconveyance Scheme, the Wire/Express Scheme and the Retained Interest Scheme;

15       F.    For an order issuing a permanent injunction requiring Defendant FATIC to (1) inform

16  all customers and potential customers in writing (i) that FASMS is an affiliated company to FATIC;

17  (ii) the charge or range of charges for services provided by FASM; and (iii) that reconveyance

18  processing may be performed by their prior lenders; (2) inform all customers and potential customers

19  of the true nature of its relationships with the banks at which escrow accounts are held and the source

20  and amounts of any benefits received from such banks; (3) inform all customers and potential

21  customers that they are not required to use FASMS or any particular settlement services provider for

22  reconveyance tracking services; (4) refund to customers any amounts collected as reconveyance fees

23  where no such disclosures were made; and (5) refund to customers the value of any benefits received

24  from banks in exchange for holding Defendant FATIC's escrow account deposits;

25       G.    For an order awarding compensatory damages on behalf of Plaintiffs and the Classes

26  in an amount to be proven at trial;

27

28

CLASS ACTION COMPLAINT
010052-12 238960 V1

- 51 -

H.      For judgment for Plaintiffs and the Classes on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' unfair or deceptive practices; along with exemplary damages to each class member for each violation;

I.      For judgment for Plaintiffs and the Classes on their RESPA claims, in an amount to be proven at trial, for: (1) three times the amount of reconveyance fees paid to Defendant FATIC by Plaintiffs and the Reconveyance Classes; (2) three times the wire fees paid to Defendant FATIC by the Jankanishes and the Wire/Express Class; and (3) three times the escrow fees paid to Defendant FATIC by Plaintiffs and the Retained Interest Class;

J.      For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and members of the Classes;

K.      For an order awarding Plaintiffs and the Classes their attorney's fees and costs; and

L.      Such other and further relief as may appear necessary and appropriate.

## IX.     JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury of the claims alleged herein.

DATED:  May 14, 2008.                    HAGENS BERMAN SOBOL SHAPIRO LLP


By
        (REED R. KATHREIN (139304)

715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com

Steve W. Berman
Tyler Weaver
Thomas E. Loeser (202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
tyler@hbsslaw.com
toml@hbsslaw.com

- 52 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Timothy J. Warzecha
LAW OFFICES OF TIMOTHY J. WARZECHA, PLLC
719 Second Avenue, Suite 104
Seattle, WA 98104-1748
Telephone:  (206) 264-0282
Facsimile:  (206) 262-9272

Attorneys for Plaintiffs and the Proposed Classes

CLASS ACTION COMPLAINT
010052-12  238960 V1