Reed R. Kathrein (139304)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com

Steve W. Berman
Tyler Weaver
Thomas E. Loeser (202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
tyler@hbsslaw.com
toml@hbsslaw.com

(Additional counsel listed on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DANIEL JANKANISH and HEATHER JANKANISH, a married couple, DAVID L. MCFERRIN, and PAIGE L. PERISICH, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | No. CV 08-2460-EMC<br><br>FIRST AMENDED<br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | ) ) | |
| v. | ) | |
| FIRST AMERICAN TITLE INSURANCE COMPANY and FIRST AMERICAN SMS, aka SMS SETTLEMENT SERVICES, | ) ) ) ) | |
| Defendants. | ) ) | |

1

2

**TABLE OF CONTENTS**

<u>PAGE</u>

3

I.     INTRODUCTION ..................................................................................................... 1

4

II.    JURISDICTION AND VENUE ............................................................................... 7

5

III.   PARTIES .................................................................................................................. 8

6

       A.     Plaintiffs ....................................................................................................... 8

7

       B.     Defendants .................................................................................................... 9

8

IV.    FACTUAL ALLEGATIONS ................................................................................. 11

9

       A.     The Nature of Escrow Services .................................................................. 11

10

       B.     Federal Regulation Under RESPA ............................................................. 14

11

       C.     Escrow Regulation and Consumer Protection in California....................... 17

12

       D.     The Affiliate Reconveyance Scheme ......................................................... 18

13

       E.     The Captive Reconveyance Scheme .......................................................... 20

14

       F.     The Retained Interest Scheme .................................................................... 21

15

       G.     The Wire/Express Fee Scheme................................................................... 23

16

       H.     Plaintiff David McFerrin's Transaction ..................................................... 24

17

       I.     The Jankanish Refi Transaction ................................................................. 27

18

       J.     The Jankanish Sale Transaction ................................................................. 33

19

       K.     The Perisich Transaction ............................................................................ 37

20

V.     EQUITABLE TOLLING, DISCOVERY RULE RE:  STATUTES OF
       LIMITATIONS ....................................................................................................... 43

21

22

VI.    CLASS ACTION ALLEGATIONS........................................................................ 43

23

VII.   CLAIMS FOR RELIEF.......................................................................................... 47

24

<u>COUNT I</u>  ON BEHALF OF THE RECONVEYANCE CLASSES AND THE WIRE/
       EXPRESS CLASS, BREACH OF CONTRACT (ESCROW INSTRUCTIONS) ................. 47

25

26

<u>COUNT II</u>  ON BEHALF OF THE RECONVEYANCE CLASSES AND THE WIRE/
       EXPRESS CLASS, BREACH OF CONTRACT (HUD-1)..................................... 49

27

28

FIRST AMENDED
CLASS ACTION COMPLAINT CV 08-2460-EMC

- i -

010052-12 241613 V1

COUNT III  ON BEHALF OF THE RECONVEYANCE CLASSES, VIOLATIONS OF
           REAL ESTATE SETTLEMENT PROCEDURES ACT 12 U.S.C. § 2607 ..........................51

COUNT IV  ON BEHALF OF THE RECONVEYANCE CLASSES, THE WIRE/
          EXPRESS CLASS AND THE RETAINED INTEREST CLASS, VIOLATIONS
          OF REAL ESTATE SETTLEMENT PROCEDURES ACT 12 U.S.C. § 2607 ....................53

COUNT V  ON BEHALF OF THE WIRE/EXPRESS CLASS, VIOLATIONS OF REAL
         ESTATE SETTLEMENT PROCEDURES ACT 12 U.S.C. § 2607 ......................................54

COUNT VI  ON BEHALF OF THE RETAINED INTEREST CLASS, VIOLATIONS
          OF REAL ESTATE SETTLEMENT PROCEDURES ACT 12 U.S.C. § 2607(a)................55

COUNT VII  ON BEHALF OF THE RECONVEYANCE CLASSES, THE WIRE/EXPRESS
           CLASS AND THE RETAINED INTEREST CLASS, UNJUST ENRICHMENT ...............56

COUNT VIII  ON BEHALF OF THE RECONVEYANCE CLASSES, THE WIRE/
            EXPRESS CLASS AND THE RETAINED INTEREST CLASS, BREACH
            OF FIDUCIARY DUTY ........................................................................................57

COUNT IX  ON BEHALF OF THE RECONVEYANCE CLASSES, THE WIRE/EXPRESS
          CLASS AND THE RETAINED INTEREST CLASS  BREACH OF AGENCY DUTY ......58

COUNT X  ON BEHALF OF THE RECONVEYANCE CLASSES, THE WIRE/
         EXPRESS CLASS AND THE RETAINED INTEREST CLASS, VIOLATION
         OF CALIFORNIA UNFAIR BUSINESS PRACTICES ACT (Bus. & Prof. Code
         §§ 17200, *et seq.*)................................................................................................59

VIII.    PRAYER FOR RELIEF .........................................................................................64

IX.      JURY TRIAL DEMANDED ..................................................................................67

1    Plaintiffs, Daniel and Heather Jankanish, David L. McFerrin, and Paige L.

2    Perisich, by their attorneys, on behalf of themselves and all others similarly situated,

3    bring this action for treble damages and injunctive relief under the Real Estate

4    Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601 *et seq.*, and California law

5    against the above-named defendants, demand a trial by jury, and complain as follows:

6                              **I.    INTRODUCTION**

7        1.    Millions of real estate transactions in the United States utilize the services

8    of a third-party escrow company to settle purchase and sale transactions of real property

9    and refinancing transactions.  As a third-party facilitator of the transaction, the escrow

10   company is relied upon by all parties to the transaction to act as a disinterested and

11   unbiased neutral facilitator and fiduciary agent, acting pursuant to its escrow instructions

12   in exchange for an agreed escrow fee.

13       2.    An escrow company performing a real estate settlement in a purchase/sale

14   transaction is responsible principally for:  (1) taking delivery of the agreed payment from

15   the buyer and/or his/her mortgagor, and delivering in return to the buyer good title to the

16   purchased property; and (2) taking title to the property from the seller, paying off

17   existing mortgage loans and delivering the net proceeds of the sale.  In a refinance

18   transaction, the escrow company is responsible for ensuring that prior loans are paid off

19   with the proceeds of the new loan(s) and new loans properly recorded.  The escrow agent

20   controls the disbursement of funds from escrow pursuant to its fiduciary and agency

21   duties and the parties' escrow instructions; and the escrow agent certifies that the HUD-1

22   Settlement Statement truly and accurately reflects the actual disbursements made and the

23   identity of any recipient of funds from the escrow.

24       3.    As part of the settlement process, whether it is a purchase transaction or a

25   refinance transaction, when prior secured loans are paid off, deeds of trust or liens

26   associated with such prior loans must be extinguished and new deeds of trusts or liens

27   associated with the new mortgages or loans must be recorded.  ***The process of***

28

1   *extinguishing the deeds of trust and liens associated with real property loans that are*

2   *being paid off in the settlement transaction is known as reconveyance.*

3       4.    Major lenders handle their own reconveyance either at no charge to the

4   borrower or with a charge that is included in the payoff amount due from the borrower to

5   close the loan account.  As a result, in virtually all transactions involving major lenders

6   the escrow company does not, in fact, process, prepare or record the reconveyance of the

7   prior loan deed(s).  At most, it may merely track the transaction to ensure that

8   reconveyance has occurred.

9       5.    In addition, lenders begin charging interest to homeowners on their

10  mortgage loans immediately upon disbursement of the loan proceeds to the escrow

11  account.  The escrow provider, however, may not disburse the loan proceeds from the

12  escrow account to the prior lender or to the home seller for several days following the

13  payment of the loan proceeds by the new lender.  The period of time between the receipt

14  of proceeds from the new loan and the time of disbursement of those funds to the prior

15  lender or the home seller is commonly called the "Float."  As a result of the Float,

16  national escrow companies, such as Defendant First American Title Insurance Company

17  ("FATIC") routinely hold hundreds of millions of dollars in their escrow accounts.

18      6.    As set forth more fully below, Defendant FATIC has cast aside the

19  presumed and claimed neutrality and fiduciary and agency duties of an escrow provider

20  in favor of their own interests by unfairly, deceptively and illegally undertaking multiple

21  schemes to charge and collect illegal, unearned, duplicative and unreasonable fees and

22  by using the collective value of customers' escrow deposits and the Float to earn credits

23  and other benefits that Defendant FATIC keeps for its own profits.

24      **Scheme 1**:  **Affiliate Reconveyance Scheme.**

25      7.    In the first such scheme, Defendant ("FATIC") or its division The Talon

26  Group ("Talon") (collectively, "FATIC") provide escrow services and fail to timely

27  disclose that customers' prior lenders are performing the actual reconveyances of the

28  paid off loans.  FATIC then hides the affiliated relationship between itself and SMS

1  Settlement Services, which is actually a trade name for Defendant First American SMS

2  ("FASMS"), and charges escrow customers reconveyance "tracking fees" paid to

3  FASMS that are three times higher than the price for "tracking" advertised by FASMS

4  on its website.  As a result, FATIC violates federal and state law by failing to timely

5  disclose the payment for settlement services is to an affiliated company, by failing to

6  timely disclose the estimated charge and notifying consumers that they need not use this

7  company; and by collecting a fee that is:  (1) illegally referred to an affiliated company;

8  and (2) a charge for which no or nominal services are performed.  This "Affiliate

9  Reconveyance Scheme" works as follows:



26  **Scheme 2:  Captive Reconveyance Scheme.**

27      8.    In the second scheme, Defendant FATIC provides escrow services and

28  fails to timely disclose that customers' prior lenders are performing the actual

reconveyances of the paid off loans.  FATIC then charges and collects reconveyance or

"tracking" fees that it pays to itself or falsely and deceptively states are paid to fictitious

settlement services providers.  As a result, FATIC violates federal and state law by

collecting a fee that is:  (1) deceptively and inadequately described on the settlement

statement; (2) illegally split with a settlement services provider; (3) duplicative of the

reconveyance fee charged by the prior lender; and (4) a charge for which no or nominal

services are performed, and is therefore unearned and unreasonable.  This "Captive

Reconveyance Scheme" works as follows:

**Captive Reconveyance Scheme**

CONSUMER

Pays prior lender
reconveyance
processing in
payoff amount

$$

Prior lender
performs
reconveyance,
and charges for it
in payoff amount

Pays FATIC
Escrow Fee

$$

Pays FATIC
additional fees for
reconveyance
processing

$$

FATIC charges escrow
fee and charges for
reconveyance(s) it
does not perform

9.      By engaging in the Affiliate Reconveyance Scheme and the Captive

Reconveyance Scheme, Defendant FATIC illegally requires the use of its own additional

and duplicate reconveyance services, dupes and deceives consumers and breaches its

contracts with consumers and its fiduciary and agency duties to its customers by

1   collecting unearned and deceptively labeled reconveyance fees for providing services

2   that it is already obligated to provide under the closing instructions in exchange for the

3   agreed escrow fee.

4       **Scheme 3**:  **Retained Interest Scheme.**

5          10.    In the third scheme, Defendant FATIC pools customers' required deposits

6   in escrow and the loan proceeds from customers' new loans and holds those deposits at

7   particular banking institutions prior to disbursement in exchange for interest and other

8   benefits that FATIC keeps and retains for itself.  FATIC is provided with free or highly

9   discounted banking services, such as wire fees, and is also provided access to large lines

10  of credit that it can then use for investment purposes.

11         11.    Rather than providing its escrow customers with the interest earned or

12  benefits accruing from the deposits, FATIC keeps them as added profit.  As a result of

13  this unfair and deceptive practice, Defendant FATIC violates state and federal law by

14  receiving a thing of value in exchange for referring business incident to federally related

15  mortgage loan.  Defendant FATIC also breaches its escrow agreements with customers

16  and its fiduciary and agency duties.  This "Retained Interest Scheme" works as follows:

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



**Retained Interest Scheme**

16     **<u>Scheme 4</u>:  The Wire/Express Fee Scheme.**

17         12.    In the fourth scheme, Defendant FATIC charges purported out-of-pocket

18 expenses on the HUD-1 Settlement Statement, such as "Wire/Express" fees that are paid

19 by customers as closing costs.  Yet, as a result of the Retained Interest Scheme and other

20 business arrangements with banks, FATIC does not, in fact, pay for the charged services

21 or pays only a small portion of the amounts that it then charges its customers at a much

22 higher rate.  Specifically with respect to wire fees, FATIC is charged a discounted rate

23 for wiring funds, but this discounted rate is then offset completely by earnings credits

24 provided by the banks to FATIC through the Retained Interest Scheme.  As a result,

25 Defendant FATIC violates federal and state law by collecting a fee that is:

26 (1) deceptively and inadequately described on the settlement statement; (2) illegally split

27 with a settlement services provider; and (3) a charge for which no or nominal services

28 are performed, and is therefore unearned and unreasonable.  FATIC dupes and deceives

its customers and breaches its contracts with customers and fiduciary and agency duties to its customers by collecting unearned, excessive and deceptively disclosed Wire/Express fees.  This "Wire/Express Fee Scheme" works as follows:



**FATIC/Talon
Wire Fee Scheme**

CONSUMERS
Pay full price
"Wire Fee"
on HUD-1

$$

ESCROW CO.
Charges Bank's full
price for Wire Fee;
pays 0 or discount
keeps excess

Escrow
Account

BANK
Holds escrow
account gives
discount or
no charge for
wire fees

13.    On information and belief, Defendants engage in these practices nationwide across hundreds of thousands of transactions and have reaped ill-gotten gains in excess of tens of millions of dollars.

14.    In this action Plaintiffs, on behalf of four classes of FATIC escrow customers, seek damages on behalf of a nationwide class arising from Defendants' violations of federal and California law.

**II.    JURISDICTION AND VENUE**

15.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that it is a civil action arising under the laws of the United States.  The

1   Court additionally has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), in

2   that this is a "civil action in which the matter in controversy exceeds the sum or value of

3   $5,000,000, exclusive of interest and costs, and is a class action in which – (A) any

4   member of a class of plaintiffs is a citizen of a State different from any defendant."  The

5   named Plaintiffs are citizens of Washington and Defendants First American Title

6   Insurance Company and First American SMS are citizens of the State of California.

7        16.    Defendants transact business, maintain offices or are found within the

8   Northern District of California.  The interstate commerce described herein is carried on,

9   in part, within the Northern District of California and the illegal charges and deceptive

10  acts herein alleged were carried on, in part, in the Northern District of California.

### III.    PARTIES

**A.    Plaintiffs**

13       17.    Plaintiff David L. McFerrin is a married person[1] residing within the State

14  of Washington.  During the Class Period,[2] Mr. McFarrin refinanced his home in Tacoma,

15  Washington, and Defendant FATIC was the escrow settlement service provider in that

16  transaction.  Mr. McFerrin has been injured by reason of the illegal, unfair and deceptive

17  acts alleged.

18       18.    Plaintiffs Daniel and Heather Jankanish ("the Jankanishes") are a married

19  couple residing within the state of Washington.  During the Class Period, the Jankanishes

20  refinanced their home on 42nd Avenue N.E. in Tacoma, Washington, on or about

21  February 13, 2007 (the "Jankanish Refi Transaction"); and sold a home on 48th Avenue

22  N.E. in Tacoma, Washington, on or about March 14, 2007 (the "Jankanish Sales

23  Transaction").  Defendant FATIC, through its Talon Group division was the named

---

[1]    The property at issue in this case was owned by Mr. McFarrin separately and apart from the community property of his marriage.  Mr. McFarrin's wife executed a quitclaim deed as part of the settlement of the refinance transaction.

[2]    The Class Period of five (5) years is based upon RESPA's statutory requirement that escrow providers retain records of transactions for five years from the transaction date.  *See* 24 C.F.R. 3400.14(h).

1   escrow agent for the Jankanish Refi Transaction while Defendant FATIC through its

2   own name was the named escrow agent for the Jankanish Sales Transaction.  In each

3   transaction, the Jankanishes have been injured by reason of the illegal, unfair and

4   deceptive acts alleged.

5           19.    Plaintiff Paige Perisich is a single person residing within the state of

6   Washington.  During the Class Period, Ms. Perisich sold her home in Renton,

7   Washington, on or about January 31, 2006 (the "Perisich Transaction").  Defendant

8   FATIC, through its Talon Group division was the named escrow agent for the Perisich

9   Transaction.  Ms. Perisich has been injured by reason of the illegal, unfair and deceptive

10  acts alleged.

11  **B.    Defendants**

12          20.    Defendant First American Title Insurance Company ("FATIC") is a

13  California Corporation with its principal place of business at 1 First American Way,

14  Santa Ana, California.  The Talon Group ("Talon") states on its website that it is "a

15  division of First American Title Insurance Company."[3]  FATIC does business in its own

16  name and under the name Talon Group in California and throughout the United States.

17  References in this Complaint to FATIC include, without limitation, Talon and references

18  to Talon include, without limitation, FATIC.

19          21.    Defendant First American SMS ("FASMS") is a California Corporation

20  with its principal place of business at 200 Commerce, Irvine, California.  FASMS does

21  business in the State of California and throughout the United States.

22          22.    The First American family of companies – which includes the parent

23  company First American Corporation ("First American"), Defendant FATIC, Talon and

24  Defendant FASMS, and their affiliates – is engaged in selling title insurance and escrow

25  services to purchasers of commercial and residential real estate throughout the United

---

[3]    *See* http://www.talonnw.com (last visited on May 11, 2008).

1   States, including California.  Nationally, First American accounts for approximately 30

2   percent of title premiums, which in 2007 amounted to roughly $4.3 billion.

3       23.    The First American family of title insurance companies and their affiliates

4   are wholly-owned and controlled by First American, and on information and belief each

5   engages in the practices described herein as part of company-wide practices.  Through its

6   subsidiaries, First American is a provider of title insurance, specialty insurance, real

7   estate settlement services, information services and claims management services.  First

8   American had 2006 revenues of roughly $8.8 billion.

9       24.    Defendant FASMS maintains an internet website at

10  http://firstamsms.com.  This website contains a page titled "FasTrax™ Tracking

11  Service" which describes in detail the reconveyance tracking service provided by

12  FASMS.[4]  The page includes the following:

13              **FasTrax Tracking Service Features**

14          •   Obtain appropriate documents from the paid off lenders

15          •   Confirm the accuracy of the documents

16          •   Record the document in the appropriate jurisdiction

17          •   24/7 internet access to status reports and images of recorded

18              documents

19      25.    Links on the http://www.firstamsms.com website connect to

20  http://www.smsfastrax.com which contains a page describing "How SMS FasTrax

21  Works" and "How To Place An Order."[5]  This webpage includes "Pricing Information"

22  and advertises **"$35 service fee per payoff** plus applicable recording fees."  (Emphasis

23  in original.)

24      26.    Recognizing that the norm is for the prior lender to complete the

25  recordation and reconveyance process, the page also states:  "If the lender's payoff

---

26  [4]      http://www.firstamsms.com/products_services/fastrax.php (last visited on
27  April 23, 2008).

28  [5]      http://www.smsfastrax.com/HowItWorks.asp (last visited on April 23, 2008).

statement indicates they are collecting the recording fee, you do not need to remit this additional amount."

## IV.    FACTUAL ALLEGATIONS

**A.    The Nature of Escrow Services**

27.    In the purchase, sale or refinance of real estate, all of the parties entrust legal documents and money to an escrow agent, which is a fiduciary and agent of the principals and is responsible for transferring the papers and funds and recording documents when the escrow closes.

28.    Under common law, and by statute and regulation, an escrow agent must act as a neutral party, strictly following the needs, interests and instructions of the principals, who are the buyers and sellers (or owners and lenders in the case of refinance transactions) of the real estate at issue.  Escrow agents are fiduciaries and are prohibited from self-dealing or obtaining any benefits for themselves during the transaction, and escrow agents must ensure that the terms of the transaction are carried out with scrupulous honesty, diligence and impartiality.  Escrow agents must communicate all material facts to the principals in unambiguous, clear terms and in a timely manner concerning the pending transactions, the use of the principals' funds, and their services to the principals.

29.    Escrow agents hold escrow accounts in trust for the benefit of the principals, and not for their own benefit.  Escrow agents do not own the funds deposited into escrow; such funds belong to the principals.  Escrow agents are generally required to promptly deposit and disburse all funds received in and out of an account in a public depository and to track and account for all receipts and disbursements from each account.

30.    An escrow company performing a real estate settlement in a purchase/sale or refinance transaction acts pursuant to escrow instructions that are purportedly agreed between the principals to the transaction.  In actuality, the escrow instructions are

prepared by the escrow provider and often supplemented by the lender and provided to the home buyers/sellers or refinancers only at the time of final signing of documents.

31.     Consumers are not given a genuine opportunity to review and/or question the instructions and do not and cannot negotiate the instructions for fear of derailing the scheduled close of the transaction, which would result in the potential loss of the opportunity for sale/purchase, the risk of claims or lawsuits for failure to close, or incurring additional fees and costs.

32.     In general in a purchase/sale transaction, the escrow provider is responsible for:  (1) taking delivery of the agreed purchase price from the buyer and/or his/her mortgagor(s), and delivering in return to the buyer good title to the purchased property; (2) taking title to the property from the seller and delivering in return the net proceeds of the sale; and (3) fairly and accurately disclosing and disbursing payments to settlement services providers in connection with the transaction.  In a refinance transaction, the escrow company is responsible for:  (1) ensuring that prior loans are paid off and new loans properly recorded; and (2) fairly and accurately disclosing and disbursing payments to settlement services providers in connection with the transaction.

33.     As part of the settlement process, whether it is a purchase/sale transaction or a refinance transaction, when prior mortgages or loans that were secured by the real property are paid off, deeds of trust or liens associated with such prior loans must be extinguished and new deeds of trusts or liens associated with the new mortgages or loans must be recorded. ***The process of extinguishing the deeds of trust and liens associated with real property loans that are being paid off in the settlement transaction is known as reconveyance.*** Defendant FATIC provides real estate settlement services, including escrow services as described above.

34.     Historically, escrow providers would include with payoff funds to a prior lender in a transaction a form evidencing payment in full of the prior note.  The lender would complete the form and return it to the escrow provider, and the escrow provider would then complete the necessary reconveyance processing and have the reconveyance

1    recorded.  In this context, escrow providers charged a reconveyance processing fee to

2    consumers to cover their costs of actually providing the service of processing the

3    reconveyance.  By statute, California has set a presumptively reasonable reconveyance

4    processing fee of $45 per loan.[6]

5           35.    However now, and for at least the time period relevant to this complaint,

6    most, if not all, major lenders handle their own reconveyance processing either at no

7    charge to the borrower or with a charge that is included in the payoff amount due from

8    the borrower to close the loan account.  As a result, in virtually all transactions involving

9    major lenders – and in the transactions of Plaintiffs and the Reconveyance Classes[7] – the

10   escrow company does not, in fact, prepare, process or record the reconveyance of the

11   prior loan deed(s), it merely ensures that it has occurred.  There are national and local

12   companies that offer reconveyance tracking services to escrow providers, including

13   Defendant FASMS, who advertises reconveyance tracking services on its website for

14   $35 per loan.[8]

15          36.    It is also common to escrow agreements and instructions that escrow

16   providers are paid a fee for the agreed services and reimbursed for out-of-pocket

17   expenses.  Historically, these expenses would include costs associated with transferring

18   funds to and from the escrow safekeeping account to the accounts of sellers and prior

19   lenders.  However due to their relationships with the banks that hold the escrow

20   safekeeping accounts and specifically the Retained Interest Scheme as described herein,

21   escrow providers, and Defendant FATIC in this case, are able to wire funds to and from

22   the escrow safekeeping accounts at significantly discounted rates that are then offset

23   completely by interest credits provided to FATIC by the safekeeping banks.

24

25

---

26   [6]      *See* Cal. Civ. Code § 2941, subd. (e)(2).

27   [7]      The "Reconveyance Classes" includes the Affiliate Reconveyance Class and the
     Captive Reconveyance Class, each as defined herein.

28   [8]      *See* http://www.smsfastrack.com/HowItWorks.asp, viewed on May 12, 2008.

FIRST AMENDED                                  - 13 -
CLASS ACTION COMPLAINT CV 08-2460-EMC
010052-12 241613 V1

37.     As a lucrative adjunct to their title insurance offerings, the nation's

leading title insurance companies, such as Defendant FATIC, have dramatically

increased their presence and power in the national escrow market.  In 2006, title insurers

provided $621 million of escrow services, up approximately 50% from $423 million in

2002.[9]

**B.     Federal Regulation Under RESPA**

38.     The Real Estate Settlement Procedures Act of 1974 ("RESPA") was

enacted to protect consumers from "unnecessarily high settlement charges caused by

certain abusive practices" in mortgage lending.  *See* 12 U.S.C. § 2601(a).

39.     Section eight of RESPA prohibits kickbacks, unearned fees and non-

disclosed affiliated business arrangements.  It provides in relevant part to this complaint

as follows:

> (a) Business Referrals.  No person shall give and no person
> shall accept any fee, kickback, or thing of value pursuant
> to any agreement or understanding, oral or otherwise, that
> business incident to or part of a real estate settlement
> service involving a federally related mortgage loan shall be
> referred to any person.
>
> (b) Splitting charges. No person shall give and no person
> shall accept any portion, split, or percentage of any charge
> made or received for the rendering of a real estate
> settlement service in connection with a transaction
> involving a federally related mortgage loan other than for
> services actually performed.
>
> (c) Fees, salaries, compensation, or other payments.
> Nothing in this section shall be construed as prohibiting
> …, (2) the payment to any person of a bona fide salary or
> compensation or other payment for goods or facilities
> actually furnished or for services actually
> performed….(4) affiliated business arrangements so long
> as (A) a disclosure is made of the existence of such an
> arrangement to the person being referred and, in
> connection with such referral, such person is provided a
> written estimate of the charge or range of charges
> generally made by the provider to which the person is
> referred…at or before the time of the referral…; (B) such
> person is not required to use any particular provider of

[9]     *See* American Land Title Association Industry Annual Statements available on
the World-Wide-Web at http://www.alta.org/industry/financial.cfm.

settlement services, and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship…

(d) Penalties for violations…

…

(2) Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

….

(5) In any private action brought pursuant to this subsection, the court may award to the prevailing party the court costs of the action together with reasonable attorneys fees.

12 U.S.C. § 2607.

40.     RESPA confers on the Secretary of the Department of Housing and Urban Development ("HUD") the authority to prescribe rules and regulations to achieve the statute's purposes.  *See* 12 U.S.C. § 2617(a).  The relevant regulation adopted by HUD is known as Regulation X and sets forth in relevant part:

§ 3500.14 Prohibition against kickbacks and unearned fees.

(a) Section 8 violation.  Any violation of this section is a violation of section 8 of RESPA (12 U.S.C. 2607) and is subject to enforcement as such under § 3500.19.

(b) No referral fees.  No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person.  Any referral of a settlement service is not a compensable service, except as set forth in § 3500.15(g)(1).  A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business.

(c) No split of charges except for actual services performed.  No person shall give and no person shall

accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this Part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

….

(e) Agreement or understanding. An agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized, but may be established by a practice, pattern or course of conduct. When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business.

(f) Referral –(1) A referral includes any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service or business incident to or part of a settlement service when such person will pay for such settlement service or business incident thereto or pay a charge attributable in whole or in part to such settlement service or business.

(2) A referral also occurs whenever a person paying for a settlement service or a business incident thereto is required to use (see § 3500.2, "required use") a particular provider of settlement service or a business incident thereto.

….

(g) Fees salaries, compensation and other payments.

….

(3) Multiple services. When a person in a position to refer settlement service business…receives a payment for providing additional settlement services as part of a real estate transaction, such payment must be for services that are actual, necessary and distinct form the primary services provided by such person.

24 C.F.R. § 3500.14.

41.    "Required use" is defined as follows:

Required use means a situation in which a person must use a particular provider of settlement service in order to have access to some distinct service or property, and the person will pay for the settlement service or the particular provider or will pay a charge attributable, in whole or in part, to the settlement service.

24 C.F.R. § 3500.2

42.    RESPA requires that a settlement service provider disclose any affiliated business arrangement with any other service provider to whom business is referred. RESPA defines "affiliated business arrangement" as:

An arrangement in which (A) a person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider.

24 C.F.R. § 3500.15(b)(1); 12 U.S.C. § 2602(7).

43.    The escrow services provided by Defendants and the settlement fees charged to Plaintiffs and the Classes[10] are settlement services subject to RESPA regulation. The placing of a pooled escrow account at a particular banking institution is "business incident to or part of a settlement service involving a federally related mortgage loan."

**C.    Escrow Regulation and Consumer Protection in California**

44.    In response to a flurry of lawsuits regarding the failure of lenders to timely file and record reconveyances, California codified the reconveyance process setting strict time requirements and a hierarchy of the preferred method of effectuating a reconveyance. Lenders are presumed to reconvey the title they hold upon payment of

---

[10]    The "Classes" include the Affiliate Reconveyance Class, the Captive Reconveyance Class, the Retained Interest Class and the Wire/Express Fee Class, each as defined herein.

the secured debt and only upon their failure to do so in a specified time can title and escrow companies perform a reconveyance.  *See* Cal. Civ. Code § 2941; Cal. Fin. Code § 22319.  California has set a presumptively reasonable reconveyance processing fee of $45 per loan.  *See* Cal. Civ. Code § 2941, subd. (e)(2).

45.     Independent California escrow providers are licensed and regulated pursuant to an extensive set of statutes in the California Financial Code.  *See* Cal. Fin. Code § 17000 *et seq.*  The escrow regulations forbid knowing or reckless participation in any fraud, and knowing or reckless misstatements or omissions.  *See* Cal. Fin. Code § 17414.  Any violation of federal law is also a violation of the escrow regulations.  *See* Cal. Fin. Code § 17425.

46.     However, title insurance companies who perform escrow services are not subject to the extensive escrow regulatory scheme.  *See* Cal. Fin. Code § 17006.  Instead, they are exclusively regulated by the Insurance Commissioner under the Insurance Code. *See* Cal. Ins. Code §§ 12340.3; 12414.29.

47.     There are no provisions of the Insurance Code which specifically regulate or describe unfair and deceptive acts in the provision of escrow services.  However, the Insurance Code forbids unfair methods of competition and unfair and deceptive acts or practices in the business of insurance.  *See* Cal. Ins. Code § 790.02.

48.     The Insurance Code expressly provides that any interest earned on money deposited in an escrow trust account belongs not to the escrow company but to the principals to the escrow transaction.  *See* Cal. Ins. Code § 12341.5.

**D.     The Affiliate Reconveyance Scheme**

49.     As set forth herein and described in detail above, Defendants employed deceptive and corrupt schemes to reap duplicate, unearned, and unreasonable reconveyance fees from consumers.

50.     The first of which, the Affiliate Reconveyance Scheme operated, generally, in the following manner:

i.    Defendant FATIC would agree to act as the settlement agent in an Affiliate Reconveyance Class member's real estate transaction involving a federally related mortgage loan, agreeing to a set escrow fee in exchange for performing its duties under the escrow instructions or agreement;

ii.    FATIC would request a loan payoff statement from the Affiliate Reconveyance Class member's prior lender(s);

ii.    The loan payoff statement would include fees for reconveyance processing and recording which FATIC would include in the amounts required to be paid to the prior lender from the escrow proceeds or would indicate the reconveyance processing and recording will be done at no cost to the Affiliate Reconveyance Class member;

iii.    Defendant FATIC would not disclose to the Affiliate Reconveyance Class member that the prior lender(s) were processing and recording the reconveyance(s);

iv.    Defendant FATIC would require Affiliate Reconveyance Class members to use Defendant FASMS for additional reconveyance settlement services and would charge and collect additional reconveyance fees from the Affiliate Reconveyance Class member, above and beyond the agreed escrow fee, to be paid from the escrow proceeds.

51.    As a direct result of the Affiliate Reconveyance Scheme, Defendants systematically and repeatedly caused Affiliate Reconveyance Class members to pay to Defendants fees far above the agreed escrow fees in exchange for no additional settlement services rendered beyond which Defendants had already agreed to perform pursuant to the Escrow Agreements and Escrow Instructions.  Defendants failed to

FIRST AMENDED
CLASS ACTION COMPLAINT CV 08-2460-EMC
- 19 -
010052-12 241613 V1

1    disclose their self dealing and omitted material facts pertaining to the escrow in violation

2    of its common law duty as a fiduciary and agent to its customers.

3    **E.    The Captive Reconveyance Scheme**

4        52.    The Captive Reconveyance Scheme is the second deceptive and corrupt

5    scheme employed by Defendants concerning reconveyance fees.

6        53.    The Captive Reconveyance Scheme operated, generally, in the following

7    manner:

8        i.    Defendant FATIC would agree to act as the settlement agent in a

9            Captive Reconveyance Class member's real estate transaction

10            involving a federally related mortgage loan, agreeing to a set

11            escrow fee in exchange for performing its duties under the escrow

12            instructions or agreement;

13        ii.    Defendant FATIC would request a loan payoff statement from the

14            Captive Reconveyance Class member's prior lender(s);

15        iii.    The loan payoff statement would include fees for reconveyance

16            processing and/or recording which Defendant FATIC would

17            include in the amounts required to be paid to the prior lender from

18            the escrow proceeds or would indicate the reconveyance

19            processing and recording will be done at no cost to the Captive

20            Reconveyance Class member;

21        iv.    Defendant FATIC would not disclose, or in the case of

22            transactions through its Talon Group division, would not timely or

23            effectively disclose to the Captive Reconveyance Class member

24            that the prior lender(s) were processing and recording the

25            reconveyance(s) and/or that there would be additional

26            reconveyance or "tracking" fees;

27        v.    Defendant FATIC would require Captive Reconveyance Class

28            members to use FATIC for additional reconveyance settlement

FIRST AMENDED                                - 20 -
CLASS ACTION COMPLAINT CV 08-2460-EMC

010052-12 241613 V1

services or would falsely state that reconveyance/tracking fees were being paid to a fictitious services provider and would charge and collect additional reconveyance fees from the Captive Reconveyance Class member, above and beyond the agreed escrow fee, to be paid from the escrow proceeds.

54.    As a direct result of the Captive Reconveyance Scheme, FATIC systematically and repeatedly caused Class members to pay to FATIC fees far above the agreed escrow fees in exchange for no additional settlement services rendered beyond which FATIC had already agreed to perform pursuant to the Escrow Agreements and Escrow Instructions.  Defendant FATIC failed to disclose its self dealing and omitted material facts pertaining to the escrow in violation of federal law and Defendant FATIC's common law duties as a fiduciary and agent to its customers.

**F.    The Retained Interest Scheme**

55.    Defendant FATIC and Talon also engaged in a scheme ("the Retained Interest Scheme"), whereby Defendant FATIC received from banks interest payments, or credits or benefits in lieu of cash payments of interest, on escrow trust account balances. Under the duties that FATIC owed its principals, and under the California Insurance Code, these monies belonged to the principals and not to Defendant FATIC.

56.    The Retained Interest Scheme operated, generally, in the following manner:

        i.    Defendant FATIC would agree to act as the settlement agent in a Retained Interest Class member's real estate transaction involving a federally related mortgage loan, agreeing to a set escrow fee in exchange for performing its duties under the escrow instructions or agreement;

        ii.    Defendant FATIC would collect from Retained Interest Class members earnest money, deposits and the proceeds of their new

FIRST AMENDED                                                        - 21 -
CLASS ACTION COMPLAINT CV 08-2460-EMC
010052-12 241613 V1

mortgage loans and comingle these funds into their pooled escrow accounts held at third-party financial institutions;

iii.   In exchange for holding the pooled escrow accounts, the third-party financial institutions would provide valuable interest, earning credits, and other benefits directly to Defendant FATIC;

iv.   Defendant FATIC would retain and keep these valuable benefits for itself and make no accounting of these benefits to Retained Interest Class members.

57.    Defendant FATIC has failed to disclose to consumers, including Plaintiffs and the Retained Interest Class, that interest, earnings credits, or other benefits were given to FATIC as a result of the deposits in escrow.  By failing to disclose these practices, Defendant FATIC collected illegal referral fees and failed to disclose its self dealing and omitted material facts pertaining to the escrow in violation of its common law duty as a fiduciary and agent to its customers, in breach of the authority given to it in the escrow instructions, in breach of its contracts with its principals and in violation of federal law and the laws of California.

58.    On information and belief, the Retained Interest Scheme was not limited to monies deposited into escrow prior to or on the day of closing, but also included interest paid on Float.  In other words, FATIC earned and kept for itself interest for several days following closing, until all checks and disbursements cleared the general escrow account.

59.    Defendant FATIC did not use the interest or earnings credits for the benefit of Plaintiffs, nor for members of the Retained Interest Class.  The interest, or its functional equivalent, provided a direct financial benefit to FATIC.  The Retained Interest Scheme was used to bolster the profits of Defendant FATIC and its Talon Group division, and it did not result directly or indirectly in any reduction of fees charged by FATIC and Talon, nor any cost saving or other benefit for customers.  At no time was any program, effort, or mechanism used by FATIC and Talon to reduce fees for escrow

services in recognition of the secret interest payments and other consideration that Defendant FATIC received.

60.     The Retained Interest Scheme and FATIC's retention of interest, earnings credits, or other benefits in these circumstances was an illegal receipt of referral fees in exchange for placing the escrow accounts at a particular financial institution, in violation of RESPA, and a breach of Defendant FATIC's fiduciary and agency duties, an unfair and deceptive business practice, and a breach of contract. Under the duties that FATIC and Talon owed their principals, and under the California Insurance Code, these monies (and any earnings thereon) belonged to the principals and not to FATIC.

**G.     The Wire/Express Fee Scheme**

61.     Defendant FATIC and Talon also engaged in a scheme ("the Wire/Express Scheme"), whereby FATIC charged Plaintiffs and the Wire/Express Class for settlement services for which Defendant FATIC did not actually have to pay the indicated amounts.

62.     The Wire/Express Scheme operated, generally, in the following manner:

i.      Defendant FATIC and Talon would agree to act as the settlement agent in a Wire/Express Fee Class member's real estate transaction involving a federally related mortgage loan, agreeing to a set escrow fee in exchange for performing its duties under the escrow instructions or agreement;

ii.     Defendant FATIC and Talon would set forth on the HUD-1 and collect from Wire/Express Fee Class members fees purportedly as reimbursement for wire fees charged to Defendant FATIC by their banks in connection with the Wire/Express Fee Class members' transaction;

iii.    The purported wire fees would in fact be substantially discounted by FATIC's banks and the discounted amounts offset completely by interest credits accrued as a result of the Retained Interest

1            Scheme.  FATIC would not disclose the discount or offset and

2            would instead keep and retain the false wire fee expense as profit.

3        63.     By placing each of these charges and fees on the settlement statement,

4 FATIC represented that they would in fact be paid at closing out of the escrowed funds

5 and that such expenses were in fact incurred.

6        64.     Defendant FATIC collected from customers fees for charges that it never

7 incurred, or, in the alternative, charged customers excessive fees relative to the fees it

8 paid.  Either way, FATIC retained charges, either in full or in part, for expenses that it

9 never paid, in violation of RESPA.  Under the duties that FATIC owed its principals, and

10 under the California Insurance Code, these monies belonged to the principals and not to

11 Defendant FATIC.

12 **H.**      **Plaintiff David McFerrin's Transaction**

13        65.     On or about June 15, 2006, Plaintiff David McFerrin signed closing

14 documents for a refinance of his home located at 4025 South Park Avenue, Tacoma,

15 Washington.  The "settlement agent" was FATIC and the place of settlement was 24105

16 S.E. Kent-Langley Road, Maple Valley, Washington.  FATIC's "Escrow Number" was

17 4205-833645.

18        66.     Mr. McFerrin's refinancing transaction involved two new loans totaling

19 $144,000 and the repayment of two prior mortgage loans, a first mortgage from

20 American Servicing Company ("ASC") and a second mortgage from EMC Mortgage

21 Company ("EMC").  Each of these loans was a "federally related mortgage loan" as

22 defined in RESPA.

23        67.     At the time of signing his refinancing documents, Mr. McFerrin was

24 provided with an unsigned copy of the documents presented to him (the "McFerrin

25 Closing Packet").

26        68.     The McFerrin Closing Packet contained an "Estimated Settlement

27 Statement" for Mr. McFerrin's transaction ("McFerrin HUD-1") that contained three

28 pages and was completed by Defendant FATIC.

69.    The McFerrin HUD-1 indicated a settlement date of June 23, 2006.

70.    The McFerrin HUD-1 sets forth in detail a litany of fees paid by Mr. McFerrin in connection with his refinancing and, according to the applicable regulations, should identify the person or company receiving each settlement fee and a description of the fee.[11]

71.    As set forth in the McFerrin HUD-1, Mr. McFerrin paid a "Settlement or Closing Fee" to Defendant FATIC in the amount of $487.80, which was a $450 fee plus $37.80 in applicable sales tax.  Mr. McFerrin also paid a $250 "Escrow Fee for 2nd Mortgage" to FATIC, plus $21 tax.

72.    Mr. McFerrin paid $446.08 to FATIC for two title insurance policies in the face amounts of his new loans.  Mr. McFerrin also paid FATIC $35 to record a quitclaim deed; $60 to record his first mortgage deed of trust; $50 to record his second mortgage deed of trust; $10 for an electronic technology fee; and $60 for messenger/courier fees.

73.    Under the section labeled "1300 Additional Settlement Charges," Section L, line 1303 of the McFerrin HUD-1 states that a "Reconveyance Tracking Fee" of $226 was paid to "SMS Settlement Services.[12]

---

[11]    24 C.F.R. § 3500, Appendix A specifically requires the following:

Blank lines are provided in Section L for any additional settlement charges.  Blank lines are also provided for additional insertions in Sections J and K.  The names of the recipients of the settlement charges in Section L and the names of the recipients of adjustments described in Section J or K should be included on the blank lines.

*See also* 24 C.F.R. § 3500.8.

[12]    Line 1303 is within Section L of the HUD-1 and thus "The names of the recipients of the settlement charges in Section L … should be included on the blank lines."  *See, supra,* footnote 11.  With respect to line 1303 in particular, the HUD-1 instructions at 24 C.F.R. § 3500 Appendix A state the following:

Lines 1303-1305 are used for any other settlement charges not referable to the categories listed above on the HUD-1, which are required to be stated by these instructions.  Examples may include structural inspections or pre-sale inspection of heating, plumbing, or electrical equipment.  These inspection charges may include a fee for insurance or warranty coverage.

74.     The McFerrin Closing Packet also contained a three-page document on First American Title Insurance Company letterhead dated May 23, 2006, indicating Mr. McFerrin's name and property address on the final page, FATIC's escrow number on the first page, and titled "ESCROW INSTRUCTIONS BORROWER(S)," ("McFerrin Closing Instructions").

75.     The McFerrin Closing Instructions state on the second page:

> If there are underlying encumbrances being paid off which require the obtaining of a Fulfillment Deed, Reconveyance, Release or Satisfaction, you are instructed to pay the demand of the appropriate party and obtain and record such a document….

76.     Nowhere in the McFerrin Closing Packet, or in any other documentation provided to Mr. McFerrin, did Defendants disclose that FATIC and FASMS are affiliated companies, wholly owned by First American.  Nor was Mr. McFerrin ever provided with the charge or range of charges generally made by FASMS.  Defendant also failed to disclose to Mr. McFerrin that he was not required to use FASMS or any particular provider of settlement services.

77.     Nowhere in the McFerrin Closing Packet, or in any other documentation provided to Mr. McFerrin, did Defendants disclose that the true business name of "SMS Settlement Services" is First American SMS.

78.     Rather than charge Mr. McFerrin the $35 per payoff service fee that Defendant FASMS advertises on its website, FATIC instead charged, and Defendant FASMS collected, $113, nearly three times the advertised amount for "Reconveyance Tracking Fee" and paid this amount to its sister company, without making any of the disclosures required by RESPA and in derogation of Defendant FATIC's statutory duties under the California Insurance Code and its fiduciary duty not to engage in unfair and deceptive acts.

79.     In addition, Mr. McFerrin did not receive any share of the interest, earnings credits, or other benefits that FATIC received as a result of the pooling of Mr. McFerrin's funds with the funds of other escrow principals.  Further, while Mr. McFarrin

1    paid interest on his new loans from the moment that the funds were paid into the escrow

2    account, he did not receive any of the interest, earning credits or other benefits that

3    FATIC received as a result of the Float on the loan proceeds.

4            80.     Mr. McFerrin did not receive any disclosure that FATIC would pool Mr.

5    McFerrin's funds and Float, with the funds and Float of other escrow principals, nor that

6    FATIC receives interest, earnings credits, or other benefits based on the amount of those

7    pooled funds.  FATIC disclosed only at the time of closing the transaction that Mr.

8    McFerrin would not receive interest on the deposit, but did not at any time disclose that

9    Defendants would earn interest, earnings credits, or other benefits.

10           81.     As a result of FATIC's illegal, unfair and deceptive nondisclosure of its

11   receipt of interest, earnings credits and other benefits from the banks holding its escrow

12   accounts, Mr. McFerrin and the Retained Interest Class have been monetarily and

13   financially harmed in an amount at least equal to the benefits received by FATIC (and

14   earnings thereon) and the illegally, unfairly and deceptively collected escrow fees paid to

15   FATIC and FASMS and unknowingly tendered by Mr. McFerrin and the Retained

16   Interest Class.

17   **I.      The Jankanish Refi Transaction**

18           82.     On or about February 9, 2007, Plaintiffs Daniel and Heather Jankanish

19   signed closing documents for a refinance of their home located at 3509 42nd Avenue

20   N.E., Tacoma, Washington.  The "settlement agent" was Defendant FATIC, through its

21   division the Talon Group, and the place of settlement was 24401 104th Avenue S.E.,

22   Suite 102, Kent, Washington.  Talon's "File Number" was 5-0701-028.

23           83.     The Jankanish Refi Transaction involved a new loan in the amount of

24   $480,000 and the repayment of two prior mortgage loans, a first mortgage from Chase

25   Bank ("Chase") and a second mortgage from KeyBank.  Each of these loans was a

26   "federally related mortgage loan" as defined in RESPA.

27           84.     At the time of signing the refinancing documents, the Jankanishes were

28   provided with an unsigned copy of the documents presented to them (the "Jankanish Refi

Closing Packet").  Signing was the first and only opportunity that Jankanishes had to review the contents of the Jankanish Refi Closing packet.

85.     Shortly after signing their documents, the Jankanishes received from Talon a final Settlement Statement for the Jankanish Refi Transaction ("Jankanish Refi HUD-1") that contained four pages and was completed by Talon.

86.     The Jankanish Refi HUD-1 indicated a settlement date of February 13, 2007.

87.     The Jankanish Refi HUD-1 sets forth in detail a litany of fees paid in connection with the refinancing and, according to the applicable regulations, should identify the person or company receiving each settlement fee and a description of the fee.[13]

88.     As set forth in the Jankanish Refi HUD-1, the Jankanishes paid a "Settlement or Closing Fee" to Defendant Talon in the amount of $462.40, which was a $425 escrow fee plus $37.40 in applicable sales tax.

89.     The Jankanishes paid a $70.72 "Wire/Express" to Talon.

90.     The Jankanishes paid $710.46 to "Talon Title" (which, on information and belief, is another division of FATIC) for a title insurance policy in the face amount of their new loan.  The Jankanishes also paid Talon $52 to record their new mortgage.

91.     Under the section labeled "1100 Title Charges," Section L, line 1112 of the Jankanish Refi HUD-1 states that a "Reconveyance Fee" of $230 was paid to "Talon Group/Recon Dept".[14]

---

[13]     *See supra*, note 11.

[14]     Line 1112 is within Section L of the HUD-1 and thus "The names of the recipients of the settlement charges in Section L … should be included on the blank lines."  *See, supra,* Note 11.  With respect to line 1112 in particular, the HUD-1 instructions at 24 C.F.R. § 3500 Appendix A state the following:

> Lines 1111-1113 are for the entry of other title charges not already itemized.  Examples in some jurisdictions would include a fee to a private tax service, a fee to a county tax collector for a tax certificate, or a fee to a public title registrar for a certificate of title in a Torrens Act transaction.

92.    The Jankanish Refi HUD-1 indicates that they were charged $257,984.92 to pay off the prior Chase loan and $79,259.67 to pay off the prior KeyBank loan.  In the Chase loan, this payoff amount included a $40 "Statement/Demand fee" and a $32 fee for recording the reconveyance of the loan.  In the KeyBank loan, this payoff amount included a "Reconveyance Fee" of $28.

93.    The Jankanish Refi Closing Packet also contained a four-page document and a two-page document, each on letterhead stating "The Talon Group A Division of First American Title Insurance Company," and each with the escrow file number that appeared on the Jankanish Refi HUD-1.  The four-page document was titled, "Closing Agreement and Escrow Instructions for Refinancing Transaction;" and the two-page document was titled: "Supplement To Closing Agreement and Escrow Instructions For Refinancing Transaction Including Instructions to record Documents and Disburse Funds" (collectively the "Jankanish Refi Escrow Instructions").

94.    The Jankanish Refi Escrow Instructions provide on the first page:

> **Documents.**  The closing agent is instructed to select, prepare, complete, correct, receive, hold, record and deliver documents as necessary to close the transaction. The closing agent may request that certain documents be prepared or obtained by the parties or their attorneys, in which case the parties shall deliver the requested documents to the closing agent before the closing date. Execution of any document will be considered approval of its form and contents by each party signing such document.

> **Deposits and Disbursements of Funds**.  Before the closing date, each party shall deposit with the closing agent all funds required to be paid by such party to close the transaction….All funds received by the closing agent shall be deposited in a trust account with any bank doing business in the State of Washington and may be transferred to any other such accounts.  The closing agent shall not be required to disburse any funds deposited by check or draft until it has been advised by its bank that such check or draft has been honored.  All disbursements shall be made by the closing agent's check.

> ….

> **Verification of Existing Encumbrances.**  The closing agent is instructed to request a written statement from the holder of each existing encumbrance on the property,

verifying its status, terms and balance owing.  The closing
agent is authorized to rely upon such written statements in
the performance of its duties, without liability for their
accuracy or completeness.

95.    The Jankanish Refi Escrow Instructions provide on the second page:

**Closing Agents Fees and Expenses.**  The closing agents
fee is intended as compensation for the services set forth in
these instructions.  If additional services are required to
comply with any change or addition to the parties
agreement or these instructions, or as a result of any
party's assignment of interest or delay in performance, the
parties agree to pay a reasonable additional fee for such
services.  The parties shall also reimburse the closing agent
for any out-of-pocket costs and expenses incurred by it
under these instructions.  The closing agents fees, costs
and expenses shall be due and payable on the closing date
or other termination of the closing agents duties and
responsibilities under these instructions, and shall be paid
by the borrower unless otherwise provided in the parties
agreement.

**Reconveyance**.  The Talon Group – Reconveyance
Department will provide reconveyance tracking services.
Such services follow up after closing to be sure a full
reconveyance or satisfaction of liens paid at closing are
recorded to clear the title.  The charges will be separately
shown on the HUD-1 settlement statement and will be the
amount charged for the particular transaction.  There are
other reconveyance service providers available with
similar services.  You are free to shop around to determine
that you are receiving the best services and the best rate for
these services.  If you wish to do so your preference should
be expressed to The Talon Group in time to arrange for the
services and fees in time for closing.

96.    The Jankanish Refi Escrow Instructions provide on the first page of the

Supplement:

**Settlement Statement Approved.**  The settlement
statement prepared by the closing agent is approved by me,
made part of these instructions by this reference, and I
agree to pay my costs expenses and other obligations
itemized on that statement.  I understand that any estimated
amounts will be adjusted to reflect the exact amounts
required when funds are disbursed, that the settlement
statement continues to be subject to audit at any time, and
if monetary error is found, the amount will be paid by the
party liable for such payment to the party entitled to
receive it.

….

1
2
3
4
5

**Instruction to Close.**  The closing agent is instructed to perform its customary closing duties under these instructions, to deliver and record documents according to these instructions, and to disburse the funds according to the settlement statement, adjusting estimated amounts, when the closing agent has the documents required to close the transaction in its possession and has, or will obtain when the documents have been delivered and recorded: [loan proceeds and a title insurance policy].

6    97.    The Jankanish Refi HUD-1 contained the following agreements on the

7    third page, immediately above the signature blocks:

8
9
10

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.  I further certify that I have received a copy of the HUD-1 Settlement Statement.

11
12

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction.  I have cause or I will cause the funds to be disbursed in accordance with this statement.

13
14

Settlement Agent: _____  Date: _____
Rosie Bechera, The Talon Group

15    98.    The Jankanish Refi Closing Packet did not contain any disclosure of the

16    affiliated relationship between Talon Group and Talon Title nor any range of charges by

17    Talon Title for title insurance nor that the Jankanishes were not required to use Talon

18
19    Title for title insurance.

20    99.    Talon charged and kept $230 in duplicative and unearned sums for

21    nominal settlement services rendered, effectively increasing its escrow fee from $425 to

22    $655, without providing any services beyond which it was already contractually

23    obligated to provide for the agreed $425 escrow fee.

24    100.    Talon's untimely disclosure at closing of its policy of charging and

25    collecting fees for reconveyance "tracking" did not provide the Jankanishes with any

26    opportunity to determine that Talon was charging three times what its own affiliate,

27    Defendant FASMS, charges for these same services.  Talon's attempted disclosure was

28    on its face ineffective as it invited shopping around but cautioned that the Jankanishes

1    indicate their preference "in time to arrange for the services and fees in time for closing."

2    Of course, since the Jankanishes did not and could not know that Talon intended to

3    charge them reconveyance "tracking" fees until they were actually at their closing, it was

4    impossible for them to indicate a contrary preference "in time for closing."[15]

5        101.    Rather than charge the Jankanishes the $35 per payoff tracking fee that

6    Talon's affiliate, Defendant FASMS advertises on its website, Talon instead charged

7    $115 per loan, nearly three times FASMS' advertised amount for "Reconveyance

8    Tracking" and paid this amount to itself, making only a last-minute disclosure of its

9    profiteering, in derogation of federal law, and its statutory duties under the California

10   Insurance Code and its fiduciary duty not to engage in unfair and deceptive acts and self-

11   dealing.

12       102.    As a result of Talon's illegal, unfair and deceptive collection of its tripled

13   reconveyance tracking fees, the Jankanishes and the Captive Reconveyance Class have

14   been monetarily and financially harmed in an amount at least equal to the reconveyance

15   tracking fees illegally, unfairly and deceptively collected by Talon and unknowingly

16   tendered by the Jankanishes and the Captive Reconveyance Class.

17       103.    The Jankanishes did not receive any share of the interest, earnings credits,

18   or other benefits that Talon received as a result of the pooling of the Jankanishes' funds

19   with the funds of other escrow principals.  Further, while the Jankanishes paid interest on

20   their new loan from the moment that the funds were paid into the escrow account, they

21   did not receive any of the interest, earning credits or other benefits that Talon received as

22   a result of the Float on the loan proceeds.

23       104.    The Jankanishes did not receive any disclosure that Talon would pool

24   their funds and Float, nor that Talon receives interest, earnings credits, or other benefits

25   based on the amount of those pooled funds.

26   ---

[15]    Though Defendant FATIC charges reconveyance fees in all escrow transactions
27   with prior loans being paid off, for reasons as yet unknown to Plaintiffs, it only makes
     these late and ineffective disclosures of this practice in transactions through its Talon
28   Group division.

105.    As a result of Talon's illegal, unfair and deceptive nondisclosure of its receipt of interest, earnings credits and other benefits from the banks holding its escrow accounts, the Jankanishes and the Retained Interest Class have been monetarily and financially harmed in an amount at least equal to the benefits received by Talon (and earnings thereon) and the illegally, unfairly and deceptively collected escrow fees paid to Talon and unknowingly tendered by the Jankanishes and the Retained Interest Class.

106.    The Jankanishes did not receive any disclosure that Talon would not have to pay the entire sums it disclosed as Wire/Express fees that Talon charged to and collected from the Jankanishes.  As a result of Talon's illegal, unfair and deceptive statements that it made particular disbursements for wire fees, when in truth and fact its bank waived, offset or significantly discounted any such fees associated with wiring the funds from the Jankanish Refi Transaction, the Jankanishes and the Wire/Express Class have been harmed in an amount at least equal to the wire/express fees illegally and deceptively collected by Talon and FATIC.

**J.    The Jankanish Sale Transaction**

107.    On or about March 13, 2007, Plaintiffs Daniel and Heather Jankanish signed closing documents for the sale of a home located at 4001 48th Avenue N.E., Tacoma, Washington.  The "settlement agent" was Defendant FATIC and the place of settlement was 33600 6th Avenue S, Suite 105, Federal Way, Washington.  FATIC's "File Number" was 4204-977440.

108.    The Jankanish Sale Transaction involved the repayment of a prior mortgage loan from Countrywide Home Loans Servicing LP ("Countrywide").  This loan was a "federally related mortgage loan" as defined in RESPA.

109.    At the time of signing the closing documents, Mr. and Ms. Jankanish were provided with an unsigned copy of the documents presented to them (the "Jankanish Sale Closing Packet").  Signing was the first and only opportunity that Jankanishes had to review the contents of the Jankanish Sale Closing packet.

FIRST AMENDED
CLASS ACTION COMPLAINT CV 08-2460-EMC                    - 33 -

010052-12 241613 V1

110.    The Jankanishes received from FATIC in the Jankanish Sale Closing Packet an Estimated Settlement Statement for the Jankanish Sale Transaction ("Jankanish Sale HUD-1") that contained three pages and was completed by FATIC.

111.    The Jankanish Sale HUD-1 indicated a settlement date of March 14, 2007.

112.    The Jankanish Sale HUD-1 sets forth in detail a litany of fees paid in connection with the sale and, according to the applicable regulations, should identify the person or company receiving each settlement fee and a description of the fee.[16]

113.    As set forth in the Jankanish Sale HUD-1, the Jankanishes paid a "Settlement or Closing Fee" to Defendant FATIC in the amount of $1305.60, which was a $1200 escrow fee plus $105.60 in applicable sales tax.

114.    Under the section labeled "1300 Title Charges," Section L, line 1303 of the Jankanish Sale HUD-1 states that "reconveyance/tracking" of $113 was paid to "Northwest Post Closing Center." [17]

115.    A query of the Washington and California Secretary of State databases reveals no company or organization licensed to do business under the name "Northwest Post Closing Center."

116.    The Jankanish Sale HUD-1 indicates that they were charged $108,118.91 to payoff their prior Countrywide loan.  This payoff amount included a $30 "Reconveyance Fee" and a $32 fee for recording the reconveyance.

---

[16]    *See supra*, note 11.

[17]    Line 1303 is within Section L of the HUD-1 and thus "The names of the recipients of the settlement charges in Section L … should be included on the blank lines." *See, supra*, footnote 11.  With respect to line 1303 in particular, the HUD-1 instructions at 24 C.F.R. § 3500 Appendix A state the following:

> Lines 1303-1305 are used for any other settlement charges not referable to the categories listed above on the HUD-1, which are required to be stated by these instructions.  Examples may include structural inspections or pre-sale inspection of heating, plumbing, or electrical equipment.  These inspection charges may include a fee for insurance or warranty coverage.

117.     The Jankanish Sale Closing Packet also contains a five-page document on First American Title Insurance Company letterhead, dated (on pages 2-5) March 13, 2007, with the escrow file number that appeared on the Jankanish Sale HUD-1.  The document is titled, "Escrow Instructions Improved Property" (the "Jankanish Sale Escrow Instructions").

118.     The Jankanish Sale Escrow Instructions provide on the first page:

> Escrowee has been handed a copy of the Purchase and Sale Agreement or such other documents and any Addendums, as constitute the Agreement to sell and purchase this property.  Acting in accordance therewith, Escrowee is directed to close the transaction, and shall perform said closing in accordance with the following instructions.

119.     The Jankanish Sale Escrow Instructions provide on the second page:

> Buyer herein has deposited $1,000.00, in U.S. funds as Earnest Money with Prudential Northwest Realty; and hands you herewith, and/or through their lender will deliver to Escrowee, funds sufficient to close.  Buyer further hands you, or will cause to be delivered to you, such documents as may be required of them to close this transaction.  You are instructed to disburse or pay out said funds when you have recorded the necessary conveying document and/or such other documents as required by this transaction, and can cause to be issued [the agreed title insurance policy].
>
> …
>
> Sellers authorize deduction and payment of all encumbrances except those to be excepted from coverage in the title insurance policy and to pay all other disbursements and charge as itemized on the estimated closing statement and/or HUD-1 Settlement Statement (the "Closing Statement"), which seller signs contemporaneously herewith.
>
> If there are underlying encumbrances being paid off which require the obtaining of a Fulfillment Deed, Reconveyance, Release or Satisfaction, you are instructed to pay the demand of the appropriate party and obtain and record such a document.  Sellers approve payment of the amount of the demand, including interest and/or penalties and late charges, as shown on the Closing Statement, even if Escrowee has not been able to obtain written verification of the amount claimed as due.

120.    The Jankanish Sale Escrow Instructions provide on the third page:

> All disbursements shall be in U.S. funds and shall be by escrowee's check, or by wire transfer.  Escrow funds will be place in an escrow account which will pay no interest to depositor unless specifically requested.  Parties hereto understand and agree that all funds delivered into escrow are subject to immediate deposit, and that all checks must clear and be credited to escrowee's trust account as good and sufficient U.S. funds before closing can be completed.  Any delay in clearing deposits will delay closing.

121.    The Jankanish Sale HUD-1 contained the following agreement on the bottom of the first page:

> The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction.  I have cause or I will cause the funds to be disbursed in accordance with this statement.

Settlement Agent: _____ Date: _____

122.    Notwithstanding the Jankanish Sale HUD-1, on information and belief, FATIC did not make a disbursement of $113 to "Northwest Post Closing Center for "reconveyance/tracking."  Instead, FATIC kept this duplicative and unearned sum for no or nominal settlement services rendered, effectively increasing its escrow fee from $1200 to $1313, without providing any services beyond those which it was already contractually obligated to provide for the agreed $1200 escrow fee.

123.    Rather than charge the Jankanishes the $35 per payoff tracking fee that FATIC's affiliate, Defendant FASMS advertises on its website, FATIC instead charged $113, nearly three times FASMS' advertised amount for "Reconveyance Tracking" and paid this amount purportedly to Northwest Post Closing Center, but on information and belief, instead paid it to itself, making no disclosure of its profiteering, in derogation of federal law, and its statutory duties under the California Insurance Code and its fiduciary duty not to engage in unfair and deceptive acts.

124.    The Jankanishes did not receive any share of the interest, earnings credits, or other benefits that FATIC received as a result of the pooling of the Jankanishes' funds with the funds of other escrow principals.  Further, while the Jankanishes paid interest on

their new loan from the moment that the funds were paid into the escrow account, they did not receive any of the interest, earning credits or other benefits that FATIC received as a result of the Float on the loan proceeds.

125.    The Jankanishes did not receive any disclosure that FATIC would pool their funds and Float, nor that FATIC receives interest, earnings credits, or other benefits based on the amount of those pooled funds.

126.    As a result of FATIC's illegal, unfair and deceptive nondisclosure of its receipt of interest, earnings credits and other benefits from the banks holding its escrow accounts, the Jankanishes and the Retained Interest Class have been monetarily and financially harmed in an amount at least equal to the benefits received by FATIC (and earnings thereon) and the illegally, unfairly and deceptively collected escrow fees paid to FATIC and unknowingly tendered by the Jankanishes and the Retained Interest Class.

**K.    The Perisich Transaction**

127.    On or about January 30, 2006, Plaintiff Paige Perisich signed closing documents for the sale of her home located at 15150 140th Way SE #T-202, Renton, Washington.  The "settlement agent" was Defendant FATIC, through its division the Talon Group, and the place of settlement was 24401 104th Avenue S.E., Suite 102, Kent, Washington.  Talon's "File Number" was 5-0601-036.

128.    The Perisich Transaction involved a sale in the amount of $153,995 and the repayment of two prior mortgage loans, a first mortgage from Sound Community Bank ("Sound") and a second mortgage also from Sound.  Each of these loans was a "federally related mortgage loan" as defined in RESPA.

129.    At the time of signing the sale documents, Ms. Perisich was provided with an unsigned copy of the documents presented to her (the "Perisich Closing Packet").  Signing was the first and only opportunity that Ms. Perisich had to review the contents of the Perisich Closing packet.

130.    Ms. Perisich received from Talon a Settlement Statement for the Perisich Transaction ("Perisich HUD-1") that contained three pages and was completed by Talon.

131.   The Perisich HUD-1 indicated a settlement date of January 31, 2006.

132.   The Perisich HUD-1 sets forth in detail a litany of fees paid in connection with the sale and, according to the applicable regulations, should identify the person or company receiving each settlement fee and a description of the fee.[18]

133.   As set forth in the Perisich HUD-1, Ms. Perisich paid a "Settlement or Closing Fee" to Defendant Talon in the amount of $516.80, which was half of the $950 escrow fee plus $83.60 in applicable sales tax.[19]

134.   Ms. Perisich paid a $45 "Wire/Express" fee to Talon.

135.   Ms. Perisich paid $521.15 to "Talon Title" (which, on information and belief, is another division of FATIC) for a title insurance policy in the sale amount.

136.   Under the section labeled "1100 Title Charges," Section L, line 1113 of the Perisich HUD-1 states that a "Reconveyance Fee" of $230 was paid to "Talon Group/Recon Dept".[20]

137.   The Perisich HUD-1 indicates that Ms. Perisich was charged $103,353.57 to pay off the prior Sound first mortgage and $39,377.82 to pay off the prior Sound second mortgage.  Each prior loan payoff included a $10 "Demand fee" and a $65 "Reconveyance Fee" paid to Sound.

138.   The Perisich Closing Packet also contained a four-page document and a two-page document, each on letterhead stating "The Talon Group A Division of First American Title Insurance Company," and each with the escrow file number that appeared on the Perisich HUD-1.  The four-page document was titled, "Closing Agreement and Escrow Instructions for Purchase and Sale Transaction;" and the two-page document was titled: "Supplement To Closing Agreement and Escrow Instructions

---

[18] *See supra*, note 11.

[19] As is common in sales transactions, the total escrow fee of $1033.60 was divided equally between the seller (Ms. Perisich) and the home buyer.

[20] *See supra,* Note 14.

1    For Purchase and Sale Transaction Including Instructions to record Documents and

2    Disburse Funds" (collectively the "Perisich Escrow Instructions").

3        139.    The Perisich Escrow Instructions provide on the first page:

4            **Documents.**  The closing agent is instructed to select,
             prepare, complete, correct, receive, hold, record and
5            deliver documents as necessary to close the transaction.
             The closing agent may request that certain documents be
6            prepared or obtained by the parties or their attorneys, in
             which case the parties shall deliver the requested
7            documents to the closing agent before the closing date.
             Each party signing such document will consider execution
8            of any document approval of its form and contents.

9            **Deposits and Disbursements of Funds**.  Before the
             closing date, each party shall deposit with the closing agent
10           all funds required to be paid by such party to close the
             transaction….All funds received by the closing agent shall
11           be deposited in a trust account, which will pay no interest
             to depositor unless specifically requested, with any bank
12           doing business in the State of Washington and may be
             transferred to any other such accounts.  The closing agent
13           shall not be required to disburse any funds deposited by
             check or draft until it has been advised by its bank that
14           such check or draft has been honored.  All disbursements
             shall be made by the closing agent's check or bank wire
15           transfer.

16               ….

17           **Verification of Existing Encumbrances.**  The closing
             agent is instructed to request written statement from the
18           holder of each existing encumbrance on the property,
             verifying its status, terms and balance owing….  The
19           closing agent is authorized to rely upon such written
             statements in the performance of its duties, without
20           liability or responsibility for their accuracy or
             completeness.

21
         140.    The Perisich Escrow Instructions provide on the second page:
22
             **Closing Agents Fees and Expenses.**  The closing agent's
23           fee is intended as compensation for the services set forth in
             these instructions.  If additional services are required to
24           comply with any change or addition to the parties'
             agreement or these instructions, or as a result of any
25           party's assignment of interest or delay in performance, the
             parties agree to pay a reasonable additional fee for such
26           services.  The parties shall also reimburse the closing agent
             for any out-of-pocket costs and expenses incurred by it
27           under these instructions.  The closing agent's fees, costs
             and expenses shall be due and payable on the closing date
28           or other termination of the closing agent's duties and

1    responsibilities under these instructions, and shall be paid
     one-half by the buyer and one-half by the seller unless
2    otherwise provided in the parties agreement.

3    **Reconveyance**.  The Talon Group – Reconveyance
     Department will provide reconveyance tracking services.
4    Such services follow up after closing to be sure a full
     reconveyance or satisfaction of liens paid at closing are
5    recorded to clear the title.  The charges will be separately
     shown on the HUD-1 settlement statement and will be the
6    amount charged for the particular transaction.  There are
     other reconveyance service providers available with
7    similar services.  You are free to shop around to determine
     that you are receiving the best services and the best rate for
8    these services.  If you wish to do so your preference should
     be expressed to The Talon Group in time to arrange for the
9    services and fees in time for closing.

10   141.   The Perisich Escrow Instructions provide on the Supplement:

11   **Settlement Statement Approved.**  The settlement
     statement prepared by the closing agent is approved by me,
12   made part of these instructions by this reference, and I
     agree to pay my costs expenses and other obligations
13   itemized on that statement.  I understand that any estimated
     amounts will be adjusted to reflect the exact amounts
14   required when funds are disbursed, that the settlement
     statement continues to be subject to audit at any time, and
15   if any monetary error is found, the amount will be paid by
     the party liable for such payment to the party entitled to
16   receive it.

17   ….

18   **Instruction to Close.**  The closing agent is instructed to
     perform its customary closing duties under these
19   instructions, to deliver and record documents according to
     these instructions, and to disburse the funds according to
20   the settlement statement, adjusting estimated amounts,
     when the closing agent has the documents required to close
21   the transaction in its possession and has, or will obtain
     when the documents have been delivered and recorded:...
22
     142.   The Perisich HUD-1 contained the following agreements on the third
23
     page, immediately above the signature blocks:
24
     I have carefully reviewed the HUD-1 Settlement Statement
25   and to the best of my knowledge and belief, it is a true and
     accurate statement of all receipts and disbursements made
26   on my account or by me in this transaction.  I further certify
     that I have received a copy of the HUD-1 Settlement
27   Statement.

28

FIRST AMENDED                          - 40 -
CLASS ACTION COMPLAINT CV 08-2460-EMC

010052-12 241613 V1

> The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have cause or I will cause the funds to be disbursed in accordance with this statement.

Settlement Agent: _____ Date: _____

Renee Calonge, The Talon Group

143.    The Perisich Closing Packet did not contain any disclosure of the affiliated relationship between Talon Group and Talon Title nor any range of charges by Talon Title for title insurance nor that Ms. Perisich was not required to use Talon Title for title insurance.

144.    Talon charged and kept $230 in duplicative and unearned sums for nominal settlement services rendered, effectively increasing its escrow fee paid by Ms. Perisich from $475 to $705, without providing any services beyond which it was already contractually obligated to provide for the agreed $475 escrow fee.

145.    Upon learning from receipt of the HUD-1 that Talon intended to charge her $230 for "tracking," Ms. Perisich contacted her closing agent, then the closing agent's manager at Talon. The manager told Ms. Perisich that the "tracking" fee was required because Talon was required to perform the reconveyances in the Perisich Transaction. In truth and fact, Trustee Services, Inc. performed the reconveyances on behalf of Sound Bank, Ms. Perisich's prior lender.

146.    Talon refused to eliminate or reduce its "tracking" fee under any circumstance. Talon's untimely disclosure at closing of its policy of charging and collecting fees for reconveyance "tracking" did not provide Ms. Perisich with any opportunity to determine that Talon was charging three times what its own affiliate, Defendant FASMS, charges for these same services. Talon's attempted disclosure was on its face ineffective as it invited shopping around but cautioned that Ms. Perisich indicate her preference "in time to arrange for the services and fees in time for closing." Of course, since Ms. Perisich did not and could not know that Talon intended to charge

her reconveyance "tracking" fees until she was actually at her closing, it was impossible for her to indicate a contrary preference "in time for closing."[21]  Furthermore, such disclosure was illusory as when Ms. Perisich actually challenged the charging of the reconveyance "tracking" fee, she was told that the fee was not negotiable under any circumstance.

147.    Rather than charge Ms. Perisich the $35 per payoff tracking fee that Talon's affiliate Defendant FASMS advertises on its website, Talon instead charged $115 per loan, nearly three times FASMS' advertised amount for "Reconveyance Tracking" and paid this amount to itself, making only a last-minute disclosure of its profiteering, in derogation of federal law, and its statutory duties under the California Insurance Code and its fiduciary duty not to engage in unfair and deceptive acts and self-dealing.

148.    As a result of Talon's illegal, unfair and deceptive collection of its tripled reconveyance tracking fees, Ms. Perisich and the Captive Reconveyance Class have been monetarily and financially harmed in an amount at least equal to the reconveyance tracking fees illegally, unfairly and deceptively collected by Talon and unknowingly tendered by Ms. Perisich and the Captive Reconveyance Class.

149.    Ms. Perisich did not receive any share of the interest, earnings credits, or other benefits that Talon received as a result of the pooling of Ms. Perisich's funds with the funds of other escrow principals.

150.    Ms. Perisich did not receive any disclosure that Talon would pool her funds, nor that Talon receives interest, earnings credits, or other benefits based on the amount of those pooled funds.

151.    As a result of Talon's illegal, unfair and deceptive nondisclosure of its receipt of interest, earnings credits and other benefits from the banks holding its escrow accounts, Ms. Perisich and the Retained Interest Class have been monetarily and

---

[21] *See supra*, Note 15.

1    financially harmed in an amount at least equal to the benefits received by Talon (and

2    earnings thereon) and the illegally, unfairly and deceptively collected escrow fees paid to

3    Talon and unknowingly tendered by Ms. Perisich and the Retained Interest Class.

4    152.    Ms. Perisich did not receive any disclosure that Talon would not have to

5    pay the entire sums it disclosed as Wire/Express fees that Talon charged to and collected

6    from Ms. Perisich.  As a result of Talon's illegal, unfair and deceptive statements that it

7    made particular disbursements for wire fees, when in truth and fact its bank waived,

8    offset or significantly discounted any such fees associated with wiring the funds from the

9    Perisich Transaction, Ms. Perisich and the Wire/Express Class have been harmed in an

10   amount at least equal to the Wire/Express fees illegally and deceptively collected by

11   Talon and FATIC.

### V.    EQUITABLE TOLLING, DISCOVERY RULE
### RE:  STATUTES OF LIMITATIONS

13   153.    Any applicable statutes of limitations have been tolled by Defendants'

14   illegal, unfair and deceptive practices.  Defendants have concealed from Plaintiffs and

15   the Classes the truth about their illegal, unfair and deceptive practices described herein,

16   thereby tolling the running of the applicable statutes of limitations.

17   154.    Plaintiffs and the Classes could not have reasonably discovered

18   Defendants' illegal, unfair and deceptive practices as alleged herein until recently.

19   155.    Defendants are estopped from relying on any statute of limitations

20   defense because of their illegal, unfair and deceptive practices as alleged herein.

21   156.    Until shortly before filing this Complaint, Plaintiffs had no knowledge

22   that Defendants had engaged in the illegal, unfair or deceptive practices described in this

23   Complaint.

### VI.    CLASS ACTION ALLEGATIONS

25   157.    Plaintiffs bring this action on behalf of themselves and on behalf of the

26   following proposed Classes:

**Class 1:  The Affiliate Reconveyance Class**

All persons excluding governmental entities, Defendants, subsidiaries and affiliates of Defendants, who purchased directly, from Defendant FATIC and/or its affiliates and subsidiaries, escrow services for residential property in the United States involving a federally related mortgage loan, during the five-year period preceding the filing of this complaint and who were (1) charged one or more reconveyance fee(s) by Defendant FATIC; (2) such fee was paid to an affiliated company of Defendant FATIC; and (3) Defendants did not disclose the affiliation.

**Class 2:  The Captive Reconveyance Class**

All persons excluding governmental entities, Defendants, subsidiaries and affiliates of Defendants, who purchased directly, from Defendant FATIC and/or its affiliates and subsidiaries, escrow services for residential property in the United States involving a federally related mortgage loan, during the five-year period preceding the filing of this complaint and who were (1) charged one or more reconveyance fee(s) by Defendant FATIC; (2) where Defendant FATIC did not actually perform the service of preparing, processing and/or recording the reconveyance associated with the reconvened loan in the underlying real estate transaction.

**Class 3:  The Retained Interest Class**

All persons or entities excluding governmental entities, Defendants, subsidiaries and affiliates of Defendants, who, in the course of the purchase, sale, or refinance of real property in the United States involving a federally related mortgage loan, during the five-year period preceding the filing of this complaint, deposited funds or paid interest to their lenders on funds deposited in escrow accounts controlled by Defendant FATIC and/or its affiliates and subsidiaries and were not paid interest on the deposits or given the value of the benefits in lieu of interest and any earnings thereon.

**Class 4:  The Wire/Express Class**

All persons excluding governmental entities, Defendants, subsidiaries and affiliates of Defendants, who purchased directly, from Defendant FATIC and/or its affiliates and subsidiaries, escrow services for residential property in the United States involving a federally related mortgage loan, during the five-year period preceding the filing of this complaint and who were (1) charged one or more wire/express fee(s) by Defendant FATIC; (2) where Defendant FATIC did not actually incur wire fees in the amounts that they charged in the underlying real estate transaction.

1    158.    It is estimated that members of the Classes include hundreds of thousands,

2    if not millions, of consumers.  They are so numerous that their joinder would be

3    impracticable.

4    159.    Except as to the amount of damages each member of the Classes has by

5    him/herself sustained, all other questions of fact and law are common to the Classes,

6    including but not limited to the unfair and deceptive acts and practices of Defendants.

7    160.    Plaintiffs, along with all other members of the Classes, were injured as a

8    result of the activities of Defendants alleged herein, including the Affiliate

9    Reconveyance Scheme, the Captive Reconveyance Scheme, the Retained Interest

10   Scheme, and the Wire/Express Fee Scheme.

11   161.    Plaintiff McFerrin, as representative of the Affiliate Reconveyance Class,

12   will fairly and adequately protect the interests of the members of the Affiliate

13   Reconveyance Class.  The interests of Plaintiff McFerrin are coincident with, and not

14   antagonistic to, the interests of the members of the Affiliate Reconveyance Class.

15   162.    Plaintiffs Daniel and Heather Jankanish and Paige Perisich, as

16   representatives of the Captive Reconveyance Class, will fairly and adequately protect the

17   interests of the members of the Captive Reconveyance Class.  The interests of the

18   Jankanishes and Ms. Perisich are coincident with, and not antagonistic to, the interests of

19   the members of the Captive Reconveyance Class.

20   163.    Plaintiffs McFerrin, the Jankanishes, and Ms. Perisich, as representatives

21   of the Retained Interest Class, will fairly and adequately protect the interests of the

22   members of the Retained Interest Class.  The interests of Plaintiffs are coincident with,

23   and not antagonistic to, the interests of the members of the Retained Interest Class.

24   164.    Plaintiffs the Jankanishes and Ms. Perisich, as representatives of the

25   Wire/Express Class, will fairly and adequately protect the interests of the members of the

26   Wire/Express Class.  The interests of the Jankanishes and Ms. Perisich are coincident

27   with, and not antagonistic to, the interests of the members of the Wire/Express Class.

28

FIRST AMENDED                                    - 45 -
CLASS ACTION COMPLAINT CV 08-2460-EMC
010052-12 241613 V1

165.    Plaintiffs do not have any conflict of interest with other members of the Classes that they represent.  Plaintiffs' claims are typical of the claims of the Classes they represent and they will fairly and adequately reflect the interests of the respective Classes.  Counsel is competent and experienced in state and federal class action litigation and has been retained to represent the Classes.

166.    Plaintiffs also bring this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, for the illegal, unfair and deceptive acts of Defendants.

167.    Defendants have acted, continued to act, refused to act and continued to refuse to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

168.    Common questions of law and fact exist with respect to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law or fact common to the Classes are the following:

- Whether Defendants have engaged in the alleged illegal, unfair and deceptive acts of charging unearned and unreasonable reconveyance tracking fees and paying such fees to an undisclosed affiliated settlement services provider, as set forth herein;

- Whether Defendants have engaged in the alleged illegal, unfair and deceptive acts of charging duplicative, split, unearned and unreasonable reconveyance processing fees, as set forth herein;

- The duration and scope of Defendants' alleged illegal, unfair and deceptive acts;

- Whether Defendants' acts have caused damages to Plaintiffs and other purchasers of escrow services from Defendants;

- Whether Defendant FATIC received interest or other benefits or credits that served as the functional equivalent of interest on the average daily balance of escrow funds under its control;

- Whether Defendant FATIC's practice of retaining interest, earnings credits, or other benefits without disclosing its practice to principals is unfair and deceptive;

- Whether Defendant FATIC charged for wire/express fees that it did not actually incur;

- Whether Defendants' acts were in violation of RESPA;

- Whether Defendant FATIC owed fiduciary and agency duties to its customers;

- Whether Defendant FATIC breached its fiduciary and agency duties to the Plaintiffs and the members of the Classes;

- Whether Defendants have been unjustly enriched;

- Whether Defendants misrepresented or concealed from Plaintiffs any of its violations of law or duties as an agent or fiduciary, thereby delaying the accrual of any cause of action and tolling any otherwise applicable statutes of limitations.

169.    This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the Classes are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from Defendants' illegal, unfair and deceptive conduct.

170.    There will be no extraordinary difficulty in the management of the class action.

## VII.    CLAIMS FOR RELIEF

### COUNT I

**ON BEHALF OF THE RECONVEYANCE CLASSES[22] AND THE WIRE/EXPRESS CLASS**

**BREACH OF CONTRACT (ESCROW INSTRUCTIONS)**

171.    Plaintiffs reallege and incorporate by reference the preceding allegations as if fully set forth above.

172.    Defendant FATIC formed agreements and entered into contracts with Plaintiffs and the members of all the Classes including offer, acceptance and consideration ("Escrow Contracts"). The terms of the Escrow Contracts are

---

[22]    The "Reconveyance Classes" include the Affiliate Reconveyance Class and the Captive Reconveyance Class.

1    memorialized in the Escrow Instructions provided to Plaintiffs and the members of the

2    Classes.

3        173.    Plaintiffs and the members of the Classes paid an agreed escrow fee as

4    compensation for the services set forth in the escrow instructions including ensuring that

5    the appropriate reconveyance documents are prepared and recorded and the HUD-1

6    Settlement Statement accurately reflected the disbursements made in the transaction.

7        174.    The services set forth in the Escrow Contracts for Plaintiffs and members

8    of the Reconveyance Classes included the obligation of FATIC to ensure that prior loans

9    were properly reconveyed and recorded.  For example, Plaintiff McFerrin's Escrow

10    Contract stated:  "If there are underlying encumbrances being paid off which require the

11    obtaining of a Fulfillment Deed, Reconveyance, Release or Satisfaction, you are

12    instructed to pay the demand of the appropriate party and obtain and record such a

13    document…."  Similarly, the Jankanish Refi Transaction Escrow Contract included:

14    "The closing agent is instructed to select, prepare, complete, correct, receive, hold,

15    record and deliver documents as necessary to close the transaction."

16        175.    Defendant FATIC was also obligated under the Escrow Contracts to

17    disclose to Plaintiffs and the Reconveyance Classes the actual fee that it was charging for

18    the settlement services that it was providing.

19        176.    Plaintiffs and the members of the Classes fulfilled their contractual

20    obligations to Defendant FATIC by paying the escrow fees stated and charged by

21    Defendant FATIC.

22        177.    Defendant FATIC breached the Escrow Contracts by charging

23    reconveyance fees in addition to the escrow fees charged for no additional settlement

24    services other than those Defendant FATIC was already obligated to perform.

25        178.    Defendant FATIC also breached the Escrow Contracts by failing to

26    disclose to Plaintiff McFerrin and the Affiliate Reconveyance Class that they were not

27    required to use Defendant FASMS for reconveyance-related settlement services and that

28    reconveyance processing was actually being performed by the prior lenders at no charge

1    or for fees separately paid by Plaintiff and the Affiliate Reconveyance Class in their loan

2    payoffs.

3        179.    Defendant FATIC also breached the Escrow Contracts by failing to timely

4    disclose to the Jankanishes, Ms. Perisich and the Captive Reconveyance Class that they

5    were not required to use FATIC for reconveyance related settlement services and that

6    reconveyance processing was actually being performed by the prior lenders at no charge

7    or for fees separately paid by the Jankanishes, Ms. Perisich and the Captive

8    Reconveyance Class in their loan payoffs.

9        180.    Defendant FATIC also breached the Escrow Contracts by failing to

10   disclose to the Jankanishes and the Captive Reconveyance Class that "Northwest Post

11   Closing Center" was a fictitious entity and the reconveyance fees purportedly paid to

12   Northwest Post Closing Center were actually paid to Defendant FATIC.

13       181.    Defendant FATIC also breached the Escrow Contracts by failing to

14   disclose to the Jankanishes, Ms. Perisich and the Wire/Express Class that it was not

15   incurring wire fee expenses in the amounts that it was stating on the HUD-1 Settlement

16   Statements that it provided to members of the Wire/Express Class.

17       182.    As a direct and proximate result of Defendant FATIC's breaches of the

18   Escrow Contracts, Plaintiffs and the Reconveyance Classes and Wire/Express Class have

19   suffered damages in an amount to be proven at trial.

20                            **<u>COUNT II</u>**

21               **ON BEHALF OF THE RECONVEYANCE CLASSES
                   AND THE WIRE/EXPRESS CLASS**

22

23                     **BREACH OF CONTRACT
                            (HUD-1)**

24       183.    Plaintiffs reallege and incorporate by reference the preceding allegations

25   as if fully set forth above.

26       184.    By its terms, the HUD-1 Settlement Statements in each Plaintiffs and

27   Class members transaction created a binding written agreement between the Class

28   members and Defendant FATIC (the "HUD-1 Contract").

185.    For example, in the McFerrin Transaction, Plaintiff McFerrin agreed:  "I have carefully reviewed the HUD-1 settlement statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and distributions made on my account or by me in this transaction.  I further certify that I have received a copy of the HUD-1 settlement statement."

186.    Defendant FATIC agreed in return:  "The HUD-1 settlement statement which I have prepared is a true and accurate account of this transaction.  I have caused or will cause the funds to be disbursed in accordance with this statement."  The Jankanish Refi HUD-1 and the Jankanish Sale HUD-1 contained similar promissory language.

187.    Defendant FATIC breached the HUD-1 Contracts by failing to make a true and accurate account of the funds disbursed by failing to disclose to Plaintiff McFerrin and the Affiliate Reconveyance Class that they were not required to use Defendant FASMS for reconveyance services and that reconveyance processing was actually being performed by the prior lenders at no cost or for fees separately paid by Plaintiff McFerrin and the Affiliate Reconveyance Class in their loan payoffs.

188.    Defendant FATIC also breached the HUD-1 Contracts by failing to make a true and accurate account of the funds disbursed by failing to disclose or to timely disclose to the Jankanishes, Ms. Perisich and the Captive Reconveyance Class that they were not required to use FATIC for reconveyance services and that reconveyance processing was actually being performed by the prior lenders at no cost or for fees separately paid by the Jankanishes, Ms. Perisich and the Captive Reconveyance Class in their loan payoffs.

189.    Defendant FATIC also breached the HUD-1 Contracts by falsely stating on the HUD-1 Settlement Statements provided to the Jankanishes and the Captive Reconveyance Class that funds were being disbursed to Northwest Post Closing Center, when in truth and fact, such funds were being kept and retained by Defendant FATIC.

190.    Defendant FATIC also breached the HUD-1 Contracts by falsely stating on the HUD-1 Settlement Statements provided to the Jankanishes, Ms. Perisich and the

Wire/Express Class that funds were being disbursed in amounts paid for wire fees, when in truth and fact, such fees were waived or substantially discounted by FATIC's banks and the fees or a significant portion of the fees were being kept and retained by Defendant FATIC.

191.    As a direct and proximate result of Defendant FATIC's breaches of the HUD-1 Contracts, Plaintiffs and the Reconveyance Classes and Wire/Express Class have suffered damages in an amount to be proven at trial.

## COUNT III

### ON BEHALF OF THE RECONVEYANCE CLASSES

### VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT
### 12 U.S.C. § 2607

192.    Plaintiffs reallege and incorporate by reference the preceding allegations.

193.    Plaintiffs and the Reconveyance Classes contracted with Defendant FATIC for the provision of settlement services in connection with a transaction involving a federally related mortgage loan.

194.    Defendant FATIC and Defendant FASMS are affiliated companies under the common ownership of First American.  By referring reconveyance business to FASMS (1) without disclosing the affiliated relationship; (2) without providing a written estimate of the charge or range of charges generally made by FASMS; and (3) without disclosing that consumers are not required to use any particular provider of reconveyance services, Defendants have engaged and continue to engage in the practice of making illegal business referrals for the rendering of a real estate settlement service in violation of 12 U.S.C. § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2.

195.    By requiring Plaintiff McFerrin and members of the Affiliate Reconveyance Class to use FASMS for reconveyance tracking services, Defendants have engaged and continue to engage in the practice of requiring the use of a real estate settlement service provider in violation of 12 U.S.C. § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2.

196.    By charging reconveyance tracking fees that are paid to an affiliated company that are nearly three times higher than such affiliated company's generally available rate for the same services, Defendants have engaged and continue to engage in the practice of making a payment that bears no reasonable relationship to the market value of the services provided and is not for services actually performed or provided in violation of 12 U.S.C. § 2607(a)-(c) and Regulation X, 24 C.F.R. § 3500.14.

197.    By receiving a payment for "multiple services," as that term is used in Regulation X, which are not actual, necessary and distinct from the primary services provided, Defendants have violated 12 U.S.C. § 2607, and Regulation X, 24 C.F.R. § 3500.14.

198.    By charging reconveyance fees in transactions in which they have not performed reconveyance processing, Defendant FATIC has engaged and continues to engage in the practice of receiving a portion, split and percentage of a fee for the rendering of a real estate settlement service other than for services actually performed in violation of 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14.

199.    By charging reconveyance fees in real-estate transactions in which Plaintiffs the Jankanishes and Ms. Perisich and the Captive Reconveyance Class have separately been charged for reconveyance processing by their prior lenders, Defendant FATIC has engaged and continues to engage in the practice of receiving a duplicate reconveyance fee for the rendering of a real estate settlement service in violation of 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14.

200.    By failing to disclose that "Northwest Post Closing Center" is a fictitious entity and the same company as Defendant FATIC; failing to provide a written estimate of the charges to be paid; failing to disclose that consumers are not required to use "Northwest Post Closing Center;" and by receiving funds for reconveyance settlement services in addition to a return on ownership of "Northwest Post Closing Center," Defendant FATIC has violated 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14.

201.    Under 12 U.S.C. § 2607(d)(2), Plaintiffs and the Reconveyance Classes are entitled to statutory damages for Defendants' violations of 12 U.S.C. § 2607 in an amount equal to three times the amount of the reconveyance fees and "tracking" fees charged and involved in Defendants' violations.

202.    Under 12 U.S.C. § 2607(d)(5), Plaintiffs and the Reconveyance Classes are entitled to the court costs of the action together with reasonable attorney's fees.

<u>COUNT IV</u>

**ON BEHALF OF THE RECONVEYANCE CLASSES
THE WIRE/EXPRESS CLASS AND THE
RETAINED INTEREST CLASS**

**VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT
12 U.S.C. § 2607**

203.    Plaintiffs reallege and incorporate by reference the preceding allegations.

204.    Plaintiffs and the Classes contracted with Defendant FATIC for the provision of settlement services in connection with a transaction involving a federally related mortgage loan.

205.    Defendant FATIC and "Talon Title" are affiliated companies under the common ownership of First American.  By referring title insurance business to "Talon Title" (1) without disclosing the affiliated relationship; (2) without providing a written estimate of the charge or range of charges generally made by Talon Title; and (3) without disclosing that consumers are not required to use any particular provider of title insurance services, Defendant FATIC has engaged and continues to engage in the practice of making illegal business referrals for the rendering of a real estate settlement service in violation of 12 U.S.C. § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2.

206.    By requiring Plaintiff McFerrin and members of the Classes to use an afililiated company for title insurance services, Defendant FATIC has engaged and continues to engage in the practice of requiring the use of a real estate settlement service

provider in violation of 12 U.S.C. § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2.

207.    Under 12 U.S.C. § 2607(d)(2), Plaintiffs and the Classes are entitled to statutory damages for Defendants' violations of 12 U.S.C. § 2607 in an amount equal to three times the amount of the title insurance fees charged and involved in Defendant FATIC's violations.

208.    Under 12 U.S.C. § 2607(d)(5), Plaintiffs and the Classes are entitled to the court costs of the action together with reasonable attorneys' fees.

## COUNT V

### ON BEHALF OF THE WIRE/EXPRESS CLASS

### VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT
### 12 U.S.C. § 2607

209.    Plaintiffs reallege and incorporate by reference the preceding allegations.

210.    Plaintiffs the Jankanishes and Ms. Perisich and the Wire/Express Class contracted with Defendant FATIC for the provision of settlement services in connection with a transaction involving a federally related mortgage loan.

211.    By charging wire fees that are not in fact incurred by Defendant FATIC, and that are discounted and offset completely as a result of the Retained Interest Scheme, FATIC has engaged and continues to engage in the practice of collecting a fee that bears no reasonable relationship to the market value of the services provided and is not for services actually performed or provided in violation of 12 U.S.C. § 2607(a)-(c) and Regulation X, 24 C.F.R. § 3500.14.

212.    By receiving a payment for "multiple services," as that term is used in Regulation X, which are not actual, necessary and distinct from the primary services provided, Defendant FATIC has violated 12 U.S.C. § 2607, and Regulation X, 24 C.F.R. § 3500.14.

213.    By charging wire fees in transactions in which they have not had to pay the fees that are charged to the Wire/Express Class, Defendant FATIC has engaged and

1    continues to engage in the practice of receiving a portion, split and percentage of a fee

2    for the rendering of a real estate settlement service other than for services actually

3    performed in violation of 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14.

4          214.    Under 12 U.S.C. § 2607(d)(2), the Jankanishes, Ms. Perisich and the

5    Wire/Express Class are entitled to statutory damages for Defendant FATIC's violations

6    of 12 U.S.C. § 2607 in an amount equal to three times the amount of the Wire/Express

7    fees charged and involved in Defendant FATIC's violations.

8          215.    Under 12 U.S.C. § 2607(d)(5), the Jankanishes, Ms. Perisich and the

9    Wire/Express Class are entitled to the court costs of the action together with reasonable

10   attorney's fees.

11                                   **COUNT VI**

12                  **ON BEHALF OF THE RETAINED INTEREST CLASS**

13           **VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT**
                                 **12 U.S.C. § 2607(a)**

14

15         216.    Plaintiffs reallege and incorporate by reference the preceding allegations.

16         217.    Plaintiffs and the Retained Interest Class contracted with Defendant

17   FATIC for the provision of settlement services in connection with a transaction

18   involving a federally related mortgage loan.

19         218.    The deposit and maintenance of pooled escrow funds from members of

20   the Retained Interest Class and their lenders in Defendant FATIC's accounts at banking

21   institutions is business incident to or part of real estate settlement services involving

22   federally related mortgage loans.

23         219.    By receiving interest, earning credits and other benefits from banks in

24   exchange for holding its escrow accounts at such banks, Defendant FATIC has accepted

25   a fee, kickback and thing of value pursuant to an agreement and understanding to refer

26   business incident to or part of real estate settlement services involving federally related

27   mortgage loans, in violation of 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14.

28

FIRST AMENDED
CLASS ACTION COMPLAINT CV 08-2460-EMC
010052-12 241613 V1

220.    Under 12 U.S.C. § 2607(d)(2), Plaintiffs and the Retained Interest Class are entitled to statutory damages for Defendant FATIC's violations of 12 U.S.C. § 2607 in an amount equal to three times the amount of the escrow fees charged and involved in Defendant FATIC's violations.

221.    Under 12 U.S.C. § 2607(d)(5), Plaintiffs and the Retained Interest Class are entitled to the court costs of the action together with reasonable attorney's fees.

## COUNT VII

### ON BEHALF OF THE RECONVEYANCE CLASSES, THE WIRE/EXPRESS CLASS AND THE RETAINED INTEREST CLASS

### UNJUST ENRICHMENT

222.    Plaintiffs reallege and incorporate by reference the preceding allegations.

223.    As a result of the Affiliate Reconveyance Scheme and the Captive Reconveyance Scheme, Defendants have received a benefit from Plaintiffs and the Classes in the form of the reconveyance fees Plaintiffs and the Reconveyance Classes paid to Defendants, which fees were unearned, duplicative, unreasonable and made in additional to the escrow fee charged by Defendant FATIC for no additional or nominal settlement services and made in violation of federal and state law.

224.    As a result of the Wire/Express Scheme, Defendant FATIC has received a benefit from the Jankanishes, Ms. Perisich and the Wire/Express Class in the form of the wire fees that were charged to Wire/Express Class members, but for which FATIC had no costs or costs significantly less than the amounts that were charged, which fees were unearned, unreasonable and made in violation of federal and state law.

225.    As a result of the Retained Interest Scheme, Defendant FATIC misappropriated and converted interest, or its functional equivalent, earned on the escrow funds of Plaintiffs and members of the Retained Interest Class.  It is inequitable for Defendant FATIC to retain any benefit of interest or its equivalent, even if Defendant FATIC claims title in such property, where Defendant FATIC violated its duty as agent and fiduciary to provide such to Plaintiffs and the members of the Retained Interest

1   Class, and/or violated its duty to disclose the taking on terms that were timely, fair and in

2   good faith.

3       226.    Defendants are aware of their receipt of the above-described benefits.

4       227.    Defendants received the above-described benefits to the detriment of

5   Plaintiffs and each of the other members of the respective Classes.

6       228.    Defendants continue to retain the above-described benefits to the

7   detriment of Plaintiffs and the respective Classes.

8       229.    As a result of Defendants' unjust enrichment, Plaintiffs and the respective

9   Classes have sustained damages in an amount to be determined at trial and seek full

10  disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains

11  acquired as a result of the unlawful or wrongful conduct alleged above.

12                          **COUNT VIII**

13              **ON BEHALF OF THE RECONVEYANCE CLASSES,**
                    **THE WIRE/EXPRESS CLASS**
14              **AND THE RETAINED INTEREST CLASS**

15                  **BREACH OF FIDUCIARY DUTY**

16      230.    Plaintiffs reallege and incorporate by reference the preceding allegations.

17      231.    In the course of acting as an escrow agent, Defendant FATIC served as a

18  fiduciary to Plaintiffs and members of the Classes.  The fiduciary duty of an escrow

19  agent includes the obligation to act with scrupulous honesty and to refrain from self-

20  dealing that harms the principal.  Specific fiduciary duties of an escrow agent include:

21  (a) paying interest earned on escrow funds to the depositing party; (b) disclosing all

22  material facts concerning the agent's services; (c) charging fees only for services actually

23  performed and charges actually incurred and not in substantial excess to costs; and

24  (d) performing services in accord with legal duties.

25      232.    Defendant FATIC breached its fiduciary duties to Plaintiffs and members

26  of the Classes by engaging in misrepresentations and self-dealing, including the Affiliate

27  Reconveyance Scheme, the Captive Reconveyance Scheme, the Wire/Express Scheme

28  and the Retained Interest Scheme and specifically:  (a) charging wire fees not incurred or

FIRST AMENDED                          - 57 -
CLASS ACTION COMPLAINT CV 08-2460-EMC

010052-12 241613 V1

charging greatly in excess of Defendant FATIC's actual costs, if any; (b) charging fees on behalf of itself or its affiliate Defendant FASMS for settlement services greatly in excess of Defendant FATIC's actual costs or the market value, if any, of such services without disclosing the affiliate relationship; (c) receiving interest, earnings credits, or other benefits on escrow funds and failing to pay this interest to Plaintiffs and members of the Classes; (d) failing to pay interest, earnings credits, or other benefits earned on deposited escrow funds to the depositing party; (e) disbursing or causing to be disbursed escrow funds in a manner other than authorized by escrow instructions; and (f) affirmatively misrepresenting and/or omitting to state material facts pertaining to an escrow.

233.    Defendant FATIC's breaches of its fiduciary duties have directly and proximately caused damage to Plaintiffs and members of each of the Classes in an amount to be determined at trial.

## COUNT IX

### ON BEHALF OF THE RECONVEYANCE CLASSES, THE WIRE/EXPRESS CLASS AND THE RETAINED INTEREST CLASS

### BREACH OF AGENCY DUTY

234.    Plaintiffs reallege and incorporate by reference the preceding allegations.

235.    As an escrow agent, Defendant FATIC was obligated not to engage in any self-dealing to the detriment of its principal. As escrow agent for Plaintiffs and members of the Classes, Defendant FATIC failed in its duty to fully, faithfully, and honestly carry out the responsibilities of an escrow agent.

236.    Defendant FATIC, by (1) charging for reconveyance tracking to be paid to its undisclosed affiliate FASMS at three times the advertised rate of FASMS; (2) charging for reconveyance fees without disclosing that prior lenders were performing the actual reconveyances; (3) illicitly taking profits from the escrow accounts of Plaintiffs and the members of the Classes and retaining such profits; and (4) charging for wire fees when it was not actually incurring any expenses associated with such charges, violated

its duty to pay profits to its principals made in connection with transactions conducted on behalf of the principals, in accordance with common law, and with the Restatement (Second) of Agency § 388.

237.    Defendant FATIC breached its duty to Plaintiffs and the members of the Classes by receiving and retaining secret interest on escrow deposits.  Defendant FATIC violated its duty to use care to keep the interest on escrow funds safe until such funds could be remitted or delivered properly, and Defendant FATIC failed to use due care to account for any interest earned on Plaintiffs' accounts and the accounts of the members of the Classes, in accordance with common law and the Restatement (Second) of Agency § 427.

238.    Defendant FATIC's breaches of duty as an agent have directly and proximately caused damage to the Plaintiffs and all members of the Classes.  Plaintiffs and the members of the Classes are entitled to restitution of all unjust enrichment and secret profits wrongfully taken, including the value or proceeds of any and all benefits illegally acquired by Defendant FATIC from the use of Plaintiffs funds and loan proceeds in the escrow account, in addition to any other losses suffered by Plaintiffs and the members of the Classes.

## COUNT X

### ON BEHALF OF THE RECONVEYANCE CLASSES, THE WIRE/EXPRESS CLASS AND THE RETAINED INTEREST CLASS

### VIOLATION OF CALIFORNIA UNFAIR BUSINESS PRACTICES ACT (Bus. & Prof. Code §§ 17200, *et seq.*)

239.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

240.    By carrying out the Affiliate Reconveyance Scheme, the Captive Reconveyance Scheme, the Wire/Express scheme and the Retained Interest Scheme, Defendants have (1) directly and indirectly employed a scheme, device and artifice to defraud and mislead borrowers and sellers and defraud any person; (2) directly and

1    indirectly engaged in an unfair and deceptive act toward a person; (3) directly and

2    indirectly obtained property by fraud and misrepresentation; and (4) knowingly made

3    published and disseminated false, deceptive and misleading information.

4         241.     Defendants and each of them are residents of the State of California. On

5    information and belief, the actions and underlying decisions of Defendants, alleged

6    herein emanated from and occurred within the State of California and, therefore, is it

7    reasonable and appropriate to apply California law to Defendants' acts throughout the

8    United States.

9         242.     Defendants have engaged and continue to engage in the Affiliate

10    Reconveyance Scheme, the Captive Reconveyance Scheme, the Wire/Express Scheme

11    and the Retained Interest Scheme. Defendants' acts and practices as described herein

12    constitute unlawful, fraudulent and/or unfair business acts and practices. As such,

13    Defendants' conduct violates Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL").

14         243.     Defendants' conduct described herein constitutes an unlawful business

15    practice within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, in that the

16    conduct violates RESPA, the California Insurance Code and the common law of unjust

17    enrichment. Specifically, as alleged herein, Defendant FATIC has:

18            a.     Violated 12 U.S.C. § 2607(a)-(c), Regulation X, 24 C.F.R.

19    § 3500.14, and 24 C.F.R. § 3500.2 by referring reconvenyance tracking business to

20    FASMS (1) without disclosing the affiliated relationship; (2) without providing a written

21    estimate of the charge or range of charges generally made by FASMS; and (3) without

22    disclosing that consumers are not required to use any particular provider of reconveyance

23    tracking services;

24            b.     Violated 12 U.S.C. § 2607(a)-(c), Regulation X, 24 C.F.R.

25    § 3500.14, and 24 C.F.R. § 3500.2 by requiring consumers to use FASMS for

26    reconveyance tracking services;

27            c.     Violated 12 U.S.C. § 2607(a)-(c) and Regulation X, 24 C.F.R.

28    § 3500.14 by receiving a payment for "multiple services," as that term is used in

1    Regulation X, which are not actual, necessary and distinct from the primary services

2    provided;

3                    d.      Violated 12 U.S.C. § 2607(a)-(c) and Regulation X, 24 C.F.R.

4    § 3500.14 by charging reconveyance tracking fees that are paid to an affiliated company

5    that are nearly three times higher than such affiliated company's generally available rate

6    for the same services, thus engaging and continuing to engage in the practice of making a

7    payment that bears no reasonable relationship to the market value of the services

8    provided and is not for services actually performed or provided;

9                    e.      Violated 12 U.S.C. § 2607(b) and Regulation X, 24 C.F.R.

10   § 3500.14 by charging reconveyance fees in transactions in which it has not performed

11   reconveyance processing, thus engaging and continuing to engage in the practice of

12   receiving a portion, split and percentage of a fee for the rendering of a real estate

13   settlement service other than for services actually performed;

14                   f.      Violated 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14

15   by charging reconveyance fees in real-estate transactions in which the Jankanishes and

16   the Captive Reconveyance Class have separately been charged for reconveyance

17   processing by their prior lenders, thus engaging and continuing to engage in the practice

18   of receiving a duplicate reconveyance fee for the rendering of a real estate settlement

19   service;

20                   g.      Violated 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14

21   by failing to disclose that "Northwest Post Closing Center" is a fictitious entity and the

22   same company as Defendant FATIC; failing to provide a written estimate of the charges

23   to be paid; failing to disclose that consumers are not required to use "Northwest Post

24   Closing Center;" and by receiving funds for reconveyance settlement services in addition

25   to a return on ownership of "Northwest Post Closing Center;"

26                   h.      Violated 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14

27   by failing to disclose that "Talon Title" is an affiliate of Defendant FATIC; failing to

28

FIRST AMENDED                          - 61 -
CLASS ACTION COMPLAINT CV 08-2460-EMC

010052-12 241613 V1

1    provide a written estimate of the charges to be paid; and failing to disclose that

2    consumers are not required to use "Talon Title."

3              i.    Violated 12 U.S.C. § 2607(a)-(c) and Regulation X, 24 C.F.R.

4    § 3500.14 by charging wire fees that are not in fact incurred by Defendant FATIC, thus

5    engaging and continuing to engage in the practice of making a payment that bears no

6    reasonable relationship to the market value of the services provided and is not for

7    services actually performed or provided;

8              j.    Violated California Insurance Code, Section 790.02 by engaging

9    in the above described unfair and deceptive acts or practices in the business of insurance;

10             k.    Violated California Insurance Code Section 12413.5 by retaining

11   interest, earnings credits, and/or other benefits that Defendant FATIC accrued based on

12   amounts deposited in escrow by Plaintiffs and the Classes; and

13             l.    Violated the common law governing unjust enrichment by

14   receiving a benefit from Plaintiffs and the Classes in the form of: (1) the reconveyance

15   tracking fees Plaintiff McFerrin and the Affiliate Reconveyance Class paid to

16   Defendants, which fees were unearned and unreasonable and made in violation of federal

17   and state law; (2) the reconveyance fees Plaintiffs Daniel and Heather Jankanish and the

18   Captive Reconveyance Class paid to Defendant FATIC, which fees were unearned,

19   duplicative and unreasonable and made in violation of federal and state law; (3) the wire

20   fees made by Plaintiffs Daniel and Heather Jankanish and the Wire/Express Class paid to

21   Defendant FATIC, which fees were unearned, unreasonable, deceptively charged and

22   made in violation of federal and state law; and (4) interest, earnings credits, or other

23   benefits on escrow funds received as payments for the referral of business incident to

24   real estate settlement service and in violation of federal and state law.

25             244.    Defendant FATIC's conduct as described herein violates not only the

26   unlawful prong of the UCL, but also constitutes a violation of the UCL's "unfair" prong,

27   independent of the other causes of action asserted herein. Defendant FATIC's conduct

28   offends public policy and is immoral, unethical, oppressive, unscrupulous and

1    substantially injurious to consumers.  Any justification for Defendant FATIC's practices

2    is outweighed by the consequences and harm to Plaintiffs and the Classes.

3        245.    Defendant FATIC's conduct as described herein also violates the

4    "deceptive" prong of the UCL, independent of the other causes of action asserted herein.

5    Defendant FATIC acted deceptively in the following manner:

6            a.    Defendant FATIC had a duty under RESPA to (1) disclose its

7    affiliated relationship with FASMS; (2) provide a written estimate of the charge or range

8    of charges generally made by FASMS; and (3) disclose that consumers are not required

9    to use any particular provider of reconveyance tracking services.  Defendant FATIC

10    deceptively failed to make these required disclosures and charged FATIC escrow

11    customers reconveyance tracking fees paid to FASMS that are three times higher than

12    the prices advertised by FASMS on its website.

13            b.    Defendant FATIC deceives consumers and members of the

14    Affiliate Reconveyance Class by calling FASMS "SMS Settlement Services" on the

15    HUD-1 settlement statement, thereby obscuring the fact that FATIC and FASMS are

16    affiliated.  Defendant FATIC also deceives consumers and the Reconveyance Class by

17    collecting additional unearned and deceptively labeled reconveyance tracking fees for

18    providing services that they are already obligated to provide under the closing

19    instructions in exchange for the agreed escrow fee.

20            c.    Defendant FATIC deceives consumers and members of the

21    Captive Reconveyance Class by only disclosing its intention to charge reconveyance

22    "tracking" fees at closing such that members of the Captive Reconveyance Class have no

23    genuine opportunity to challenge the fees or request that any such service be provided at

24    a lower rate or by a different provider.

25            d.    Defendant FATIC deceives consumers and members of the

26    Captive Reconveyance Class by falsely stating on the HUD-1 Settlement Statement that

27    it is disbursing reconveyance/tracking fees to Northwest Post Closing Center, when it

28    truth and fact, it is keeping and retaining such fees.

FIRST AMENDED
CLASS ACTION COMPLAINT CV 08-2460-EMC

- 63 -

010052-12 241613 V1

1    e.    Defendant FATIC deceives consumers and the Retained Interest

2  Class by collecting interest, earnings credits, and/or other benefits based on the accrued

3  escrow deposits of Plaintiffs and the Retained Interest Class without disclosing its

4  practices.

5    246.  Plaintiffs and the Classes have suffered injury in fact and have lost money

6  or property as a result of Defendants' unlawful, unfair and/or deceptive business

7  practices.  Each of Defendants' omissions was material to Plaintiffs and the Classes in

8  entering into the transaction with Defendants and Plaintiffs and the Classes relied on

9  Defendants' false and misleading misrepresentations in entering into the transactions at

10  issue.

11    247.  The above-described unlawful, unfair and/or deceptive business practices

12  present an ongoing threat of continuing injury to Plaintiffs, the Classes and the general

13  public.  Among other things, Plaintiffs, the Classes and the general public continued to

14  be financially disadvantaged by such conduct.  Such wrongful conduct is continuing and,

15  unless Defendants are restrained, they will continue to engage in such conduct.

16    248.  Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Classes,

17  individually and on behalf of the public, seek an order of this Court enjoining

18  Defendants from continuing their unfair, unlawful, and/or deceptive business acts or

19  practices in the State of California and elsewhere.  The public, Plaintiffs and the Classes

20  will be irreparably harmed if such an order is not granted.

21    249.  Further, Plaintiffs and the Classes, individually and on behalf of the

22  public, seek restitution and disgorgement of profits realized by Defendants as a result of

23  their unfair, unlawful and/or deceptive practices.

24    **VIII.   PRAYER FOR RELIEF**

25    WHEREFORE, Plaintiffs demand judgment as follows:

26    A.    For an order declaring that this action may be maintained as a class action

27  pursuant to Federal Rules of Civil Procedure, Rule 23, and for an order certifying this

28  case as a class action and appointing Plaintiffs as representatives of the Classes;

FIRST AMENDED                                      - 64 -
CLASS ACTION COMPLAINT CV 08-2460-EMC

010052-12 241613 V1

B.      For an order declaring that:  (i) Defendants were obligated to disclose to Plaintiffs and the Affiliate Reconveyance Class that Defendant FASMS was affiliated with Defendant FATIC; (ii) Defendants were obligated to disclose to Plaintiffs and the Affiliate Reconveyance Class the charge or range of charges generally made by FASMS; (iii) Defendants were obligated to disclose to Plaintiffs and the Affiliate Reconveyance Classes that they were not required to use any particular provider of settlement services; and (iv) Defendants violated RESPA and the laws of California by failing to make such disclosures;

C.      For an order declaring that Defendants required the use of FASMS and charged Plaintiff McFerrin and the Affiliate Reconveyance Class nearly three times the generally advertised FASMS rate for the same services, thus making a payment bearing no reasonable relationship to the market value of the services provided, not for services actually performed, in violation of RESPA and California law;

D.      For an order declaring that Defendant FATIC misappropriated and converted interest, or its functional equivalent, earned on the escrow funds of Plaintiffs and the Retained Interest Class;

E.      For an order declaring that Defendant FATIC breached its fiduciary duties and agency duties to Plaintiffs and the Classes by carrying out the Affiliate Reconveyance Scheme, the Captive Reconveyance Scheme, the Wire/Express Scheme and the Retained Interest Scheme;

F.      For an order issuing a permanent injunction requiring Defendant FATIC to (1) inform all customers and potential customers in writing (i) that FASMS is an affiliated company to FATIC; (ii) the charge or range of charges for services provided by FASM; and (iii) that reconveyance processing may be performed by their prior lenders; (2) inform all customers and potential customers of the true nature of its relationships with the banks at which escrow accounts are held and the source and amounts of any benefits received from such banks; (3) inform all customers and potential customers that they are not required to use FASMS or any particular settlement services provider for

1   reconveyance tracking services; (4) refund to customers any amounts collected as

2   reconveyance fees where no such disclosures were made; and (5) refund to customers the

3   value of any benefits received from banks in exchange for holding Defendant FATIC's

4   escrow account deposits;

5           G.      For an order awarding compensatory damages on behalf of Plaintiffs and

6   the Classes in an amount to be proven at trial;

7           H.      For judgment for Plaintiffs and the Classes on their claims in an amount

8   to be proven at trial, for compensatory damages caused by Defendants' unfair or

9   deceptive practices; along with exemplary damages to each class member for each

10  violation;

11          I.      For judgment for Plaintiffs and the Classes on their RESPA claims, in an

12  amount to be proven at trial, for: (1) three times the amount of reconveyance fees paid to

13  Defendant FATIC by Plaintiffs and the Reconveyance Classes; (2) three times the wire

14  fees paid to Defendant FATIC by the Jankanishes, Ms. Perisich and the Wire/Express

15  Class; and (3) three times the escrow fees paid to Defendant FATIC by Plaintiffs and the

16  Retained Interest Class;

17          J.      For restitution of all improperly collected charges and interest, and the

18  imposition of an equitable constructive trust over all such amounts for the benefit of

19  Plaintiffs and members of the Classes;

20          K.      For an accounting of all credits, disbursements and charges associated

21  with Plaintiffs' and Class members' real estate transactions.

22          L.      For an order awarding Plaintiffs and the Classes their attorneys' fees and

23  costs; and

24          M.      Such other and further relief as may appear necessary and appropriate.

25

26

27

28

| | |
|---|---|
| 1 | **IX.    JURY TRIAL DEMANDED** |
| 2 | Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury of the claims |
| 3 | alleged herein. |
| 4 | DATED:  May 30, 2008.                    HAGENS BERMAN SOBOL SHAPIRO LLP |

By:   s/ Reed R. Kathrein
         REED R. KATHREIN (139304)

715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com

Steve W. Berman
Tyler Weaver
Thomas E. Loeser (202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
tyler@hbsslaw.com
toml@hbsslaw.com

Timothy J. Warzecha
LAW OFFICES OF TIMOTHY J.
WARZECHA, PLLC
719 Second Avenue, Suite 104
Seattle, WA 98104-1748
Telephone:  (206) 264-0282
Facsimile:  (206) 262-9272
Warzecha@warzecha-law.com

Attorneys for Plaintiffs and the Proposed
Classes